SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF MISSISSIPPI
2                  ABERDEEN DIVISION

3
SHEARSON HAUGHTON                          PLAINTIFF
4
VS.                    CIVIL ACTION NO. 1:20-cv-241-SA-DAS
5
JA-CO FOODS, INC. d/b/a SONIC DRIVE-INs    DEFENDANT
6

7
8  ************************************************************
9
         DEPOSITION OF SHEARSON GABRIELLE HAUGHTON SIMS
10

11 ************************************************************

12

13

14

15          TAKEN AT THE INSTANCE OF THE DEFENDANT
          AT THE MONROE COUNTY CIRCUIT COURT
16     301 SOUTH CHESTNUT STREET, ABERDEEN, MISSISSIPPI
         ON NOVEMBER 15, 2021, BEGINNING AT 9:08 A.M.
17

18

19

20

21

22

23

24

25          GENA MATTISON GLENN, CSR 1568

EXHIBIT
3

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 2..5

---

Page 2

```
1
     APPEARANCES:
     THE STUTZMAN LAW FIRM
 3        106 Luckney Station Road, Suite B
          Flowood, MS  39232
 4        For the Plaintiff
          BY:  RONALD E. STUTZMAN
 5
 BUTLER SNOW LLP
 6        P.O. Box 6010
          Ridgeland, MS  39157-6010
 7        For the Defendant
          BY:  ROBIN BANCK TAYLOR
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Reported by:  GENA MATTISON GLENN, CSR 1568
```

Page 3

```
 1              TABLE OF CONTENTS
 2    WITNESS                                      PAGE
 3    SHEARSON GABRIELLE HAUGHTON SIMS
 4    Examination by Ms. Robin Banck Taylor          4
 5
 6    EXHIBIT
      NO.     DESCRIPTION                          PAGE
 7
        1     Plaintiff's Responses to Defendant's First
 8            Set of Interrogatories and Requests for
              Production of Documents               22
 9
        2     Plaintiff's Supplemental and Restated
10            Responses to Defendant's First Set of
              Interrogatories and Requests for
11            Production of Documents               33
12      3     11-1-13 Associate Discipline Record   72
13      4     1-12-14 Associate Discipline Record   74
14      5     1-30-14 Associate Discipline Record   78
15      6     1-31-14 Associate Discipline Record   79
16      7     2-2-14 Associate Dicipline Record     81
17      8     2-17-14 Employee Statements           82
18      9     New Hire Form                         98
19     10     Employee Acknowledgement              98
20     11     Aberdeen PD Facts & Circumstances Form  145
21     12     EEOC Charge of Discrimination         190
22     13     First Amended Complaint               192
23     14     Bent                                  203
24
25
```

Page 4

```
 1            SHEARSON GABRIELLE HAUGHTON SIMS,
 2         being first duly sworn, was examined
 3         and testified under oath as follows:
 4
 5                   EXAMINATION
 6    BY MS. TAYLOR:
 7       Q.  Ms. Haughton, my name is Robin Taylor,
 8    and we've just met right before the deposition;
 9    is that correct?
10       A.  Yes, ma'am.
11       Q.  Okay.  Can you please state your full
12    name for the record?
13       A.  Shearson Gabrielle Haughton Sims.
14       Q.  And do you go by Shearson?
15       A.  Yes, ma'am, or Gabrielle.
16       Q.  Say it again?
17       A.  Shearson or Gabrielle.
18       Q.  Okay.  Gabrielle?  And what is your
19    date of birth?
20       A.  [redacted]
21       Q.  Okay.  And where are you from?
22       A.  Aberdeen.
23       Q.  Have you been born and raised here?
24       A.  Yes, ma'am.
25       Q.  Okay.  Is it okay if I call you
```

Page 5

```
 1    Shearston [sic]?
 2       A.  Yes, ma'am.
 3       Q.  Okay.  So, Shearston, have you ever
 4    had your deposition taken before?
 5       A.  No, ma'am.
 6       Q.  Okay.  Have you ever testified in
 7    court?
 8       A.  No, ma'am.
 9       Q.  Okay.  So what's going to happen today
10    is -- obviously you've been sworn to tell the
11    truth under penalty of perjury.
12       A.  Uh-huh.
13       Q.  I am going to ask you questions during
14    the deposition.  If you understand the question
15    I ask, you can answer it.  If I ask a bad
16    question and you don't understand what I'm
17    asking, let me know.  I'll try to rephrase it in
18    a way that you can understand it.  Is that okay?
19       A.  Okay.
20       Q.  Does that sound fair?
21       A.  Yes, ma'am.
22       Q.  Okay.  And you'll let me know if you
23    don't understand my question?
24       A.  Yes, ma'am.
25       Q.  Okay.  Wonderful.  Have you had any
```

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021                    Pages 6..9

Page 6

1  medication within the last week?
2      A.   Allergy medicine for my allergies.
3      Q.   Okay.  Do you have seasonal allergies?
4      A.   Yes, ma'am.
5      Q.   What allergy medication have you had?
6      A.   A Benadryl.
7      Q.   All right.  You haven't had any
8  medication that would impact your ability to
9  testify truthfully today; is that correct?
10     A.   Correct.
11     Q.   Okay.  Now, during the deposition --
12 and I told Craig.  I'm not sure if Ronnie and I
13 have had a conversation about it.  I typically
14 take a while for a deposition.  And so during
15 the day, if you need to take a break for any
16 reason, just let me know.
17     A.   Okay.
18     Q.   It's not a marathon so, you know, just
19 let me know.  I'll ask that we kind of finish
20 the line of questioning that we have and then we
21 can take a break.  Okay?
22     A.   Okay.
23     Q.   Sometimes I can lose track of time and
24 I may continue on.  I'd like for you to be able
25 to take a break about every hour.  So, you know,

Page 7

1  if you feel like we've been at it for a while
2  and you want to breathe for a little bit and
3  step out, walk around, that's fine with me as
4  well.  Okay?
5      A.   Okay.
6      Q.   All right.  Can you think of any
7  reason why you could not testify truthfully
8  today?
9      A.   No, ma'am.
10     Q.   Okay.  And would you agree that you
11 can recall events clearer or better closer in
12 time to the event than you can, perhaps, several
13 years later?
14     A.   That's true.
15     Q.   Okay.  Where do you live now?
16     A.   Aberdeen.  The street address?
17     Q.   Yes, ma'am.
18     A.   862 Clay Street.
19     Q.   And how long have you lived there?
20     A.   For three years.
21     Q.   Three years.  And where did you live
22 before that?
23     A.   I lived at 303 South Meridian Street
24 before that?
25     Q.   Is your Clay Street -- do you live in

Page 8

1  a single-family home or do you live in an
2  apartment?  What is your --
3      A.   It's an apartment house.
4      Q.   Who lives with you there?
5      A.   My husband and our four children.
6      Q.   Okay.  How long have you been married
7  to your husband?
8      A.   12 and a half years.
9      Q.   And how old are your children?
10     A.   ████████████████████
11     Q.   Let's start with the ████████
12 What is his name or is it a girl?
13     A.   ████████
14     Q.   Where does he go to school?
15     A.   He's homeschooled.
16     Q.   Homeschooled?
17     A.   All my children are homeschooled.
18     Q.   What grade is he in?
19     A.   He's in the 9th.
20     Q.   9th grade.  What curriculum do you use
21 to homeschool?
22     A.   Discovery K12, Khan Academy, and books
23 and stuff I order for them.
24     Q.   How long have you homeschooled
25 children?

Page 9

1      A.   For about five years, give or take.
2      Q.   Okay.  You've homeschooled all of your
3  children for five years?
4      A.   Yes.
5      Q.   ████████████████████████████
6  ████████
7      A.   ██████████████████
8      Q.   ██████████
9      A.   ████████████████████
10     A.   She's in the 5th.
11     A.   She's in the 5th.
12     Q.   ██████████████████████████ or a
13 ██████
14     A.   ██████████
15     Q.   ██████████████ ██?
16     A.   ██████████
17     Q.   And is she in school?
18     A.   Yes.
19     Q.   Okay.  ████████████████████████
20 ████████████████████
21     A.   He's not in school.
22     Q.   Of course he's not.  What's his name?
23     A.   Oh, I'm sorry.
24     Q.   No, that's quite all right.
25     A.   ████████████████████████████

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 10..13

Page 10

```
 1    Q.   You don't have any other children?
 2    A.   No.
 3    Q.   Okay.  What is your husband's name?
 4    A.   Curtis Sims, Sr.
 5    Q.   Is he from Aberdeen as well?
 6    A.   Yes, ma'am.
 7    Q.   Okay.  What does he do for a living?
 8    A.   He work at True Temper.
 9    Q.   Where?
10    A.   True Temper.
11    Q.   What is that?  What is that place?
12    A.   It's a company that make golf clubs
13 and shafts.
14    Q.   Okay.  Where is it located?
15    A.   In Amory.
16    Q.   How long has he worked for them?
17    A.   He's been there a year.
18    Q.   What does he do there?
19    A.   He run the things through the machine
20 or something.
21    Q.   Okay.  He's a machine operator?
22    A.   Yes.
23    Q.   And do you know how much -- is he paid
24 hourly?
25    A.   22.
```

Page 11

```
 1    Q.   20 --
 2    A.   Plus production.
 3    Q.   Okay.  So that's $22 an hour?
 4    A.   Yes.
 5    Q.   Okay.  Does he usually work 40 hours a
 6 week?
 7    A.   Yes.
 8    Q.   Okay.  And do you -- do you homeschool
 9 your four children yourself?
10    A.   Yes.
11    Q.   Okay.  So you would be considered
12 their teacher?
13    A.   Yes.
14    Q.   Okay.  And you've done that for five
15 years?
16    A.   Yes.
17    Q.   Are your children involved in any
18 extracurricular activities or sports?
19    A.   No.
20    Q.   I would think that homeschooling four
21 children would be a full-time job.
22    A.   It's actually -- they enjoy it, you
23 know.
24    Q.   Yeah.
25    A.   They enjoy -- they like to learn.
```

Page 12

```
 1    Q.   Okay.  Okay.  And tell me kind of what
 2 your typical day is with homeschooling your
 3 children.
 4    A.   Normally we eat breakfast.  And we do
 5 work, take a break, do more work.  And we --
 6 sometimes we play games with the work.  And we
 7 read to each other.
 8    Q.   Okay.  And about what time does your
 9 day begin?
10    A.   We normally just start around 10:00 or
11 11:00.
12    Q.   Okay.  And about what time do y'all
13 finish schooling?
14    A.   It just varies.
15    Q.   What's your typical day that you end
16 your schooling?
17    A.   Normally around 4:00 we be done.
18    Q.   Okay.  Where did your husband work
19 before he worked for the -- you said True
20 Temper?
21    A.   He worked at a furniture factory in
22 Wren, Lane Furniture.
23    Q.   I'm familiar with that.  And how long
24 did he work there?
25    A.   He was there over a year.
```

Page 13

```
 1    Q.   And do you know why he left?
 2    A.   COVID.  He told them that he came in
 3 contact with -- he went to Food Giant, and they
 4 said to self-quarantine, so he did it.  They
 5 fired him.
 6    Q.   Okay.  Where did he work before that?
 7    A.   He was at NauticStar.  Boats.
 8    Q.   And how long did he work there?
 9    A.   He worked there a long time.  Years.
10    Q.   And why did he leave?
11    A.   Because I was having to go to the
12 doctor and, well, take our children to the
13 doctor and stuff, and he basically pointed out.
14    Q.   Okay.  Okay.
15    A.   Because I don't drive.
16    Q.   Oh, you don't drive a vehicle?
17    A.   No, ma'am.
18    Q.   Have you ever driven?
19    A.   No, ma'am.
20    Q.   Okay.  Is there a reason why you don't
21 drive?
22    A.   I just don't drive.  I don't -- it's
23 not a reason.  I just don't drive.
24    Q.   Just never learned?
25    A.   No.
```

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 14..17

Page 14

1    Q.   Okay.  Well, I was 17 before I got my
2    driver's license, so -- and I think if I could
3    find people to drive me places, I would do that
4    all the time.  So I do understand.
5         Other than your four children and your
6    husband, does anyone else live with y'all?
7    A.   No.  That's all.
8    Q.   During COVID did you receive any of
9    the COVID unemployment insurance or --
10   A.   My husband did.
11   Q.   Husband did?
12   A.   Uh-huh.
13   Q.   About how much was that a week?
14   A.   It was 600 a week.
15   Q.   Okay.  And about how long did he
16   receive that for?
17   A.   I hate to guess because I really -- I
18   really can't remember.  I don't know.  I don't
19   know how long.  I can't remember how long it
20   was.  I know he started in April, I want to say.
21   And I think -- I don't know when it ended.
22   Q.   Okay.  And what are your household
23   bills in your home?
24   A.   Car payment, house payment, light
25   bill, gas bill, and internet, phone bill.

Page 15

1    Q.   Is that pretty much it?
2    A.   Yes.
3    Q.   Okay.  How much is your car payment?
4    A.   It's 461 a month.
5    Q.   Okay.  That's for your husband's
6    vehicle?
7    A.   It's ours but he drives.
8    Q.   Okay.  And what kind of vehicle is it?
9    A.   It's a Acura MDX.
10   Q.   What year?
11   A.   I think it's a 2016.
12   Q.   Okay.  And about how much is your
13   house payment?
14   A.   It's 462.
15   Q.   Okay.  What about your light bill?
16   A.   It varies.
17   Q.   What's about the highest it usually is
18   during the summer?
19   A.   200 -- a little over 200, I want to
20   say.
21   Q.   Okay.  What about your gas bill?
22   A.   It varies.
23   Q.   If you could give an average of what
24   it is?
25   A.   I don't know.

Page 16

1    Q.   Okay.  Is it over a hundred?
2    A.   I really don't know because -- I don't
3    know.
4    Q.   Okay.  Do you typically pay the
5    household bills, or is that something your
6    husband does?
7    A.   He does it.
8    Q.   Okay.  What about your internet?  Do
9    you know how much that is?
10   A.   I know it's over a hundred.
11   Q.   Okay.  And your phone?
12   A.   Well, we have internet and phone, and
13   then we have our cell phones as well.
14   Q.   Okay.  You have a -- you have a
15   landline?
16   A.   Yes.
17   Q.   Okay.  And what is your cell bill
18   typically a month?
19   A.   Right at 40.  Mine's right at 40.
20   Q.   Okay.  That's pretty fantastic for a
21   cell phone bill.  It's ridiculous how much they
22   typically are.
23        Now, I understand that you had a child
24   that was born with a heart condition; is that
25   correct?

Page 17

1    A.   Yes, ma'am.
2    Q.   And which child is that?
3    A.   My baby.
4    Q.   It's your --
5    A.   11-month-old.
6    Q.   Okay.  And how is he doing?
7    A.   He's doing much better.
8    Q.   Okay.  And you had indicated that he
9    needed to have some type of a procedure done?
10   A.   Yes.  He had heart surgery February
11   the 15th.
12   Q.   Of '21?
13   A.   Yes, ma'am.
14   Q.   Okay.  And what was his heart
15   condition?
16   A.   TAPVR.
17   Q.   And what was the heart surgery he had?
18   A.   They -- it's TAPV repair.  That's all
19   I know.
20   Q.   Okay.  Has he continued to have
21   regular doctors' appointments related to the
22   heart surgery or heart condition?
23   A.   Well, his last one was August.
24   Q.   When is his next one scheduled?
25   A.   February.

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 18..21

Page 18

1    Q.   Does he need any, like, maybe physical
2  therapy or some type of a regular care related
3  to his heart condition?
4    A.   Not anymore.
5    Q.   Okay.  Do you anticipate that he will
6  be able to develop typically as a child would --
7    A.   Yes.
8    Q.   -- or will he need any further
9  treatment in the future?
10   A.   No.  He won't need any further
11 treatment.
12   Q.   Okay.  That's wonderful news.
13   A.   Uh-huh.  A blessing.
14   Q.   Yeah.  Do you -- do you attend church?
15   A.   We do church at home.
16   Q.   Okay.  And what church do y'all do at
17 home?
18   A.   We worship the Sabbath.
19   Q.   Okay.  And what do you mean by that,
20 Sabbath?
21   A.   On Saturday -- we have church on
22 Saturday.  Like, normally people will have
23 church on Sunday?
24   Q.   Uh-huh.
25   A.   We have church on Saturday.

Page 19

1    Q.   Okay.  And do you attend a church or
2  is it only church at home?
3    A.   Just church at home.
4    Q.   Okay.  Is there a certain denomination
5  that you're affiliated with?
6    A.   Nondenominal [sic].
7    Q.   Nondenominational?  I'm assuming, if
8  you are from Aberdeen, that you have a number of
9  relatives that live in the Aberdeen area?
10   A.   Yes.
11   Q.   Okay.  And typically -- and I'll tell
12 you why we ask this.  It's just when we go
13 through the process of selecting a jury --
14   A.   Uh-huh.
15   Q.   -- we'll want to know who your
16 relatives are so that we can understand if
17 you're related to any of the members of the jury
18 or the potential members of the jury.  So if you
19 could just quickly kind of -- for both you and
20 your husband, just give me a brief synopsis of
21 what your family tree is of your living
22 relatives.  We can start with your siblings.
23   A.   Oh, my -- you want to know their
24 names?
25   Q.   Yes, ma'am.

Page 20

1    A.   Fatima Haughton.  Benjamin Haughton.
2  Stephanie Haughton.  Dassana Haughton.  I'm
3  sorry.  That's Stephanie Haughton Griffin.  It's
4  Griffin.  She's married.
5    Q.   Okay.
6    A.   And then it's Darius Haughton.  And
7  the last one is Aaliyah Haughton.
8    Q.   Do you have any -- are those all of
9  your siblings.
10   A.   On my mother's side.
11   Q.   Okay.  And what about on your father's
12 side?
13   A.   Cora McPherson, Jhorace McPherson, and
14 Daisie McPherson.
15   Q.   Okay.  What about aunts and uncles?
16   A.   I don't have any uncles on my -- on
17 either side that live here.
18   Q.   Okay.  Where do they live?
19   A.   Four of them died.  The other one live
20 in Virginia.
21   Q.   Okay.  Okay.  And are your parents
22 still alive?
23   A.   Yes.
24   Q.   What is your mother's name?
25   A.   Minerva Haughton.

Page 21

1    Q.   And what about your father?
2    A.   David McPherson.
3    Q.   And do they live in Aberdeen?
4    A.   I think my daddy still live in
5  Aberdeen.
6    Q.   Okay.  Are you not close with your
7  dad?
8    A.   We are.  It just I haven't seen him in
9  a while.
10   Q.   Okay.  Does your mother live in
11 Aberdeen?
12   A.   Yes.
13   Q.   Okay.  What about your husband's
14 siblings?
15   A.   One of his brothers stay in Seattle.
16 And the other one, he's in Aberdeen.  His name
17 Byron Sims.
18   Q.   Does he have any aunts and uncles?
19   A.   He has a great aunt, Emma Griffin.
20 His uncle, Andre Payne, he stays in Tupelo.
21   Q.   Are his parents still alive?
22   A.   Yes.
23   Q.   Okay.  And what are their names?
24   A.   Debra Sims is his mother.  And his
25 father is named Walter Curtis.  He don't live

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021

Page 22

1  here.

2  Q.  Okay.  Where does he live?

3  A.  Chicago.

4  Q.  Okay.  Okay.  So what did you do to

5  prepare for your deposition?

6  A.  What did I do to prepare?

7  Q.  To prepare to be here today.

8  A.  I went over notes.

9  Q.  And what notes did you go over?

10  A.  Notes that were sent to me.

11  MR. STUTZMAN:  The discovery

12  responses.

13  MS. TAYLOR:  I see.  Okay.  Okay.  So

14  just to -- let me go ahead and mark this.

15  This is going to be challenging.

16

17  - - - - -

18  (Exhibit Number 1 marked.)

19  BY MS. TAYLOR:

20  Q.  Ms. Haughton, is this what you

21  reviewed?

22  A.  Yes.

23  Q.  Okay.  Did you review anything else in

24  preparing for your deposition?

25  A.  This is -- it's a pretty much all

Page 23

1  besides of a sheet that I was sent to -- you

2  know.

3  Q.  Okay.  Okay.  And I don't want to know

4  what you -- like, if your attorney gave you a

5  certain sheet to give you instructions on

6  depositions or something along those lines, but

7  I would like to know the documents that you've

8  reviewed in order to prepare for your

9  deposition.  So what is marked as Exhibit 1,

10  that's the document you reviewed?

11  A.  It was only to try to memorize the

12  dates because --

13  Q.  Okay.  Okay.  Did you review any other

14  documents?

15  A.  No.

16  Q.  Okay.  Did you have any conversations

17  with anyone other than your attorney in

18  preparing for your deposition today?

19  A.  No.

20  Q.  Okay.  Now, before your responses to

21  interrogatories were -- and request for

22  production were sent to us, did you review these

23  to make sure that they were accurate?

24  A.  I really just -- before they were sent

25  to you-all?

Page 24

1  Q.  Yes, ma'am.

2  A.  Yes, I did.

3  Q.  Okay.  Okay.  And as you sit here

4  today, you believe that they're accurate?

5  A.  As far as I -- the best of my ability,

6  you know, as accurate as I could remember.

7  Q.  Okay.  Okay.  Now, where did -- where

8  have you gone to school as far as you know, did

9  you graduate from high school?

10  A.  Yes.

11  Q.  Okay.  And where did you graduate

12  from?

13  A.  Aberdeen High School.

14  Q.  Okay.  And when did you graduate?

15  A.  2007.

16  Q.  Have you attended any technical

17  school, community college, or college after

18  graduating from high school?

19  A.  Itawamba, but I didn't finish.

20  Q.  Okay.  How long did you attend?

21  A.  It was only a few months.

22  Q.  Okay.  And that's a community college?

23  A.  Yes.

24  Q.  What were you studying?

25  A.  Early childhood education.

Page 25

1  Q.  And you said it was only for a couple

2  of months?

3  A.  Yes.

4  Q.  And why did you -- why did you leave?

5  A.  Because I needed to focus more on my

6  son.

7  Q.  How old were you when your son was

8  born?

9  A.  I was 18.

10  Q.  And I should have asked this earlier.

11  Is -- are all of your children -- is your

12  husband the father of all of your children?

13  A.  Yes.

14  Q.  Okay.  And I assume that you have

15  never been married --

16  A.  No.

17  Q.  -- before?

18  A.  No.

19  Q.  Has your husband ever been married

20  before?

21  A.  No.

22  Q.  Have you ever been arrested?

23  A.  No.

24  Q.  Other than the charges you filed

25  related to your employment at Sonic, have you

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 26..29

Page 26

1  ever filed any other criminal charges against
2  anyone before?
3       A.   No.
4       Q.   Have you ever called the police on
5  anyone before?
6       A.   I'm pretty sure I have.  I don't -- I
7  don't remember.  I'm pretty sure I have.
8       Q.   When do you think that you did that?
9       A.   When it was shooting in my
10 neighborhood.
11      Q.   When was that?
12      A.   It was around the time of the 4th.
13      Q.   Was it this year?
14      A.   This year, last year, like, whenever
15 they shoot, you know --
16      Q.   Okay.  So it typically is something
17 that happens every year?
18      A.   Yes.
19      Q.   Okay.
20      A.   I don't call every year.
21      Q.   Okay.  How many times do you think
22 you've called?
23      A.   Let me rephrase that.  Let me -- the
24 times I'm home and they shoot around the 4th of
25 July, I have called.  But I don't be at home

Page 27

1  every year.
2       Q.   Okay.  Okay.  Were you home this year
3  for July 4th?
4       A.   Yes.
5       Q.   Okay.
6       A.   Oh, no, I -- for a little while, but I
7  left.  It was -- it wasn't on the 4th.  It was
8  around the time of the 4th when I called.
9       Q.   Okay.  And you called this year?
10      A.   Yes.
11      Q.   Okay.  Have you ever called the police
12 for anything else?
13      A.   Not that I can remember.
14      Q.   Okay.  Have the police ever been
15 called to your home?
16      A.   To my home?  No.
17      Q.   Have you ever filed for bankruptcy?
18      A.   No.
19      Q.   Have you ever filed a lawsuit against
20 anybody?
21      A.   No, ma'am.
22      Q.   I mean, of course, other than the one
23 we're here about today.
24      A.   No.  This the only one.
25      Q.   Okay.  Have you ever filed any workers

Page 28

1  compensation claims?
2       A.   No.  Not that I can remember.
3       Q.   What about -- have you ever filed for
4  unemployment?
5       A.   I have filed for unemployment before.
6       Q.   And when did you file for
7  unemployment?
8       A.   I don't recall, but I know I have.
9       Q.   Okay.  You don't recall what job that
10 was?
11      A.   I don't recall.  I think it may have
12 been -- well, I don't recall.
13      Q.   Okay.  And what do you think it could
14 have possibly been?
15      A.   It probably was -- like I say, I'm
16 just going to say I don't recall because I
17 really don't remember.
18      Q.   Okay.  Okay.  And do you remember
19 about how long ago it was?
20      A.   I don't.
21      Q.   Okay.  Have you ever testified in any
22 court?
23      A.   No, ma'am.
24      Q.   And you've never had your deposition
25 taken?

Page 29

1       A.   No, ma'am.
2       Q.   Have you ever filed an insurance claim
3  on your home or automobile?
4       A.   No.
5       Q.   Have you ever filed any other charges
6  of discrimination other than what was related to
7  your employment at Sonic?
8       A.   No.  Not that I can remember.  I'm....
9       Q.   Have you ever settled a claim short of
10 filing a lawsuit, perhaps threatened to file a
11 lawsuit and then ended up resolving the claim?
12      A.   No.
13      Q.   Have you ever used illegal drugs?
14      A.   No.
15      Q.   Okay.  So you said that you currently
16 live -- is that Clay Street?
17      A.   Yes, ma'am.
18      Q.   862 Clay Street?
19      A.   Yes.
20      Q.   Okay.  And you've lived there for, you
21 said, about three years?
22      A.   Yes.
23      Q.   And how long did you live at your 303
24 South Meridian Street location?
25      A.   I think I lived there two years.

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021     **Pages 30..33**

Page 30

1     Q.   Okay. And I see in your responses to
2 interrogatories, Number 12, you state that
3 before that you lived at 404 Evergreen Drive?
4     A.   Yes.
5     Q.   And how long did you live at 404
6 Evergreen Drive?
7     A.   A year, give or take.
8     Q.   And you also list that you
9 lived at 904 Watson Boulevard?
10     A.   Yes, I lived there in a house for a
11 while. I lived there for about a year, give or
12 take. I don't know.
13     Q.   And why did you move from the 404
14 Evergreen Drive location to the 303 South
15 Meridian Street location?
16     A.   Because it was sewage at the bottom of
17 the basement.
18     Q.   Okay. And what about the 303 South
19 Meridian Street address? Why did you move from
20 there to the 862 Clay Street?
21     A.   The water wasn't working right. We
22 had electrical issues.
23     MR. STUTZMAN: Do you want to scoot
24     down a little bit so that sun's not in your
25     eyes? Does that help?

Page 31

1     THE WITNESS: Yes.
2 BY MS. TAYLOR:
3     Q.   Okay. Is that better? I feel like
4 the sun is still in your eyes.
5     A.   It's better.
6     Q.   Okay. I can scoot down if we need to
7 spread out a little bit more, so --
8     A.   I'm okay.
9     Q.   Okay. Okay. And are you having any
10 issues with your Clay Street --
11     A.   Not --
12     Q.   -- location?
13     A.   None at all.
14     Q.   Okay. Where have you worked during
15 your working life? Did you have a job while you
16 were in high school?
17     A.   Yes, I did.
18     Q.   Okay. And what job did you have
19 during high school?
20     A.   I worked at Wendy's.
21     Q.   Okay. And how long did you work at
22 Wendy's?
23     A.   It wasn't long at all.
24     Q.   How long was it?
25     A.   I don't know. A few months, maybe.

Page 32

1     Q.   Okay. And this might help because
2 this really is not a memory contest.
3     A.   Uh-huh.
4     Q.   So in preparing your responses to
5 interrogatories, one of the questions that we
6 asked you was for you to identify your prior
7 employers.
8     A.   Uh-huh.
9     Q.   And in identifying those prior
10 employers, how were you able to identify who you
11 had worked for previously?
12     A.   I know -- I know I worked for Wendy's.
13     Q.   Okay.
14     A.   I couldn't remember the exact time --
15 you know, I gave my best, you know -- the time
16 that I could remember best, you know. It's not
17 accurate, you know.
18     Q.   Okay.
19     A.   It's not the exact, you know, time
20 frame. It was the best that I could remember
21 because it was so long ago.
22     Q.   I've got your employment -- let me --
23     MR. STUTZMAN: We objected to
24     Interrogatory Number 11.
25     MS. TAYLOR: Let's see. Sorry. It's

Page 33

1 just taking me a little while to find....
2     Let's go ahead and mark this as
3 Exhibit Number 2.
4
5     - - - - -
6     (Exhibit Number 2 marked.)
7 BY MS. TAYLOR:
8     Q.   Okay. So, Ms. Haughton, I have just
9 marked Exhibit Number 2, which are your
10 supplemental responses to interrogatories; and I
11 understand that initially you objected to
12 Interrogatory Number 11. And then after
13 discussion with your attorneys, you supplemented
14 that response to list your prior work history;
15 is that correct?
16     A.   Correct.
17     Q.   Okay. I thought it might help
18 shortcut this and help you remember --
19     A.   Uh-huh.
20     Q.   -- as far as your prior work life.
21     If you go to your response or your
22 supplemental response to Interrogatory Number
23 11 -- I believe that's on page 15.
24     A.   I'm here.
25     Q.   Okay. Wonderful. Wonderful.

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021     Pages 34..37

Page 34

1    And you list here that you worked at
2    Wendy's from approximately August of 2006 to
3    October of 2006?
4        A.   Yes.
5        Q.   Is that right?
6        A.   Yes.  Around that time.
7        Q.   Okay.  So you worked there for about
8    two months?
9        A.   Yes.  It could have been a little
10   less, but I know it wasn't longer than October.
11       Q.   Okay.  Okay.
12            Let's do this.  I wonder if you push
13   back your chair a little bit, you would not be
14   -- is that better?
15       A.   Yes, ma'am.
16       Q.   Okay.  Okay.  And you indicate that
17   you made approximately a dollar -- I mean $6.25
18   per hour?
19       A.   Yes.
20       Q.   And do you remember any issues while
21   you worked at Wendy's?  Did you get along well
22   with your supervisor?
23       A.   Yes.
24       Q.   Okay.  Do you remember what your
25   supervisor's name was when you worked at

Page 35

1    Wendy's?
2        A.   I think the -- at that time I think
3    his name was Anthony.  I'm not sure.
4        Q.   And do you think that Anthony was a
5    fair supervisor?
6        A.   Yes, I do.
7        Q.   Was Anthony ever inappropriate with
8    you?
9        A.   No.
10       Q.   And why did you leave Wendy's?
11       A.   I was pregnant, and my mama wanted me
12   to focus more on school.
13       Q.   Okay.
14       A.   I didn't know at that time, though.
15       Q.   You were not aware you were pregnant?
16       A.   Huh-uh.
17       Q.   Okay.  How far along were you when you
18   found out you were pregnant with your first
19   child?
20       A.   I was, like -- I want to say almost
21   three months.
22       Q.   Okay.  Did you have your child before
23   or after you graduated?
24       A.   Before I graduated.
25       Q.   Okay.  And what is your child's date

Page 36

1    of birth?
2        A.   ███████████.
3        Q.   Okay.  And then the next employer you
4    list is at McDonald's in 2008.  So that's about
5    two years after?
6        A.   Uh-huh.
7        Q.   What year did you graduate from high
8    school?
9        A.   I graduated in May -- the year was
10   2007.
11       Q.   Okay.  And do you remember who your
12   supervisor was when you worked at McDonald's?
13       A.   Nora.  That was her name.
14       Q.   And did you get along with Nora?
15       A.   I did. .
16       Q.   And did you think that Nora was a fair
17   supervisor?
18       A.   I do.
19       Q.   And you indicate that you made $6.25
20   per hour; is that correct?
21       A.   I'm not a hundred percent sure, but
22   that's what I'm thinking.
23       Q.   Okay.  And why did you leave
24   McDonald's?
25       A.   I had issues keeping a babysitter.

Page 37

1        Q.   Okay.  Did you have any discipline or
2    any issues while you worked at McDonald's?
3        A.   I had an issue with -- I never had,
4    like, a conflict; but it was a manager,
5    assistant manager or something, the things she
6    used to do, you know, how she act.
7        Q.   And you --
8        A.   I never had any conflict with her.
9        Q.   How did she act?
10       A.   She was just rude to customers and
11   stuff.  And, you know, if you're in a public
12   place, I just felt like that was not fair.
13       Q.   Were you ever disciplined when you
14   worked at McDonald's?
15       A.   No, ma'am.
16       Q.   And are you eligible to be rehired at
17   McDonald's?
18       A.   I'm not sure.  As far as I know, yes.
19       Q.   Okay.  Do you remember the assistant
20   manager's name?
21       A.   I don't.
22       Q.   And you never had any conflict with
23   the assistant manager?
24       A.   No.
25       Q.   Okay.  And the next employer you list

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 38..41

Page 38

1   is Food Giant?
2        A.    Correct.
3        Q.    Okay.  And how long did you work at
4   Food Giant?
5        A.    From -- let me see.  It was -- I left
6   in February.  I started in August, and it was
7   February.
8        Q.    Okay.  So you worked there for about
9   six months?
10       A.    Yes.
11       Q.    Okay.  And you indicate that you
12  worked at McDonald's for about -- I guess about
13  two months or three months; is that right?
14       A.    Yes.
15       Q.    Okay.  You indicate that you made
16  $7.25 per hour?
17       A.    At Food Giant?
18       Q.    Yes, ma'am.
19       A.    Yes.
20       Q.    Okay.  And it looks like that you had
21  a gap in employment from 2008 until 2013; is
22  that right?
23       A.    Yes.
24       Q.    And why were you unemployed during
25  that time?

Page 39

1        A.    Oh, I was going back and forth to the
2   doctor with my son.
3        Q.    Okay.
4        A.    My oldest son.
5        Q.    Oh, okay.  Was there -- did your
6   oldest son have a health condition?
7        A.    He had GERD, real bad GERD.
8        Q.    Okay.
9        A.    And he's also lactose intolerant.
10       Q.    Pardon?
11       A.    He's also lactose intolerant.
12       Q.    Okay.  And you said that your
13  supervisor's name was Ms. Peggy?
14       A.    Yes.
15       Q.    At Food Giant?
16       A.    Yes.
17       Q.    Did you get along with Ms. Peggy?
18       A.    Yes.
19       Q.    Do you think Ms. Peggy was a fair
20  supervisor?
21       A.    Yes.
22       Q.    Was she the manager of the Food Giant
23  or was she the manager of your department?
24       A.    She was the manager of -- she was the
25  supervisor of my department.  The manager of my

Page 40

1   department was named Shirley.
2        Q.    Shirley.  Okay.  And did you get along
3   with Shirley?
4        A.    Yes.
5        Q.    Do you remember what her last name is?
6        A.    I don't remember what her last name
7   is.
8        Q.    Did you have any issues while you
9   worked at Food Giant?
10       A.    I did have an issue with an employee.
11       Q.    And what issue did you have with an
12  employee?
13       A.    She pushed me, and I told on her.
14       Q.    And why did she push you?
15       A.    I was the new girl, you know.  And she
16  felt like I was taking over, you know.  Those
17  was her words.  She told me I can't come taking
18  over, and I told her we could share the scene,
19  you know.  But she later apologized, and I even
20  gave her a ride home.
21       Q.    Okay.  And what was her name?
22       A.    Her name was Lorraine.
23       Q.    What was her last name?
24       A.    I think she was married to -- the guy
25  she was married to was a Strong.

Page 41

1        Q.    Okay.  When she pushed you did you
2   push her back?
3        A.    No, ma'am.
4        Q.    Did you have any other issues when you
5   worked at Food Giant?
6        A.    No, ma'am.
7        Q.    Were you ever disciplined while you
8   worked at Food Giant?
9        A.    No.
10       Q.    And why did you leave Food Giant?
11       A.    I end up missing work.  My son got
12  sick.  And I took him -- had to take him to the
13  emergency room in Amory.  And the manager -- the
14  store manager, he was mad because I missed; and
15  I told him that my son was sick.  And he was
16  like, Well, don't miss again.  And I was like,
17  I'm going to have to because he got to go to
18  LeBonheur.  So I just -- I -- I walked out.  I
19  left.
20       Q.    Okay.  So you just left and quit?
21       A.    Yeah, because I knew my son had to go
22  to the doctor, and I could not not take him.
23       Q.    Okay.  How old was your son at that
24  point?
25       A.    He was 9.  8 or 9.

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          **Pages 42..45**

Page 42

1  Q.   And what was the manager who told you
2  you couldn't leave -- what was his name?
3  A.   His name was Dwayne.
4  Q.   And other than that did you get along
5  with Dwayne?
6  A.   Yes.
7  Q.   And did you think that he was a fair
8  supervisor?
9  A.   Yes, besides me missing.  I don't
10  think that was fair, you know.  Besides me
11  missing to take my son to the doctor.
12  Q.   Okay.  Now, it looks like you -- so
13  from August 13 until you worked at Sonic in
14  2019, am I correct that you didn't have any
15  other employment?  Well, it looks like you
16  worked at Superior Hair Products in August of
17  2019; is that correct?
18  A.   Yes.  I was working there -- in 2017 I
19  was writing books.  I was self-employed in 2017.
20  Q.   Okay.  And how many books have you
21  written?
22  A.   Eight.
23  Q.   And have they been published?
24  A.   Yes.
25  Q.   How many have been published?

Page 43

1  A.   All of them.
2  Q.   Okay.  Who was the publisher?
3  A.   Amazon.
4  Q.   Amazon published them?
5  A.   Uh-huh.
6  Q.   Okay.  Did you work with a publishing
7  company to have them published?
8  A.   No.
9  Q.   Okay.  Are they digital books or print
10  books?
11  A.   Both.
12  Q.   Okay.  And Amazon printed them as
13  well?
14  A.   Yes.
15  Q.   Okay.  And what are the names of the
16  books?
17  A.   Hooked.
18  Q.   And when was that book published?
19  A.   I'm not sure.
20  Q.   Would it be in the year 2017?
21  A.   I'm not sure.  I know Fundable Girls,
22  that's my very first book I wrote.  And that one
23  was in 2017.
24  Q.   Okay.  And what is it called?
25  A.   Fundable Girls.

Page 44

1  Q.   And what is that about?
2  A.   Both of them are erotica.
3  Q.   What other books have you written?
4  A.   I started off writing erotica.  Then I
5  started writing Christian books.  So it was --
6  Bent was the third erotica book.  And then it
7  was -- I started writing Christian books.  The
8  Dreamer, God Is Real.  Blessings and Lessons.
9  Q.   What is that?  Something and
10  blessings?  What is it?
11  A.   Blessings and Lessons.
12  Q.   Okay.
13  A.   And Secrets Within.  My daughter has a
14  book, Snowy Day, that I helped her write.
15  Q.   Any other books?
16  A.   Huh-uh.  I think that's all of them.
17  The Heart of Danny.
18  Q.   The heart of what?
19  A.   The Heart of Danny.
20  Q.   Okay.  So what -- the erotica books
21  that you wrote, what is the -- what is the book
22  Hooked about?
23  A.   It's things that happen in everyday
24  life.  You know, it's....
25  Q.   If you were to just briefly state what

Page 45

1  the story line is?
2  A.   It was a girl and her friend, and I
3  think her and her friend fell out, and she ended
4  up with a girl -- boyfriend.
5  Q.   Ended up with a boyfriend?
6  A.   Uh-huh.
7  Q.   So it was a lesbian who ended up --
8  A.   Yes.
9  Q.   -- with a boy?
10  A.   Uh-huh.
11  Q.   Okay.  What about -- what about
12  Fundable Girls?
13  A.   They are strippers who try and make
14  ends meet, and it was just really -- how can I
15  put this?  She basically learned her lesson, in
16  the end, of, you know, messing around.  The
17  story line is the reason why it's not good to --
18  you know.
19  Q.   You mean mess around like --
20  A.   Yes.
21  Q.   -- being unfaithful?
22  A.   Why you should not mess around.
23  Q.   And what about Bent?
24  A.   Bent is about a mother who basically
25  neglected her kids and -- and she end up leaving

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021                    Pages 46..49

Page 46

1   the guy in the end.
2        Q.   How did she leave him?
3        A.   Ma'am?
4        Q.   How did she leave the guy in the end?
5        A.   How did she leave him?
6        Q.   Yeah.
7        A.   She was no longer with him.
8        Q.   Have you written any other erotica
9   books?
10       A.   No.  I'm leaving out one.  The Link
11  Up.  That's, like, a -- it's, like, a spinoff to
12  the other ones, when all the characters come
13  together.
14       Q.   Would it be correct that your erotica
15  novels are explicit --
16       A.   Yes.
17       Q.   -- when it comes to sex?
18       A.   It is.
19       Q.   Okay.  Now, your books that -- when
20  did you begin writing Christian novels?
21       A.   After the erotica.  I left the erotica
22  alone and started writing Christian novels.  I
23  don't know the exact date that I started, but it
24  was -- it wasn't in 2017.  It was after 2017.
25       Q.   And what is the book The Dreamer, God

Page 47

1   Is Real?
2        A.   It's based on a true story where this
3   girl named Sherry, she had, like, premonitions
4   and stuff.
5        Q.   And you said it's based on a true
6   story?
7        A.   Yes.
8        Q.   And who was Sherry?  Do you know her?
9        A.   I'm Sherry.
10       Q.   You're Sherry?
11       A.   Uh-huh.
12       Q.   Okay.  And what premonitions did she
13  have or have you had?
14       A.   I just -- I dream -- I see stuff
15  before it happen.
16       Q.   So in your book, what did -- what did
17  you write in your book as far as seeing stuff
18  before it happens?
19       A.   When I told my brother -- he went to a
20  club, my younger brother.  And I told him that I
21  didn't want him to go.  But he went anyway, and
22  I had a bad feeling, like.  So I called him and
23  he didn't answer.  And he told me, Like, two,
24  three minutes after you called, they were
25  shooting at the club.  And he was like, I should

Page 48

1   have listened.
2        Q.   Was your brother okay?
3        A.   Yeah.  He was okay.
4        Q.   Any other premonitions?
5        A.   It's not really -- all of them is not
6   premonitions.  Some of them is, like, you know,
7   this person, I touched her hand; and I got a bad
8   feeling and I jerked my hand back away from her.
9   I didn't know what that feeling was.  She end up
10  dying in a car accident.
11       Q.   And was it close in time to when you
12  touched her hand?
13       A.   No.  It was, like -- I want to say a
14  month afterwards.
15       Q.   Have you had any other premonitions or
16  feelings?
17       A.   I've had them all my life.
18       Q.   Have you had any other significant
19  premonitions that were significant to you or
20  perhaps foreshadowed something happening?
21       A.   To me?
22       Q.   Uh-huh.
23       A.   No.  Not to me.  I kept picturing my
24  uncle.  I didn't know why.  Two days later he
25  was in the hospital, and he end up dying.

Page 49

1        Q.   Okay.  When did he pass away?
2        A.   April 4th.
3        Q.   Of this year?
4        A.   April 5th.  Yeah.  Easter.  April 5th.
5        Q.   This year?
6        A.   Yes, ma'am.
7        Q.   Okay.  I'm sorry for your loss.
8        A.   It's okay.
9        Q.   What about your book Blessings and
10  Lessons?  What was that book about?
11       A.   That book is about the blessings
12  that'll come from doing good and the lessons
13  that come from doing wrong.
14       Q.   And what about the book Secrets
15  Within?
16       A.   Secrets Within was about -- the
17  character was being molested.
18       Q.   How old was the character?
19       A.   I can't remember.  I really can't
20  remember how old she was.  I can't remember.
21       Q.   Okay.  Was she under the age of 18?
22       A.   Yes.
23       Q.   Okay.  And what was the -- what
24  happened in the book?
25       A.   Her cousin husband molested her and

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021                 Pages 50..53

Page 50

1  her brother friend molested her.  Just really
2  just touched all over her and stuff.  But she
3  didn't tell.
4      Q.  And in what way was that a Christian
5  book?  What was the Christian connection with
6  that book?
7      A.  Oh, I'm sorry.  I want to rephrase
8  that.  That was -- it's not erotica, but it's
9  more of, like, an autobiography.
10     Q.  Okay.  And what about The Heart of
11 Danny?
12     A.  It's a fantasy.  It's, like, a love
13 story.  It could be -- children could read it.
14 It's nothing bad at all.  Well, teenagers.  I'll
15 say teenagers could read it.  It's nothing....
16     Q.  And what about your daughter's book,
17 Snowy Day?  What is that about?
18     A.  This young girl, she went to sleep --
19 well, she wanted it to snow, and she was waiting
20 for it to snow.  And it didn't know, and she --
21 the whole time she thought it was snowing, it
22 really wasn't snowing.  She was asleep, dreaming
23 it; and when she woke up, it actually started
24 snowing.
25     Q.  Okay.  Okay.  And how much income have

Page 51

1  you received from your book sales?
2      A.  I want to say -- let me see.  I want
3  to say it was 150.
4      Q.  And how many books have you sold?
5      A.  I -- I really give my books away.  I
6  don't deal with the erotica ones.  But yeah.  I
7  mainly give my books away.  I....
8      Q.  You give your books away from Amazon?
9      A.  Like -- it's not a lot of money in it.
10 Like, you'll get royalties.  Your royalties
11 might be 10 cent, you know, for somebody turning
12 a page; or if someone order a book, you'll get
13 60 or 70%.  They get they percentage, you know.
14 But it might equal up to $2, you know.
15     Q.  Okay.  So in all you think that you've
16 made about $150?
17     A.  Yes.
18     Q.  Now, in your erotica books -- and I
19 stated this earlier -- you have very explicit
20 sex scenes; isn't that right?
21     A.  Yes, that's correct.
22     Q.  And you have scenes that depict rape;
23 isn't that correct?
24     A.  Yes.
25     Q.  And you have scenes that depict rape

Page 52

1  of men with a broomstick; isn't that correct?
2      A.  That's with Bent, yes.
3      Q.  Okay.
4      A.  Yes.  Bent.  When she left her
5  boyfriend.
6      Q.  And she raped him with a broomstick;
7  is that correct?
8      A.  Correct.
9      Q.  And you also have rape of children in
10 that book; isn't that right?
11     A.  It was her daughter.  She was 18.
12     Q.  And she was raped?
13     A.  Yes.
14     Q.  Okay.  Now, I see that you also worked
15 for Superior Hair Growth Products.  But it looks
16 like you worked there for a very short period of
17 time; is that right?
18     A.  After the stuff happened at Sonic, I
19 didn't deal with my books.  I -- I didn't deal
20 with my hair products or my books after that.
21     MR. STUTZMAN:  Do you need to take a
22 break?
23     THE WITNESS:  I'm okay.
24     MS. TAYLOR:  So, Ms. Haughton, we've
25 been going for about an hour and 20

Page 53

1  minutes.  Let's take a five-minute break,
2  and then we can -- we can continue.  Okay?
3      THE WITNESS:  Okay.
4      (Brief recess.)
5  BY MS. TAYLOR:
6      Q.  So, Ms. Haughton, when we broke we
7  were -- we had just finished talking about your
8  book-writing and the erotic novels, and then we
9  had begun talking about the Superior Hair Growth
10 Products piece.
11     And before we start, I should have
12 said this before we broke, but I would ask that
13 you not discuss your deposition testimony with
14 anyone during breaks.  Okay?
15     A.  Okay.
16     Q.  Did you have any conversations with
17 anyone about your deposition testimony during
18 the break?
19     A.  No.
20     Q.  Okay.  So when your attorney called
21 you outside into the hallway, y'all did not have
22 a conversation about your deposition testimony?
23     MR. STUTZMAN:  I'm going to object to
24 this.  We did not, but --
25     MS. TAYLOR:  Okay.

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 54..57

Page 54

BY MS. TAYLOR:
1  Q.    Is that correct?
3  A.    Yeah.
4  Q.    Okay.  Now, you worked for Superior
5  Hair Growth Products?
6  A.    Yes, I did.
7  Q.    Okay.  And how long did you work for
8  them?
9  A.    I started in August and I stopped in
10  January.
11  Q.    Okay.  And what did you do for them?
12  A.    It was my own company that I had
13  started.
14  Q.    And how did you start the company?
15  What was it based on?
16  A.    It was hair growth products.
17  Q.    And how do you make the hair growth
18  products?
19  A.    I make it from home.  100% organic
20  products.
21  Q.    And did you receive any income from
22  that?
23  A.    Around a hundred dollars.
24  Q.    And do you do people's hair at your
25  home?

Page 55

1  A.    No.
2  Q.    Okay.  How did you sell the products?
3  A.    What do you mean, how?
4  Q.    How did you -- did you sell them in a
5  store, or did you sell them to your neighbors
6  and friends?  How did you sell the products?
7  A.    No, I sold them to -- I had an LLC,
8  and I would sell it to whoever wanted the
9  products.
10  Q.    Okay.  And how much income did you
11  receive from the products?
12  A.    $100.
13  Q.    That's all?
14  A.    That's all.
15  Q.    Okay.  How much did you sell the
16  products for?
17  A.    $4.  It -- it depends on what -- the
18  most I sold it for was, like, $6.
19  Q.    Okay.
20  A.    But I often -- I was just on -- I
21  would mainly have, like, a sale, you know, have
22  it at a low price starting out.
23  Q.    Okay.  And you stopped that in January
24  of 2020?
25  A.    Yes.

Page 56

1  Q.    And you indicated it was due to COVID;
2  is that right?
3  A.    No, it wasn't due to COVID.  It was
4  due to what happened.  I stopped everything.
5  Q.    Okay.  And what do you mean by "what
6  happened"?
7  A.    What Eric did, what Tay and his
8  daughter did, what Alesha did.
9  Q.    So your testimony is that your
10  employment at Sonic and what you experienced
11  there made you stop your hair product business?
12  A.    Yes.  Yes.
13  Q.    And it was not due to COVID, as stated
14  in your interrogatories; is that correct?
15  A.    No, it's not -- it wasn't due to
16  COVID.
17  Q.    And if you look on page 16 of your
18  interrogatory responses, you indicated under
19  your employment with Superior Hair Growth
20  Products, under G --
21  A.    I think I was already on that page.
22  But no, it wasn't due to COVID.  I looked over
23  -- I must have missed it, but it wasn't due to
24  COVID.
25  Q.    Okay.  After you left Sonic at the end

Page 57

1  of December of 2019, what did you do in order to
2  find other employment?
3  A.    I searched online.  I called places.
4  I went places.
5  Q.    And where did you search online?
6  A.    Indeed.
7  Q.    And did you apply for unemployment
8  after you left Sonic?
9  A.    No.
10  Q.    And why not?
11  A.    I guess it didn't really cross my
12  mind.  I'm -- it didn't cross my mind to apply
13  for unemployment.
14  Q.    And why is that?
15  A.    I don't know.
16  Q.    And when -- your husband received
17  unemployment; is that right?  He received $600 a
18  week for the COVID unemployment; is that right?
19  A.    Yes.
20  Q.    And why did you not apply for
21  unemployment at that point when you learned that
22  you could receive a significant amount a week
23  for COVID?
24  A.    It wasn't about the money.  It wasn't
25  about that.

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 58..61

Page 58

```
 1       Q.   So you did not apply for unemployment
 2  because it was not about the money?
 3       A.   No, it wasn't about the money.
 4       Q.   But -- but you knew that you could
 5  receive a significant amount of money due to the
 6  pandemic unemployment; isn't that right?
 7       A.   I wasn't sure if I could.  I wasn't
 8  sure if I could -- I really -- it -- it really
 9  wasn't on my mind.  I was depressed.  I was
10  really depressed.  Maybe I wasn't just clearly
11  thinking straight, but....
12       Q.   So you said that you searched online
13  through Indeed.  What places did you call?
14       A.   I called Smokey's and asked them are
15  they hiring.  I called to check on up on my
16  application in West Point at Popeyes.  I called
17  -- I called Hardee's or Burger King.  One of
18  them I did online and one of them I called them.
19  I'm not sure which one was which.
20       Q.   Anyone else that you called?
21       A.   I can't remember.
22       Q.   Were there periods of time where you
23  did not look for a job at all?
24       A.   When I was depressed.  It's like some
25  days will be good, some days will be bad.
```

Page 59

```
 1       Q.   Have you ever suffered from depression
 2  before?
 3       A.   No, ma'am.  Never.
 4       Q.   Did you have health insurance through
 5  your husband's job?
 6       A.   No.
 7       Q.   Did you have health insurance through
 8  some type of a state -- Medicare, Medicaid,
 9  health insurance for women who were having
10  children?
11       A.   I had that after I had -- when I was
12  pregnant with my son, when I was -- a few months
13  -- like, three months after I had my son, I had
14  Medicaid then.
15       Q.   Are your children covered by your
16  husband's health insurance?
17       A.   No.
18       Q.   And do you currently have any health
19  insurance?
20       A.   No.
21       Q.   Okay.  Does your husband have health
22  insurance?
23       A.   Yes.  My children had Medicaid.  We
24  just got recertified.  I'm waiting to hear if I
25  got approved or denied.  I might have got denied
```

Page 60

```
 1  because of his income.  I'm not sure.  But if --
 2  if they are denied, then he's going to add us --
 3  all us on.
 4       Q.   Okay.  Now, it looks like, according
 5  to your responses to interrogatories -- let's
 6  see.  It would be response to Interrogatory
 7  Number 10.  It looks like you applied to
 8  positions in January and February and March of
 9  2020.  Is that right?
10       A.   Yes.
11       Q.   It looks like you applied to three
12  positions in January; is that correct?
13       A.   Correct.
14       Q.   And four positions in February of
15  2020; is that right?
16       A.   Correct.
17       Q.   And seven positions in March; is that
18  right?
19       A.   March.  (Witness reviews document.)
20  Yes.
21       Q.   And it looks like you did not apply to
22  any positions at all between August of 2020 and
23  April 25th of 2021; is that right?
24       A.   August 2020?  In August -- I was
25  having trouble off and on during my pregnancy.
```

Page 61

```
 1  I applied for Sitel, and I was working there in
 2  2020 from September to October sometime.  And
 3  then I became ill.  I tried to see could I get a
 4  leave so I could have my job back when I -- but
 5  they said that I wasn't there long enough to do
 6  that.
 7       Q.   Okay.  And so I guess after you left
 8  Sitel in October of 2020, you didn't apply to
 9  any positions until April 25th of 2021; is that
10  right?
11       A.   Well, I had -- I had my baby in
12  December, and he was born with that heart -- his
13  heart condition.  And I knew it's no way I could
14  work and be there for him.  So no, I didn't
15  apply.
16       Q.   Okay.  And then it looks like you
17  applied to five positions on April 25th of 2021
18  by an internet site; is that correct?
19       A.   Correct.
20       Q.   And did any of those people call you
21  back?
22       A.   I didn't hear anything, you know, from
23  anyone.  I never talked to anyone.  This one guy
24  I spoke to, he said he would call me back or
25  something; but I never heard anything from him.
```

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 62..65

Page 62

1    Q.    And where did you -- where did you
2  speak to somebody?  Which of the employers?
3    A.    That was at -- oh, no.  No.  That was
4  about the Sitel, trying to get back -- my job
5  back at Sitel.  Someone said they'll get in
6  touch with me.
7    Q.    I see.  I see.  And did you -- other
8  than applying to these positions on April 25th,
9  did you call any of these businesses?  Did you
10 ever call Wendy's?
11   A.    I'm pretty sure I did, but I don't
12 remember.
13   Q.    Okay.  Do you ever remember calling
14 Focus Workforce Management?
15   A.    No, I didn't call them.
16   Q.    And did you ever call Jack's Family
17 Restaurant?
18   A.    No, ma'am.
19   Q.    And then it looks like there's a
20 period between April 25th of 2021 and then
21 August 31st of 2021 where you did not apply for
22 any positions; is that right?
23   A.    August?  I did apply.  In August I did
24 apply.
25   Q.    Right.  In between April of 2021 and

Page 63

1  August of 2021, you did not apply for any
2  positions; is that correct?
3    A.    In August I did.  I think it might
4  have been -- it might have before after this or
5  something.  No, it wasn't.  I think that -- it
6  was before this.  I think I sent that in.  I
7  thought I sent that in.
8    Q.    So if we look at -- do you have
9  Exhibit Number 2 in front of you?
10   A.    Let's see.  August.  Oh, August 31st.
11   Q.    That's right.  It looks like there's a
12 period between April 25th of 2021 and August
13 31st of 2021 that you did not apply for any
14 positions; is that right?
15   A.    Yes, ma'am.
16   Q.    Okay.
17   A.    I'm sorry.  I -- it was in August,
18 yes.  You're correct.  I'm sorry.
19   Q.    And then it looks like you applied for
20 four positions in August of 2021; is that right?
21   A.    Correct.  It was in August, yes.
22   Q.    And did you hear back from any of
23 those positions?
24   A.    No, ma'am.
25   Q.    And have you made any other efforts to

Page 64

1  find employment after August 31st?
2    A.    Well, I was trying to get at my
3  sister's restaurant.  She's opening her a
4  restaurant, and she -- I was kind of waiting on
5  that.  She said when business pick up.
6    Q.    And what restaurant does your sister
7  own?
8    A.    It's called J A & B's Kitchen.
9    Q.    And where is it located?
10   A.    It's on Highway 45 -- it's 45 North by
11 -- the same highway McDonald's on.  I think
12 that's 45 North?  Yeah.
13   Q.    Has your sister had any issues finding
14 people to work at her restaurant?
15   A.    The only person that working with her
16 right now is my mother.  She trying to wait till
17 business pick up before she just hires somebody.
18   Q.    Okay.  And other than you have put on
19 your responses to interrogatories, that's your
20 only efforts to find other employment; is that
21 right?
22   A.    I filled out something a few days ago.
23   Q.    And what did you fill out?
24   A.    I filled out an application -- may I
25 grab my phone?  It's in -- well, it was at

Page 65

1  Wendy's in Aberdeen.
2    Q.    And when did you apply for that?
3    A.    It was sometime this month.  And I
4  called --
5    Q.    November?
6    A.    Yes.  And I called them as well.
7    Q.    And what did they say or -- did they
8  hire you?
9    A.    They was -- they closed early.  They
10 -- I didn't get in touch with anyone.  And I
11 didn't call back after that.
12   Q.    How did you find your job at Sitel?
13   A.    Through Indeed.
14   Q.    And who was your supervisor at Sitel?
15   A.    My online instructor was Tameka?  I
16 want to say her name was Tameka.
17   Q.    And how long did you work at Sitel?
18   A.    From September to October sometime.
19   Q.    Okay.
20   A.    I was there for about six weeks.
21   Q.    And what was your position there?
22   A.    I was taking calls, training to take
23 calls and stuff.
24   Q.    Was that a job that you performed from
25 home or did you have to go to the Sitel

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          **Pages 66..69**

Page 66

1    location?
2        A.    It was from home.
3        Q.    And how much did you earn an hour at
4    Sitel?
5        A.    It was 9. Either 9 -- between 9 and
6    9.50. Let me see. Let me go....
7        Q.    So if you state in your responses to
8    so interrogatories it was 9.25 --
9        A.    9.25. Yes.
10       Q.    Okay. And how many hours a week were
11   you going to work at Sitel?
12       A.    I was working 40 hours.
13       Q.    And had you gotten past the training
14   process?
15       A.    I can't remember -- I really can't
16   remember, like....
17       Q.    Okay. And you said Tameka was your
18   trainer?
19       A.    Yes. Her name was Tameka.
20       Q.    And did you get along with Tameka?
21       A.    Yes.
22       Q.    And did you think she was a fair
23   trainer?
24       A.    Yes.
25       Q.    And did you have a supervisor at

Page 67

1    Sitel, or was Tameka your supervisor?
2        A.    All I know was Tameka, you know. She
3    was the one who was over us, you know, that
4    particular class.
5        Q.    Okay.
6        A.    That's what I mean by this.
7        Q.    And what were the hours that you were
8    training?
9        A.    Eight hours a week -- eight hours a
10   day.
11       Q.    And what hours were you working?
12       A.    From 8:00 to 5:00.
13       Q.    And how were you able to work from
14   8:00 to 5:00 and homeschool your four -- three
15   children?
16       A.    Oh. I was able to -- with
17   homeschooling, it's not a set time when you --
18   when I get off work, we do schoolwork. When I
19   get off work, we -- we would do schoolwork.
20       Q.    Okay.
21       A.    And sometimes, like -- at that time my
22   husband, he would, you know, also do the little
23   games and stuff and read with them. But I did
24   the main teaching part, so....
25       Q.    And you would do that after 5:00?

Page 68

1        A.    Yes. But in between that time he
2    would be doing -- you know.
3        Q.    And you said that you -- after you
4    quit Skytel [sic], you called to see if you
5    could get your job back?
6        A.    I didn't quit. They told me that I
7    couldn't -- I couldn't keep my position after I
8    had my baby. After I left I didn't call back
9    because the stuff was going on with my baby. I
10   didn't contact anyone for, like, four months.
11       Q.    Okay. So after you left Skytel -- or
12   Sitel, you didn't call them back and see if you
13   could get your job back?
14       A.    I applied again. I did. I have
15   applied for Sitel. No, let me take that back.
16   I don't remember. I really don't remember. But
17   I do know that after I had my baby, I did not
18   apply for at least four months, I know. But
19   after that I really don't know if I applied with
20   them or not.
21       Q.    And you don't remember calling them to
22   see if you could get your position back?
23       A.    I know I don't -- I know I didn't
24   call, but I don't know if I submitted my
25   application with them.

Page 69

1        Q.    Would you have included that in your
2    responses to interrogatories if you had applied
3    to Sitel after leaving in October of 2020?
4        A.    I'm pretty sure I would. I just don't
5    remember if I did or -- I know I didn't call.
6        Q.    Okay. You know you didn't call?
7        A.    I know I didn't call.
8        Q.    Okay. And if your response to
9    interrogatory said that you applied to Sitel in
10   July of 2020, and then again in August of
11   2020 --
12       A.    That's --
13       Q.    -- would you have any reason to
14   dispute that?
15       A.    Yes. In 2020, that's when I got
16   hired. In 2021 is -- 2020 is -- in July and
17   August -- I applied in August. I got hired in
18   September. I started working in September of
19   2020. From September to October is when I
20   worked. I stopped working in October of 2020
21   because of pregnancy complications, and I had my
22   baby December 2nd.
23       Q.    Okay. What were the complications you
24   had with your pregnancy?
25       A.    I had severe pain and dizziness,

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021 **Pages 70..73**

Page 70

1  nausea, vomiting.
2  Q.  Okay.  Nausea and what?
3  A.  Vomiting.
4  Q.  Okay.  Any other -- were there any
5  other complications with your pregnancy?
6  A.  I can't remember.  Those I remember
7  off top.
8  MS. TAYLOR:  Okay.  Would it be okay
9  if we took a quick break so I could make a
10  phone call?
11  MR. STUTZMAN:  Okay.
12  MS. TAYLOR:  And I will say, please
13  don't discuss your deposition testimony
14  with anyone during the break.  Okay?
15  THE WITNESS:  I won't.
16  MS. TAYLOR:  And I am really sorry.  I
17  will try to make this as quick as possible.
18  (Brief recess.)
19  A.  May I say something?
20  BY MS. TAYLOR:
21  Q.  Absolutely.
22  A.  I want to go back and -- I got it
23  wrong.  It was -- November the 1st it was Pizza
24  Hut that I applied for.  Pizza Hut.
25  Q.  November the 1st.

Page 71

1  A.  Yes.
2  Q.  Okay.  Okay.  And, Ms. Haughton, I
3  should have said this earlier.  I -- if there's
4  anything that you need to go back and change as
5  we're talking today, please do exactly what you
6  just did.  Just let me know and you can revisit.
7  Okay?
8  A.  Okay.  And I also want to state that
9  when I was doing the work online with Sitel, on
10  my lunch breaks I would go check -- because they
11  got a laptop that they would do they work on,
12  you know, and I would go check -- you know, they
13  pretty much knew what to do, but I would go over
14  it -- after work I would go over everything with
15  them to make sure they understood it.
16  Q.  Okay.  Okay.
17  Okay.  So to go back to your
18  employment at Food Giant, when you worked at
19  Food Giant, you understood that your employment
20  was at will, meaning that you could quit for any
21  reason or you could be terminated for any reason
22  without notice?
23  A.  Yes.
24  Q.  Okay.  Now, if the records that Food
25  Giant produced indicated that you had been

Page 72

1  disciplined quite a few times while working at
2  Food Giant, would that be consistent with your
3  memory of being disciplined while you worked
4  there?
5  A.  I don't never remember being suspended
6  or disciplined or anything.
7  Q.  Okay.  Let me show you --
8  A.  I take that back.  I think I did get a
9  write-up or something.
10  Q.  If you got five write-ups while you
11  worked at Food Giant, would you have any reason
12  to dispute that?
13  A.  Correct.  I would dispute that because
14  I don't remember -- five write-ups?
15  Q.  That's correct.
16  A.  No, ma'am.  I'm not aware of that.
17  Q.  Okay.  Okay.  Let me show you --
18  MS. TAYLOR:  We'll mark this as
19  Exhibit 3.
20
21  - - - - -
22  (Exhibit Number 3 marked.)
23  BY MS. TAYLOR:
24  Q.  I apologize that this is not a good
25  copy.  This exhibit is dated November 1st of

Page 73

1  2013, and it -- under Number 3 it says, Explain
2  the standards, policies, and practices.  It
3  says, We will not put up with anyone mistreating
4  any customer at any time.
5  A.  I've never signed anything with all of
6  this together like this.  And I -- I don't
7  remember -- I didn't know I was -- I remember
8  one write-up, but I explained -- she told me
9  that it was okay about the customer.  I
10  explained to her that I never got an attitude.
11  All I ever did was treat customers with respect.
12  Q.  Okay.  Is that your signature on the
13  bottom of that document?
14  A.  Yes, that's correct.
15  Q.  Okay.  And do you remember being
16  issued an Associate Discipline Record for being
17  rude to a customer?
18  A.  I don't remember this paper.  No, I
19  don't remember this paper at all.
20  Q.  Okay.
21  A.  That is my signature, but I do not
22  remember this paper at all.
23  Q.  Okay.  Do you ever remember being
24  presented with a disciplinary record and
25  refusing to sign it?

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021    Pages 74..77

Page 74

1    A.    Refusing to sign it. I don't
2  remember; but if I felt like something -- you
3  know, if I was being truthful about something,
4  then it might have. I don't know.
5    Q.    Okay.
6    A.    I really don't know.
7    Q.    Okay.
8         MS. TAYLOR: We'll mark this as
9  Exhibit Number 4.
10
11             - - - - -
12         (Exhibit Number 4 marked.)
13  BY MS. TAYLOR:
14    Q.    Now, Exhibit Number 4 is dated January
15  12th of 2014. It indicates that a customer said
16  that she was at the hot bar waiting on Shearson
17  to help her, that you were on the phone at the
18  time; and that when you got off the phone, you
19  turned and walked off and did not come back to
20  see what the customer wanted.
21    A.    No, that's not true.
22    Q.    Okay.
23    A.    When I worked at Food Giant, I was the
24  only one at the front. They would leave me and
25  when -- I was the only one who really worked the

Page 75

1  front without help. I trained myself, really,
2  because -- I never turned my back on a customer.
3  It may have been a time when I was on the phone
4  and I acknowledged the customer hold on a second
5  because I've got something cooking or something,
6  but I never -- I don't recall this at all.
7    Q.    Do you remember being told when you
8  worked at the Food Giant that you need to take
9  care of customers and be friendly to customers?
10    A.    No. I know she said that -- she told
11  me to smile more. She did tell me to smile
12  more. She did say that.
13    Q.    Okay. And do you remember refusing to
14  sign this disciplinary form?
15    A.    I didn't know I was disciplined for
16  not smiling at the customers.
17    Q.    Actually I'm referring to the
18  disciplinary form marked Exhibit 4 that states
19  that you turned and walked away from a customer
20  after being on a phone call. Do you remember
21  refusing to sign the form?
22    A.    And then I do know she told me -- I
23  said I was never told you take care of customer
24  if -- you know, you take care of customer -- I
25  didn't know should I turn to go get the food or

Page 76

1  should I attend to a customer. They never --
2  that's something they never explained to me. My
3  thinking was check on this food, then attend to
4  the customer.
5    Q.    And do you recall -- do you recall
6  refusing to sign this form?
7    A.    Because I -- I felt like it wasn't
8  right because they didn't tell me that, oh, you
9  -- you take care of the customer, then the food.
10  Then you go attend to the food. They never told
11  me attend to the customer first.
12         It was a lot of times at Food Giant
13  when I was out there, somebody would -- in the
14  kitchen would cook -- because I also used to
15  bake, like, cookies and roast chicken and stuff
16  at Food Giant. And I felt like that wasn't
17  right. That's why I didn't sign that because I
18  wasn't told.
19    Q.    But you do remember it being --
20    A.    Yes.
21    Q.    -- brought up to you.
22    A.    I do now, yes.
23    Q.    Okay.
24    A.    And when she said smile at customers,
25  I said, I do smile. She said, But you got to

Page 77

1  keep a smile. You know, it's hard to -- it's
2  not like I was frowning up. She wanted me to
3  smile all the time.
4    Q.    Okay.
5    A.    That's what she wanted.
6    Q.    Now, you could understand that, you
7  know, in that type of a business, a grocery
8  store, that you would need to be courteous to
9  customers and make sure that they had a good
10  experience; is that correct?
11    A.    I do --
12         MR. STUTZMAN: Object to the form.
13  BY MS. TAYLOR:
14    Q.    Is that correct?
15    A.    I do --
16         MR. STUTZMAN: You can answer it. You
17  can answer it.
18    A.    I do want to clarify that I was never
19  rude. What it was, I would say, Hey, how are
20  you doing, you know. But she wanted me to
21  smile, you know, be jolly, more jolly. She
22  wasn't saying I wasn't doing it. She said I
23  wasn't doing it enough.
24    Q.    Okay. So just to restate my question,
25  you do understand that in a business like Food

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021

Pages 78..81

Page 78

1  Giant, that you would need to be courteous to
2  customers and make sure that they have a good
3  experience in the store; is that right?
4      MR. STUTZMAN:  Object to the form.
5  You can answer.
6      A.  Yes.
7      MS. TAYLOR:  Okay.  Let's go ahead and
8  mark this as the next exhibit.
9
10             - - - - -
11     (Exhibit Number 5 marked.)
12  BY MS. TAYLOR:
13     Q.  Now, this exhibit is dated -- and it's
14  Exhibit Number 5.  Exhibit Number 5 is dated
15  January the 30th of 2014, and it's signed by
16  Shirley Carter.  That's your supervisor; is that
17  correct?
18     A.  Yes.  Yes, that's her name.
19     Q.  And it states that you were not going
20  to sign this, that you said you would not sign
21  it.
22     But do you recall indicating to your
23  supervisors that you would come in and work an
24  evening and that you did not show up and did not
25  call?  Do you remember being counseled about

Page 79

1  that?
2      A.  I remember that it wasn't my day to
3  work, and I told her that I would try my best to
4  come in.  I never said that -- I said that I
5  would try my best.  So that's why I got in
6  trouble for that.
7      Q.  Okay.  But you do remember them --
8      A.  I remember --
9      Q.  -- talking to you about that.
10     A.  Yes.
11     Q.  And do you recall not showing up the
12  next day to work --
13     A.  I don't --
14     Q.  -- on the 31st of January?
15     A.  I don't recall that.
16
17             - - - - -
18     (Exhibit Number 6 marked.)
19  BY MS. TAYLOR:
20     Q.  So this looks like it's dated January
21  31st of 2014, Exhibit 6.  There's the Associate
22  Disciplinary Record.  It indicates that you were
23  scheduled to work from 12:00 to 7:00 and that
24  you were a no-call/no-show.  Do you ever
25  remember being given a disciplinary warning for

Page 80

1  being a no-call/no-show?
2      A.  I don't -- I don't remember that.  I
3  do not remember at all.  If she wrote it -- she
4  didn't hand it to me if she did.  This is not
5  even signed.
6      Q.  Is that not?
7      A.  No.  I don't even remember this paper.
8      Q.  You don't remember ever being
9  presented this on the 31st?
10     A.  No, ma'am.
11     Q.  Do you remember having a conversation
12  with Shirley Carter on the 2nd of the 14th that
13  you came in to get your check and that you told
14  them you were through?
15     A.  I was -- no, ma'am.  That's not true.
16     Q.  Okay.  So you didn't tell them you
17  were through?
18     A.  No, ma'am.  The day I left work,
19  Shirley was not even there.
20     Q.  Do you ever remember having to come
21  back in and get your check after being absent?
22     A.  After I left I got my check.  That's
23  -- you know, I had another check to get anyway
24  after I left.  It's not that.  I had a
25  conversation with her.  I didn't talk to Shirley

Page 81

1  again after I left.  That day I left, Shirley
2  wasn't even there.
3      Q.  Okay.  So you don't remember Shirley
4  giving you the final write-up, the fifth
5  write-up, and you refusing to sign it?
6      A.  I didn't -- this is new to me.  This
7  here is new to me.  Now, about the smiling of
8  the customers, that's true.  But this is new to
9  me.
10     Q.  Okay.
11     MS. TAYLOR:  Go ahead and mark this as
12  Exhibit Number 7.
13
14             - - - - -
15     (Exhibit Number 7 marked.)
16     A.  This is so new -- I never in my life
17  seen this before.
18  BY MS. TAYLOR:
19     Q.  So you don't recall your supervisor,
20  Shirley Carter, giving you an Associate
21  Discipline Record on the 2nd?
22     A.  No, ma'am.  She didn't.
23     Q.  Do you know if you're eligible to be
24  rehired at Food Giant?
25     A.  One day I went there and Shirley was

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021

Pages 82..85

**Page 82**

1 like, Come on back here and help us. So I'm --
2 as far as I know, yes.
3     Q.    Okay.  And if their records indicate
4 that you are not eligible to be rehired, would
5 you have any reason to dispute that?
6     A.    It'll be new to me.  I didn't know
7 because she did say "Come on back here and help
8 us" one day.
9     Q.    You had mentioned Dwayne.  Is that
10 Dwayne Jackson?
11    A.    Yes.
12    Q.    Is that the --
13    A.    He's the store manager.
14    Q.    -- the store manager?  And if Dwayne
15 Jackson said that you're not eligible to be
16 rehired there, you would dispute that?
17    A.    I -- it -- I didn't know anything
18 about it if I wasn't able to work there again.
19
20            - - - - -
21         (Exhibit Number 8 marked.)
22 BY MS. TAYLOR:
23    Q.    Okay.  Now, it appears that Dwayne
24 Jackson, in this note dated February 17th of
25 2014, said that you had been a problem employee

**Page 83**

1 from the start and have been given chances to
2 improve but has not, and that you had gone on
3 break on Sunday and never returned and said you
4 quit.  Do you remember doing that?
5     A.    Joanne Pointer is dead.
6     Q.    Could you say that one more time?
7     A.    Joanne Pointer, she's deceased.
8     Q.    Okay.  And when did she pass away?
9     A.    I never went to her.
10    Q.    When did she pass away?
11    A.    She passed away -- I want to say it
12 was in 2018.
13    Q.    So it would be sometime after 2014?
14    A.    Yes.  But this is new to me.  I never
15 went to Joanne and asked her to work for me.  My
16 son got sick.  I didn't know he -- and my phone
17 did die.  My phone was dead.  I rushed him to
18 the hospital, didn't have no phone charger or
19 nothing.  February the 14th, 2014.  You can
20 contact the hospital.
21    Q.    Okay.  And so the record saying that
22 you went on break on Sunday and never returned
23 and called and said you quit, that would be
24 consistent with what happened?
25    A.    No, ma'am, that's not true.  God knows

**Page 84**

1 that's not true at all.
2     Q.    Okay.
3     A.    A lot of these are false information.
4     Q.    Okay.  Now, when you worked at Sitel,
5 did you understand that your employment was at
6 will, meaning you could quit your job for any
7 reason and you could be terminated for any
8 reason without notice?
9     A.    Yes.  I thought it was everything
10 except discrimination.
11    Q.    Okay.  Now, you worked for Sonic on
12 two occasions; isn't that correct?
13    A.    Correct.
14    Q.    And how did you find out about the job
15 at Sonic?
16    A.    I can't remember.  The second time I
17 think I seen it on Indeed.  I saw it on Indeed.
18    Q.    And the first time that you worked for
19 Sonic, when was that?
20    A.    I want to say it was in 2014, 2015,
21 one of those.
22    Q.    And why did you leave Sonic the first
23 time?
24    A.    I was sick.  I was ill, very ill then.
25 And I didn't know I was pregnant then.

**Page 85**

1     Q.    And so you quit your position the
2 first time?
3     A.    No.  The first time I was fired
4 because I did miss then.  I didn't come in.  I
5 was sick that day.  And I hadn't been there that
6 long.
7     Q.    If you only worked at Sonic the first
8 time for just a couple of weeks, would that be
9 consistent with your memory?
10    A.    I don't remember, but I know it wasn't
11 long.
12    Q.    Okay.  What was your position the
13 first time?
14    A.    I was a -- I fixed sandwiches, and I
15 was a -- I was a cook.
16    Q.    A cook?  Okay.  And who was the
17 managers at Sonic the first time?
18    A.    Alesha, Eric, and Teresa.  And also
19 Allison Brown.
20    Q.    And what was your schedule the first
21 time you worked at Sonic?
22    A.    I only worked, like, two, three hours.
23    Q.    You only worked for a couple of hours?
24    A.    Yes.
25    Q.    Okay.  So it was a very short period

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021      Pages 86..89

Page 86

1  of time.
2      A.  Yes, ma'am.
3      Q.  Okay.  Did you have any issues the
4  first time that you worked?
5      A.  I didn't have any issues the first
6  time.
7      Q.  When you worked for just a couple of
8  hours, do you remember if you worked in the day
9  or if you worked at nighttime?
10     A.  Then -- I can't remember.  I can't
11 remember then.  It might have been both.  I'm
12 not sure.
13     Q.  Okay.  And the second time that you
14 worked for Sonic, how did you find out about the
15 position?
16     A.  The second time I called her and --
17 the first -- no, the second time I seen it on
18 Indeed, and then I called her and --
19     Q.  And who did you call?
20     A.  I called Sonic and talked to Alesha.
21     Q.  Did you know Alesha before you worked
22 at Sonic?
23     A.  No.
24     Q.  And you said Teresa was also a manager
25 the first time?

Page 87

1      A.  Yes.  Teresa and Allison Brown.
2      Q.  Okay.  What's Teresa's last name?
3      A.  Williams.
4      Q.  Did you know Teresa?
5      A.  I know Teresa.
6      Q.  And how did you know Teresa?
7      A.  She used to work in the cafeteria at
8  school, and she also used to hang with my
9  cousin.
10     Q.  Did you get along with Teresa?
11     A.  Yes.
12     Q.  And do you have any reason to believe
13 Teresa would say anything untruthful about you?
14     A.  I didn't do anything.  Not that I know
15 of.
16     Q.  Okay.  What about Allison Brown?  Did
17 you know Allison Brown before you worked at
18 Sonic?
19     A.  I knew of her.
20     Q.  And did you get along with her?
21     A.  Yes.
22     Q.  Do you think that she was a fair
23 supervisor?
24     A.  I wasn't really -- she was there
25 sometimes, but I really mainly was there when

Page 88

1  Teresa was there or Alesha.
2      Q.  Okay.  And did you think Teresa was a
3  fair supervisor?
4      A.  Besides sending me home early, yes.
5  Other than that, yes.
6      Q.  Okay.  Why did she send you home
7  early?
8      A.  Because she said that work was slow
9  and she needed to get, you know, some people off
10 of the clock.
11     Q.  I see.  And do you have any reason to
12 believe Allison Brown would say anything
13 untruthful about you?
14     A.  Not that I know of.
15     Q.  Did you know Eric Ellis before you
16 worked at Sonic?
17     A.  I never knew him until I worked at
18 Sonic.
19     Q.  And did you get along with him other
20 than this incident?
21     A.  Yes, we got along.
22     Q.  And do you think he was a fair
23 supervisor?
24     A.  No.
25     Q.  And why is that?

Page 89

1      A.  Because -- because of what he did to
2  me.
3      Q.  And Alesha, is that -- is it Alesha
4  Gardner?
5      A.  Yes.
6      Q.  And did you get along with Alesha?
7      A.  The only time that I really -- we got
8  along; but when I tried to tell her, she didn't
9  try to hear me.
10     Q.  Say that again?  When you tried to
11 tell her, she what?
12     A.  She cut me off.  She wasn't trying to
13 hear me.  She wasn't trying to listen.
14     Q.  Now, the second time that you worked
15 at Sonic, who were the supervisors?
16     A.  It was -- Alesha was the manager, and
17 then it was Eric and then Tay.
18     Q.  And what's Tay's last name?
19     A.  I think it's Davis.  Her real name
20 Shaquika or something.
21     Q.  Okay.  Would Randle sound like her
22 last name or -- you think it was Davis?
23     A.  I know that she said something about
24 she was married or something once.
25     Q.  Okay.

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          **Pages 90..93**

Page 90

```
1      A.   So I don't know if Davis or Randle her
2   married name, but she went by Davis up there.
3      Q.   Okay.  And did you get along with Tay?
4      A.   Me and Tay got along real good.
5      Q.   Okay.  And do you think Tay was a fair
6   supervisor?
7      A.   Up until the incident with Eric, yes.
8      Q.   Who interviewed you when you applied
9   for the position?
10     A.   Alesha did.
11     Q.   Alesha?
12     A.   Yes, ma'am.
13     Q.   Okay.  And at the time you were hired,
14  you were provided a copy of Sonic's policies;
15  isn't that right?
16     A.   I never received a copy of -- I signed
17  some documents, but I never had anything to take
18  home with me.
19     Q.   Okay.  But there was a copy of the
20  handbook that was there --
21     A.   I never read it -- I never -- they
22  never gave it to me to take home.  You know, I
23  signed some documents, you know.
24     Q.   Okay.  But one was made available to
25  you; isn't that correct?
```

Page 91

```
1      A.   Not to take home with me.
2      Q.   Right.
3      A.   They never gave me a copy.
4      Q.   Right.  But one was made available to
5   you at the store; isn't that right?
6      A.   I don't know.  They never said it --
7   that -- well, here's the handbook.  They never
8   said that.  I just -- when I got hired, it was
9   papers that I signed, and that was it.  They
10  never said, Here's the handbook if you need to
11  look through it or anything.  They never said
12  that.
13     Q.   They never told you that there was a
14  handbook?
15     A.   They never -- I never saw -- I never
16  got a handbook.  I signed some documents.  I don't
17  know if those were copies of the handbook or
18  what.
19     Q.   Okay.  But you understood that Sonic
20  had a policy that prohibited discrimination;
21  isn't that right?
22     A.   Correct.
23     Q.   And also a policy that prohibited
24  harassment based on sex or any other
```

Page 92

```
1   characteristic; isn't that right?
2      A.   Correct.
3      Q.   And that Sonic's policy required
4   employees to report any incidents of
5   discrimination or harassment; isn't that
6   correct?
7      A.   Yes.
8      Q.   Okay.  And you understood that you
9   could report incidents of harassment to your
10  manager all the way up to the owner of the
11  company; isn't that right?
12     A.   Well, I went to Alesha, and I tried to
13  talk to her.
14     Q.   Well, I'm just talking about at the --
15  at the beginning of your employment, you
16  understood that you could report those claims up
17  the management chain all the way to the
18  corporate office; isn't that correct?  Because
19  you called the corporate office.
20     A.   No.  At first she never mentioned it.
21  She told -- she never mentioned anything about
22  if you have problems you can call corporate.
23  She never said anything like that.
24     Q.   And how did you call corporate, then?
25  How did you know how to call corporate?
```

Page 93

```
1      A.   I called corporate -- I googled the
2   number I was just trying to -- I googled the
3   number to corporate.  That's how I got in touch
4   with corporate.
5      Q.   Okay.  But you did call corporate in
6   order to report it?
7      A.   The number I called at first was in
8   another state or something.  It was the wrong
9   one.  So I kept googling till I found the right
10  one in Columbus --
11     Q.   Okay.
12     A.   -- to call.
13     Q.   Okay.  Now, the second time that you
14  worked for Sonic, you earned $7.25 an hour; is
15  that right?
16     A.   Yes, until I became a manager.
17     Q.   And I don't see in the documents
18  anywhere when you were hired that you were a
19  manager-in-training.  What -- your position is
20  that you were going to become a manager at
21  Sonic?
22     A.   Yes.  I was training to be a manager.
23  Alesha even told Claudia.
24     Q.   And who is Claudia?
25     A.   That's Tay's auntie.  And she said,
```

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          **Pages 94..97**

Page 94

1  Oh, so you're training to be a manager. And I
2  said, How do you know? And she said, Alesha
3  told me. And I said, Yes. She said, Well, they
4  wanted me to be a manager, but I didn't want to
5  be nairm.
6      Q.  Did Claudia work at Sonic?
7      A.  Yes, ma'am.
8      Q.  Okay. Did Alesha ever tell you that
9  you were going to be a manager?
10     A.  Yes, ma'am.
11     Q.  And when did she tell you that?
12     A.  She told me when I was hired it was
13 for that position and that in February I was
14 supposed to be a manager.
15     Q.  But you weren't a manager-in-training;
16 isn't that right?
17     A.  I was a manager-in-training.
18     Q.  You're saying that your position while
19 you worked at Sonic was as a
20 manager-in-training?
21     A.  Yes, ma'am.
22     Q.  And if Sonic's records don't indicate
23 that you were a manager-in-training, do you have
24 any reason why that would be?
25     A.  I don't understand why.

Page 95

1      Q.  Okay. Do you have anything in writing
2  that states that you were a manager-in-training?
3      A.  They never gave me anything.
4      Q.  Did you apply for a
5  manager-in-training position?
6      A.  I think I -- I'm not sure, but I think
7  I did.
8      Q.  Do you have any documents that show
9  that you applied for a manager-in-training
10 position?
11     A.  I don't.
12     Q.  And tell me exactly what you remember
13 about the conversation about you being a
14 manager-in-training.
15     A.  She told me that she couldn't start me
16 off as a manager just, you know, coming through
17 the door because she done did that before and it
18 didn't work out right. So she said that she
19 would train me, and she said after three months
20 I could be a manager as long as I had everything
21 down pat. And she told me that -- we had a
22 conversation, and she said, Good job; keep it
23 up. And she told me, You'll be getting right at
24 $9 and that I would be a manager in February
25 long as I kept doing a good job.

Page 96

1      Q.  And you're saying that she did that at
2  the time that she hired you?
3      A.  When she hired me, I was supposed -- I
4  was told that I was an MIT is what she said.
5  Manager-in-training. And she said that she
6  couldn't just start me off as a manager, so she
7  would train me to be a manager; and after three
8  months, if I was doing good, then I would be a
9  manager.
10         Well, right before this incident
11 happened, like, around Thanksgiving -- it was
12 after Thanksgiving. She was like, You're doing
13 a good job; keep it up. February you'll be a --
14 February you'll be a manager, just long as you
15 keep it up.
16     Q.  And what particular training were you
17 given as a manager?
18     A.  It was just -- I was trained on
19 everything, like, cooking sandwiches, stocking.
20 I was trained on everything. She told me I was
21 supposed to go -- in January she told me that I
22 would go to the front and start with the carhop.
23 But I never got to that point.
24     Q.  Now, when it comes to the
25 manager-in-training, you said that you were --

Page 97

1  you were -- you were a cook when you were
2  working at Sonic; isn't that right?
3      A.  I was a cook and I fixed sandwiches,
4  but -- I was a cook. I would fix sandwiches.
5  That's what I started off doing. I also would
6  be on the fryer. And the fryer, that's cooking.
7  But I was supposed to go to the front starting
8  January. But yes, I did start off cooking and
9  fixing sandwiches.
10     Q.  Okay. And --
11     A.  And stocking.
12     Q.  Okay. And so when you're saying that
13 you received training on cooking and stocking,
14 that would be for the position of being a cook?
15     A.  No. I was supposed to be in --
16 manager-in-training. To be a
17 manager-in-training, you got to have the cooking
18 down pat. You had to have the sandwiches down
19 pat and the frying down pat. So I was working
20 each area, you know, back and forth with that
21 first before I was moved to the front.
22     Q.  Okay. I guess what I was asking, did
23 you receive any training that was specific to a
24 manager and not a cook?
25     A.  No. Well, she said when she wanted to

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          **Pages 98..101**

Page 98

1  take me -- she didn't want to take me too fast.
2  That's why it was....
3       Q.  Now, when you were hired by Sonic, you
4  were paid $7.25 an hour; isn't that right?
5       A.  Correct.
6           MS. TAYLOR:  I'm going to mark this as
7       the next exhibit.
8
9                 - - - - -
10          (Exhibit Number 9 marked.)
11 BY MS. TAYLOR:
12      Q.  Now, Ms. Haughton, this is the --
13 Sonic's New Hire Form, where they indicate your
14 rate of pay and how you're paid and what your
15 position was.  If you look on the very left-hand
16 side in the file, it indicates your job code of
17 being a cook; isn't that correct?
18      A.  No, that's not -- I was told that I
19 was an MIT.
20          MS. TAYLOR:  Let's go ahead and mark
21      this as the next exhibit.
22
23                - - - - -
24          (Exhibit Number 10 marked.)
25 BY MS. TAYLOR:

Page 99

1       Q.  And, Ms. Haughton, what is marked as
2  Exhibit --
3           MS. TAYLOR:  What exhibit number?
4           COURT REPORTER:  10.
5           MS. TAYLOR:  10?
6  BY MS. TAYLOR:
7       Q.  It looks like you electronically
8  signed this on November 12th of 2019, which is
9  consistent with your hire date; isn't that
10 right?
11      A.  That's not correct.
12      Q.  Did you not sign it electronically?
13      A.  No, ma'am.
14      Q.  How did you sign it?
15      A.  I had a pen signing my papers.
16      Q.  So you're saying you signed your
17 Employee Acknowledgment?
18      A.  It was a piece of paper.  I had to
19 write in print, sign it, and date it.  It was
20 not electronically.
21      Q.  Okay.  Was the form the same?
22      A.  I never seen this form before.
23      Q.  Okay.  So you're saying that you did
24 not electronically sign this document?
25      A.  I would have remembered signing it.  I

Page 100

1  -- when I got hired nothing was electronically
2  signed.
3       Q.  You didn't go into a computer and sign
4  any documents?
5       A.  I signed computers -- I signed when I
6  was doing the computer -- the training about the
7  washing the hands and that training.  But I
8  never signed this.  The day I got hired, I did
9  not -- I haven't seen this form is what I'm
10 saying.
11      Q.  Okay.  So tell me what -- what
12 training did you do on the computer when you
13 were hired by Sonic?
14      A.  It was telling me about the washing
15 the hands and -- I can't remember everything,
16 but it was about the temperatures of the food
17 and stuff like that, about when you closing, how
18 to close.
19      Q.  Was it on the process for cooking and
20 what the standards were for Sonic for preparing
21 food?
22      A.  Yes.
23      Q.  Did it go over Sonic's standards of
24 conduct?
25      A.  I can't remember.  I can't remember.

Page 101

1  I know the paper I signed, the one I printed and
2  signed in cursive and dated, that one did.
3       Q.  Went over the standards of conduct?
4       A.  Yes.
5       Q.  Did it also go over the
6  nondiscrimination policy?
7       A.  Yes.  The one I signed did.
8       Q.  So you understood at that time, at
9  least, that Sonic had the standards of conduct,
10 and they expected their employees to conduct
11 themselves consistent with that; isn't that
12 right?
13      A.  Correct.
14          MR. STUTZMAN:  Object to the form.
15      You may answer.
16      A.  Okay.  Correct.
17 BY MS. TAYLOR:
18      Q.  And you understood that Sonic's
19 policies prohibited sexual harassment in the
20 work place; isn't that right?
21      A.  Correct.
22      Q.  And you also understood that Sonic's
23 policies prohibited anyone from engaging in
24 threatening or abusive conduct; isn't that
25 correct?

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021        Pages 102..105

**Page 102**

1    A.   Correct.
2    Q.   And you understood that Sonic's policy
3  prohibited anyone from using profane language in
4  the workplace; isn't that right?
5    A.   Correct.
6         MR. STUTZMAN:  Robin, how much longer
7  do you think we'll be going?
8         MS. TAYLOR:  Well, you know, it's
9  12:09 now.  I expect that we will probably
10  go for another hour or two hours.  So if we
11  want to go ahead and take a break now and
12  then just reconvene --
13         MR. STUTZMAN:  I'd like to get some
14  lunch.
15         MS. TAYLOR:  Okay.
16         MR. STUTZMAN:  I'm getting hungry.
17         MS. TAYLOR:  I think that's okay.
18  Let's go ahead and do that.  And how long
19  do y'all think we need to take for lunch?
20  Do y'all want to take one hour or --
21         THE WITNESS:  Well, I got dropped off
22  here, so I'll probably just stay to make
23  sure I don't miss it.
24         MR. STUTZMAN:  Okay.  We can keep
25  going.

**Page 103**

1         MS. TAYLOR:  Well, actually, I
2  wouldn't -- I haven't eaten today at all,
3  so I wouldn't mind taking just a quick
4  30-minute break so I could just get a
5  little bit of food.  Is that all right with
6  y'all?
7         MR. STUTZMAN:  Yeah.  I'll hit the
8  snack machine.
9         MS. TAYLOR:  Okay.  Okay.  That works
10  for me.
11         (Brief recess.)
12  BY MS. TAYLOR:
13    Q.   Okay.  So when we broke for lunch, we
14  were talking about your training --
15    A.   Yes, ma'am.
16    Q.   -- that you had related to your work
17  at Sonic.  And you said that you did some online
18  training?
19    A.   Yes.  It was some online training
20  about the food temperatures and the rules and
21  stuff.
22    Q.   Okay.  And it also included your --
23  the standards of conduct?
24    A.   I don't remember.  But I do know that
25  the paper I signed that said something about

**Page 104**

1  handbook, it was -- I signed it.  It wasn't like
2  this.  It wasn't.
3    Q.   Okay.  Okay.  But you do agree, as
4  part of your -- Sonic's standards of conduct,
5  that they prohibited rude or disrespectful
6  conduct to customers or to other employees,
7  correct?
8    A.   Yes, ma'am.
9    Q.   And they prohibited insubordination or
10  disrespectful conduct to members of management;
11  isn't that right?
12    A.   Yes.
13    Q.   And they also prohibited violence or
14  threats of violence; isn't that correct?
15    A.   Yes.
16    Q.   And you can understand, similar to
17  your work at Food Giant, that it would -- that
18  Sonic needs to ensure that its customers have --
19  are treated respectfully and have a good
20  experience while visiting the Sonic; isn't that
21  right?
22    A.   Yes.  I didn't deal with customers;
23  but yes, I do agree with that.
24    Q.   All right.  Now, you had mentioned
25  earlier that during your second time that you

**Page 105**

1  worked at Sonic, that you had Alesha Gardner,
2  who was the -- I guess that would be the general
3  manager; is that correct?
4    A.   Yes.  Correct.
5    Q.   And she's the individual who hired
6  you, correct?
7    A.   Correct.
8    Q.   And then there was also Eric Ellis,
9  who was an assistant manager; is that right?
10    A.   Correct.
11    Q.   And then you also said that there was
12  a lady by the name of Tay Davis?
13    A.   Correct.
14    Q.   And were you aware that she was a
15  manager on duty, meaning that she wasn't an
16  assistant manager or a --
17    A.   Well, she was the --
18    Q.   -- general manager?
19    A.   Yeah.  She wasn't the general manager
20  but she was a manager.
21    Q.   Okay.  If you had to describe the,
22  kind of, hierarchy of management at the Sonic
23  how would you describe it?
24    A.   Could you rephrase that?
25    Q.   Yeah.  Like, would -- would Eric Ellis

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 106..109

**Page 106**

1   have to report to Alesha Gardner?
2       A.    No.
3       Q.    So she would not supervise him as far
4   as what he does?
5       A.    No, ma'am.
6       Q.    Okay.  And would Tay Davis have to
7   report to Alesha Gardner?
8       A.    She would.
9       Q.    And Alesha Gardner would oversee and
10  supervise what she did?
11      A.    Yeah, she would.
12      Q.    And why don't you think that Eric
13  Ellis reported to Alesha Gardner?
14      A.    Because she told me in her own mouth,
15  when I tried to tell her, that, This is my
16  store.  You'll never see the owner of this
17  store, so I'm here.  This my store.  When I'm
18  not here Eric is in charge.  Eric is my
19  right-hand man.
20          That's exactly what she told me.
21      Q.    Okay.  When did she tell you that?
22      A.    I can't remember the exact -- I can't
23  remember the exact date, but it was before the
24  incident happened.  I tried to tell her about
25  Eric.

**Page 107**

1       Q.    So you're saying before the incident
2   happened you tried to tell her about Eric?
3       A.    Yes, ma'am.
4       Q.    What did you try to tell her?
5       A.    I told her I said, Eric be -- when I
6   work with Eric he touch -- and she was like --
7   and she cut me off.  She wasn't trying to hear
8   me.
9       Q.    Okay.  And what were you trying to
10  tell her again?
11      A.    That he would touch my hand and sing
12  songs to me.
13      Q.    And what songs?
14      A.    "Back that A up."
15      Q.    Does that mean back that ass up?
16      A.    Yes, ma'am.
17      Q.    Okay.
18      A.    "Drop it like it's hot."  He would
19  say, Do something strange for a little piece of
20  change.
21      Q.    Excuse me?
22      A.    He'd say, Do something strange for a
23  little piece of change.
24      Q.    Okay.  Is that a song he would sing?
25      A.    He would say that.  He would say that,

**Page 108**

1   Do something strange for a little -- and he'd
2   also will say, I'll make you "holla for a
3   dolla."  Stuff like that.
4       Q.    And when did he say that?
5       A.    He said stuff all the time.  That's
6   the only inappropriate things he said.  He would
7   sing, like, Keith Sweat songs, like -- but yeah,
8   he....
9       Q.    How many times did he say, Do
10  something strange -- what did you say he said?
11      A.    Do something strange for a little
12  piece of change.  He only said that once.  And
13  I'll make you "holla for a dolla," he only said
14  that once.  But he also sung, "Back that A up."
15      Q.    When did he tell you -- did he say
16  that to you?
17      A.    Yes, ma'am.  I backed up and looked at
18  the screen and he said -- that's when he said,
19  "back that ass up."  And when I -- I --
20      Q.    Let's first talk about do something
21  strange for a little piece of change.  When did
22  he tell you that?
23      A.    It was -- it was before the incident.
24  Maybe two weeks before the incident.
25      Q.    And when you refer to the incident, is

**Page 109**

1   that the one that you reported regarding --
2       A.    What he did.
3       Q.    -- him coming up behind you as you
4   were leaning over a trash can?
5       A.    Yes, ma'am.
6       Q.    Okay.  And tell me the circumstances
7   of him saying along the lines of do
8   something strange for a little piece of change.
9       A.    He would just blurt it out, you know.
10  He -- he sung a lot.
11      Q.    Is that a song that he was singing?
12      A.    I don't know about do something
13  strange for a little piece of strange, but I'm
14  saying he -- he would sing a lot, and he would
15  just say stuff.
16      Q.    Well, what were the circumstances
17  surrounding him saying, Do something strange for
18  a little piece of change?
19      A.    I don't know.  He just -- that was --
20  he just did it.  I don't know.
21      Q.    And are you saying that he said that
22  to you?
23      A.    When he said it, I was beside him.  He
24  was looking at me.  He -- I don't know for a
25  fact he was talking to me, but he was looking at

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021     Pages 110..113

Page 110

1  me and he said it when I walked by him.
2     Q.  And was anyone else around when he
3  said this?
4     A.  Somebody was always around, but they
5  didn't -- like, they didn't -- it was okay for
6  them.
7     Q.  So who was around specifically when he
8  said do something strange for a little piece of
9  change?
10     A.  Tay was there.  If I'm not mistaken, I
11  think Claudia was there.
12     Q.  Did you ever have a conversation with
13  Tay or Claudia about him making that comment?
14     A.  With Claudia.
15     Q.  When did you have that conversation?
16     A.  It was that same day.  And I was like,
17  Why he do that?  Why he -- and she said, I asked
18  him the same thing, and he said that he wouldn't
19  do it if he didn't like you.  He didn't -- he
20  wouldn't do it if -- not me, but just if he
21  didn't like a person.  He wouldn't do it if he
22  didn't like a person.
23     Q.  What did she mean by that, if you
24  know?
25     A.  I have no idea.

Page 111

1     Q.  Did you ever have a conversation with
2  Tay about that?
3     A.  No, because -- no.
4     Q.  And what else did he say that you
5  thought was inappropriate?
6     A.  He called me Baby before.  You're
7  talking about besides him singing the songs?
8     Q.  Yes.
9     A.  He called me Baby, and I asked him not
10  to do that.
11     Q.  How many times did he call you Baby?
12     A.  He did it twice after I -- the very
13  first time I asked him not to, he did it again.
14     Q.  He did it one more time again?
15     A.  Just one more time, yes.
16     Q.  And was that -- so you were hired
17  November -- what was that?  November 22nd; is
18  that right?
19     A.  No.  I was --
20     Q.  Of 2019?
21     A.  12.
22     Q.  November 12 --
23     A.  Yes.
24     Q.  -- of 2019.
25     A.  Yes.

Page 112

1     Q.  And then you left Sonic December 31st
2  of 2019.  So that's --
3     A.  They fired me December 31st.
4     Q.  So that's about, I guess, a --
5     A.  It was December 30th or 31st when they
6  fired me.
7     Q.  Okay.  And that's about a month and a
8  half that you worked there?
9     A.  Yes.
10     Q.  Okay.  And so when -- when was -- how
11  soon into your employment there did he call you
12  baby?
13     A.  It was -- ooh, a -- probably about a
14  week --
15     Q.  Okay.
16     A.  Before that happened.
17     Q.  Before the trash can incident
18  happened?
19     A.  Yes.
20     Q.  Okay.  And you told him not to call
21  you that?
22     A.  I did, yes.
23     Q.  And when did he refer to you as Baby
24  again?
25     A.  He was like, Excuse me, Baby.

Page 113

1     Q.  Excuse me?
2     A.  He said, Excuse me, Baby.
3     Q.  Okay.  Did you ever hear him refer to
4  other people as Baby?
5     A.  I never heard him.
6     Q.  When was the last time that he called
7  you Baby?
8     A.  On that same day.
9     Q.  What same day?
10     A.  The first time -- the first time he
11  said Baby, he was like, Slow down, Baby, because
12  I was washing the dishes.  And I asked him not
13  to call me that.  And the second time he was
14  like, Excuse me, Baby.
15     Q.  Okay.  And it was that same day --
16     A.  Yes, ma'am.
17     Q.  -- that you asked him not to?
18     A.  Yes.
19     Q.  But he didn't call you Baby after
20  that?
21     A.  No.
22     Q.  Okay.  What other comments did he make
23  that you thought were inappropriate?
24     A.  That's all I that can remember.  The
25  singing and -- that's all that I can remember is

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 114..117

Page 114

1    the singing and him saying that. And like, when
2    I passed him food, he'll try to, like -- you
3    know, you passing the food he'll do this
4    (indicating). You know, instead of just
5    grabbing it he would do like -- put his hand
6    over your hand like that (indicating).
7        Q.   Okay. So I just want to make sure the
8    record is clear because the court reporter is --
9        A.   Okay.
10       Q.   -- taking it down. He would touch
11   your hand when --
12       A.   Yes.
13       Q.   -- you handed him food?
14       A.   Being extra friendly.
15       Q.   What songs did he sing?
16       A.   It was "drop it like it's hot" and
17   "back that A up." And that "drop it like it's
18   hot," I don't know if that's a song or not, but
19   he used to say it.
20       Q.   And when did he sing that?
21       A.   He said that a lot. Make you "holla
22   for a dolla," he only said that that one time.
23   But he -- he said "back that A up" -- he used to
24   sing that a lot.
25       Q.   And what do you mean "a lot"? How

Page 115

1    many times?
2        A.   I don't know. It just -- he would
3    just sing it, like -- I want to say every time I
4    worked with him, but I know it was more than
5    twice, more than three times. I would say more
6    than three times, I know.
7        Q.   Would you say less than five?
8        A.   Less than five, yes, ma'am.
9        Q.   How many times did he say make you
10   holler for a dollar?
11       A.   I only heard him say it once.
12       Q.   Say that again?
13       A.   I think he only said that once.
14       Q.   And when did he say that?
15       A.   It was a couple of weeks before that
16   happened.
17       Q.   You mean the trash can situation?
18       A.   Yes, ma'am.
19       Q.   Okay. And what were the circumstances
20   surrounding him saying that?
21       A.   Could you rephrase that?
22       Q.   Yeah. What -- where -- when he said
23   make you holler for a dollar, was he speaking to
24   you?
25       A.   All I know, he would be looking at me

Page 116

1    and he'll say it out loud, you know. So he'll
2    be looking at me when he say it. I don't -- I'm
3    not sure if he was just talking to me, but he
4    would be looking directly at me when he say it.
5        Q.   And were other people around when he
6    said that?
7        A.   Yes, other people was around.
8        Q.   And who was around?
9        A.   I don't know. I just know that
10   everybody heard him -- everybody I worked with
11   been heard him sing and say stuff.
12       Q.   Okay. And -- but particularly when he
13   said make you holler for a dollar --
14       A.   Uh-huh.
15       Q.   -- was there anyone that was around
16   that heard that?
17       A.   I know Claudia and Tay was around when
18   he was -- Alesha have been around when she....
19       Q.   Who was around when he said make you
20   holler for a dollar?
21       A.   I can't remember exactly who was
22   around. I just know -- I can't remember exactly
23   who I was working with that day.
24       Q.   Now, when you were hired, you were
25   hired as a part-time employee; is that correct?

Page 117

1        A.   I was supposed to be -- start off --
2    she was going to start me off for -- between 30
3    and 35 hours. 25 to 35, something. She said
4    it'll be somewhere up in there before I go to
5    full-time. She said when I became an actual
6    manager, that's when I would be full-time.
7        Q.   So during the time that you worked for
8    Sonic, you only worked about 20 hours a week;
9    isn't that right?
10       A.   No. I worked more. 20 hours -- yeah.
11   Yes, ma'am. A week, yes.
12       Q.   That's correct.
13            What other comments did Eric Ellis
14   make?
15       A.   That's all I can remember.
16       Q.   Okay.
17       A.   You -- probably....
18       Q.   And you mentioned earlier that you
19   spoke with Alesha Gardner about Eric Ellis?
20       A.   Yes, ma'am.
21       Q.   And when did you do that?
22       A.   It was about two weeks before the
23   incident happening. It was after he was singing
24   a song and touched my hand.
25       Q.   What song?

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 118..121

**Page 118**

1      A.   "Back that A up"....
2      Q.   Did you ever tell him not to touch
3  your hand?
4      A.   I really wanted to keep my job.
5  That's why I went to Alesha.  But Alesha told me
6  that he was -- that -- I went to her first
7  before I said anything to him.  And she -- after
8  she told me what she said, I was -- I didn't say
9  anything, you know.  I would get to the point
10  where I'd try to hurry and just sit the food
11  down so he could just pick it up without having
12  to touch my hand but I didn't always pass the
13  food, you know.  He didn't do that all the time.
14  It was just sometime whenever I was working, you
15  know, bagging up the food he would do it.
16      Q.   About how many times did he touch your
17  hand?
18      A.   At least three.
19      Q.   And you never -- you never told him
20  not to touch your hand; is that correct?
21      A.   Correct.
22      Q.   And you never told him not to sing the
23  songs; is that correct?
24      A.   Correct.
25      Q.   When he made the comment, Make you

**Page 119**

1  holler for a dollar, you didn't tell him not to
2  say that; is that right?
3      A.   I just ignore him.  No, I didn't.
4      Q.   And you didn't tell him not to say, Do
5  something strange for a little piece of change?
6  You didn't tell him not to say that either; is
7  that right?
8      A.   Correct.  I was just trying to ignore
9  him.
10      Q.   But you did tell him not to call you
11  Baby; is that correct?
12      A.   Yes, ma'am.
13      Q.   And when you told him that, he did it
14  one more time but never did it again.
15      A.   Correct.
16      Q.   And you said that you spoke with
17  Alesha Gardner about two weeks before --
18      A.   Correct.
19      Q.   -- the trash can incident?
20      A.   Correct.
21      Q.   Okay.  And tell me what you told her.
22      A.   I told her, I said, When I work with
23  Eric, he touch -- and she was like, Let me stop
24  you -- she said, Let me tell you:  This my
25  store -- it's like she knew what I was fixing to

**Page 120**

1  say or something.
2           She cut me off, and she was like, This
3  is my store.  When I'm not here, Eric in charge.
4  He my right-hand man.  You'll never see the
5  owner of this store.  So therefore, this is my
6  store.
7      Q.   Did you tell her that he touched your
8  hand or did you not get it out?
9      A.   I didn't because Alesha was drunk -- I
10  didn't see her drinking, but I smelled the
11  alcohol.  She -- she was -- it's hard to
12  explain, but she wasn't trying to hear me.
13      Q.   And when did you speak to her?
14      A.   I told her about that two weeks before
15  that happened.
16      Q.   Did you speak to her by telephone, or
17  did y'all speak in person?
18      A.   In person.  And Barbara seen when I
19  called her and asked to speak to her a minute.
20      Q.   Say that one more time?
21      A.   Barbara standing right there when I
22  said, Alesha, may I speak to you for a moment?
23      Q.   And who is Barbara?
24      A.   Barbara Crawford.
25      Q.   Was Barbara Crawford -- was she also a

**Page 121**

1  cook?
2      A.   Yes.
3      Q.   Did you get along with Barbara?
4      A.   I didn't have no problems with
5  Barbara.
6      Q.   Do you think Barbara would say
7  anything untruthful about you?
8      A.   I got along with everybody there till
9  after that happened.
10      Q.   Do you have any reason to believe that
11  Barbara would say anything untruthful about you?
12      A.   I don't know.  Everybody turned on me.
13      Q.   Do you remember, when you spoke with
14  Alesha Gardner, was that -- well, what time of
15  the day was it?
16      A.   I'm not sure.  I don't know.  I don't
17  know.
18      Q.   Was it during your shift when you
19  spoke to her?
20      A.   Yes, it was during my shift.
21      Q.   What was the shift that you worked?
22      A.   It was 5:00 to 9:00 or 5:00 to 10:00,
23  starting off, until I became manager.
24      Q.   So you were working after -- after
25  5:00 until close?

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021
**Pages 122..125**

Page 122

1    A.   Well, I wasn't supposed to close until
2  January.  But one night Tay asked me to help
3  close because somebody didn't come in.  So I was
4  like, Sure, I'll help you.  So I helped her
5  close that night.
6         And the night the incident happened
7  she said my schedule -- Eric changed it so I
8  could work with him because she told him how
9  well I did holding down the kitchen by myself,
10  and said he didn't believe it, so he wanted to
11  see for hisself, so he put it so I could work --
12  close with him that night.
13    Q.   Okay.  But typically you would work
14  from 5:00 till 10:00?
15    A.   5:00 to 9:00 or 5:00 to 10:00.
16    Q.   What time does Sonic close at night?
17    A.   10:00 through the week, I think, and
18  11:00 on the weekend.
19    Q.   Did you speak with anyone else about
20  your concerns about Eric?
21    A.   No.
22    Q.   Do you have anything in writing about
23  your conversation with Alesha Gardner a couple
24  of weeks before the trash can incident?
25    A.   No, I didn't write it down because I

Page 123

1  didn't think it'll get to this, you know.  I
2  never wrote that down.
3    Q.   Okay.  Did you ever complain to Alesha
4  Gardner about anything else while you were
5  working at Sonic?
6    A.   No.  I remember one night that I was
7  in tears just because of how she would drink,
8  and I was trying to learn and stuff.  And I told
9  her that -- I talked to her, and she -- she
10  said, It's going to be -- I never said anything
11  about her drinking specifically.  But I was
12  like, I just feel uncomfortable here.  And she
13  was like, It's going to be all right.
14         It was another manager there that
15  night from Columbus.  She saw me crying.
16    Q.   And what was the other manager's name?
17    A.   I'm not sure because she was just
18  filling in fork Eric at that time because he was
19  on vacation or something.  So I'm not sure what
20  her name is.  I just know she was from Columbus.
21    Q.   And when did you -- when did you cry
22  and tell her -- what did you tell her?
23    A.   I just told her that I was
24  uncomfortable here.
25    Q.   Okay.  Did she ask you why?

Page 124

1    A.   She didn't care.  She drunk a lot.
2  She was -- I never seen her drinking.  I'm not
3  going to -- but I smelled it on her.  I've seen
4  cans in the garbage can.  I've....
5    Q.   Did you see her -- you never saw her
6  drink?
7    A.   I never saw her.  I just -- it was
8  loud on her.
9    Q.   And how many times did you see cans in
10  the garbage can?
11    A.   I only seen cans once.  When Claudia
12  and Barbara was emptying the garbage can, they
13  said, This don't make sense at all.  Pitiful.
14  That's they word.
15    Q.   And how many cans were in the garbage?
16    A.   I seen two.
17    Q.   And how many times did you smell
18  alcohol on Alesha?
19    A.   A lot.  Like, I don't remember -- I
20  remember one time when I didn't smell it and
21  that's when I got hired.  Other than that it was
22  on her.
23    Q.   Did you smell alcohol on anyone else?
24    A.   Eric, but his wasn't as loud as
25  Alesha.

Page 125

1    Q.   And how many times did you smell
2  alcohol on Eric's breath?
3    A.   Only twice on him.
4    Q.   How many times did you work with Eric?
5    A.   I don't -- I don't know.  I don't
6  know.  I know it was more than five times, but I
7  don't know.  That's me -- him being there while
8  I was there, because he changed my schedule to
9  his shift, to work with him, the day shift.  And
10  I talked to Alesha about it and she changed it
11  back to the night shift.
12    Q.   Okay.  So who worked the night shift?
13    A.   The managers will take turns, but on
14  -- and see, that week that he changed it, he was
15  on days, so -- he was on days that week.  And I
16  came to her and asked her why my schedule was
17  changed, you know, because she -- we had already
18  agreed that I work from 5:00 to either 9:00 or
19  5:00 to closing until I actually became a
20  manager, you know.
21    Q.   Okay.  And so how -- when your
22  schedule -- well, when was your schedule
23  switched to days?
24    A.   It was a few weeks before that
25  happened.  It was a few weeks before that

Page 126

1  happened.  I don't know exactly when.  I don't
2  know exactly when, but I know he change -- they
3  -- he changed it to his shift.
4      Q.   Was it -- was it before the trash can
5  incident or after the trash can incident?
6      A.   It was before it.
7      Q.   Okay.  And how many weeks before, if
8  you know?
9      A.   I want to say it was, like, two, maybe
10 -- I'm not really sure.
11     Q.   Were you switched back to the nights?
12     A.   Yes.
13     Q.   Did you ever make any other complaints
14 about anything at work to Alesha or to anyone
15 else?
16     A.   Not that I can remember.
17     Q.   Do you have any other complaints about
18 your work at Sonic?
19     A.   Everything was fine until after that
20 happened.
21     Q.   When did you -- because you said
22 earlier that you were crying at work one day and
23 told Alesha that --
24     A.   I mean, yes, that.  I'm saying, like,
25 I don't -- besides that?  What I mean by I don't

Page 127

1  have anymore complaints, he was -- I already
2  discussed the fact that he was, you know,
3  touching my hand and singing songs and stuff.  I
4  didn't have -- what I mean by that is I didn't
5  have any problems with Tay.  I didn't have any
6  major problem with Alesha besides, you know, I
7  tried to tell her and she wasn't trying to hear
8  me, and when I was crying at work I told her I
9  felt uncomfortable.  But other than that, there
10 was nothing -- there was nothing else that I can
11 remember.
12     Q.   Okay.  So let's talk about kind of the
13 other employees that you worked with.  Who all
14 did you work with in the kitchen?
15     A.   Barbara, Jordan, Mike, and Claudia;
16 and a new guy had came, but I only worked with
17 him once or twice.
18     Q.   And what's Mike's last name?
19     A.   I want to say his last name was Hill.
20 Yeah, it was Hill.
21     Q.   And did you get along with Mike Hill?
22     A.   I didn't have -- he never said
23 anything to me, you know.
24     Q.   So you didn't have any problems with
25 him?

Page 128

1      A.   No.
2      Q.   Do you have any reason to believe that
3  Mike Hill would say anything untruthful about
4  you?
5      A.   I don't see why he would because --
6      Q.   What's Jordan's last name?
7      A.   I don't know Jordan's last name.
8      Q.   Does Jordan Atkinson sound correct?
9      A.   I really -- even when I went to the
10 police station, I told them I don't know -- I
11 don't know her last name.
12     Q.   Okay.  And did you get along with
13 Jordan?
14     A.   I didn't really know her like that.
15 It's like we worked together, you know.  But we
16 didn't have any problems.
17     Q.   You didn't have any issues with her?
18     A.   No.
19     Q.   Do you have any reason to believe that
20 she would say anything untruthful about you?
21     A.   No.
22     Q.   And Claudia is your aunt?
23     A.   No, ma'am.  She's Tay's auntie.  I
24 don't know her last name.
25     Q.   And did you know Claudia before you

Page 129

1  worked at Sonic?
2      A.   No, ma'am.
3      Q.   And did you get along with Claudia?
4      A.   Yes, ma'am.
5      Q.   And do you have any reason to believe
6  that she would say anything untruthful about
7  you?
8      A.   No, ma'am.
9      Q.   What about the carhops who worked --
10 or I guess they're servers.  Do you call them
11 servers or carhops?
12     A.   Carhops.
13     Q.   Carhops?  Who were the carhops who
14 worked with you?
15     A.   One of them was one they called Twin.
16 I don't know her real name.  But she's from
17 Aberdeen.  She's young, like she -- I think her
18 last name is Thomas, but I don't know -- well,
19 her -- she -- her mother is a Thomas.  I know of
20 her mother, but I don't know her, you know.
21 When I stayed at 307 Hardy Street, they stayed
22 at 307 Hardy.  That was years ago.
23     Q.   Okay.  Any other carhops that worked
24 with you when you worked there?
25     A.   Yes, it was.  I don't know her name,

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 130..133

Page 130

1   but it was -- I really didn't know them like
2   that.  It was another girl named -- that night
3   she was yelling.  She was meddling with them,
4   like, picking at me.  What's her name?  I forgot
5   her name.  I forgot her name.
6        It was another carhop, a new girl
7   named Christina or something.
8        Q.   And you're saying that she yelled at
9   you?
10       A.   Huh-uh.  It was -- what is her name?
11  I don't know her name.  I forgot her name.
12       Q.   Any other carhops that you can recall?
13       A.   Alexius Ellis.  Yeah.
14       Q.   Say that again.
15       A.   Alexius Ellis.
16       Q.   Okay.  She was another carhop?
17       A.   Yes.
18       Q.   And is she related to Eric Ellis?
19       A.   That's his daughter.
20       Q.   How old was Alexius, if you know?
21       A.   I don't know how old she was.
22       Q.   Do you know if she had graduated from
23  school yet?
24       A.   Yes, she had graduated from school.
25       Q.   Do you know how long she had worked at

Page 131

1   Sonic?
2        A.   She was there before I started.
3        Q.   And did you get along with Alexius?
4        A.   Yes.
5        Q.   Any other carhops that you can think
6   of?
7        A.   I can't remember.  I cannot remember.
8        Q.   Okay.  Tell me what happened the night
9   that you claim that Eric Ellis was inappropriate
10  with you when you leaned over a trash can.  Tell
11  me, where were you and what -- what time of the
12  night was that?
13       A.   It was around 7:00-something.  I was
14  just got done with -- work had got slow, and so
15  I started cleaning my work area.  And I noticed
16  that the trash bag fell down into the can, into
17  the trash can.  So I bent over to pull the trash
18  can -- the trash bag out the -- up over the
19  trash can, and I felt grinding stroke feeling
20  behind me.  And I looked to the side and all I
21  seen was that big grin on his face.
22       And I looked and I seen -- I seen
23  Jordan was looking, but I didn't know if she
24  actually seen what he did.  So after he did it,
25  he went outside.  And I asked her I said, Did

Page 132

1   you see what he did?  And she was like, Girl,
2   yes.  And I told her I said, I'm fixing to go.
3   And she was like, Don't leave.  I said, No, I'm
4   not staying here.  I'm fixing to go.  And she
5   said, Don't leave me because he did the -- she
6   said, I'm going to be back here with him by
7   myself, and he did the same thing to me.
8        Q.   And that was Jordan?
9        A.   Yes, ma'am.
10       Q.   Okay.  So let's go back to the
11  incident.  Did you see where Eric was before you
12  leaned over the trash can?  Did you know where
13  he was in the store?
14       A.   I wasn't really paying attention.  I
15  was just cleaning.  And I noticed the bag fell
16  down and I pulled the -- I got the bread off the
17  top of the garbage and was putting inside the --
18  inside the bag.  And I was fixing to pull it up,
19  you know.  It happened so fast, you know.  And I
20  was, like, in shock for, like, a few seconds.
21       Q.   Now explain to me what -- you said
22  that you felt stroking?
23       A.   It was like a stroke and a grind,
24  like.
25       Q.   What do you mean by a stroke and a

Page 133

1   grind?
2        A.   It felt like he was humping me and
3   moving, like.
4        Q.   How long did it last?
5        A.   It didn't last long at all.
6        Q.   Would it have lasted a second?
7        A.   It was longer than a second.
8        Q.   Was it longer than two seconds?
9        A.   I would say maybe -- maybe three
10  seconds.
11       Q.   And did he say anything as he moved
12  by?  Did he say, Excuse me, or make any comment?
13       A.   He say, Excuse me.  But he had a big
14  grin on his face.
15       And Jordan was like, I know he tried
16  to do it because all of that space, he could
17  have went around you, and he did me like that.
18       That's why she don't like working with
19  him by herself.
20       Q.   Now, the area between, I guess, you
21  and the trash can, was there a walkway by the
22  trash can?
23       A.   It was, like, a walkway; but it was
24  also another space.  It was, like, a deep space
25  where he could have went out.  He had plenty of

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021
**Pages 134..137**

**Page 134**

1  space to walk out instead of, you know --
2  Q.  How wide was the space that he had to
3  walk through?
4  A.  I would say about -- that area was
5  probably about an aisle and a half, an aisle,
6  because the garbage can was pushed back, and I
7  was bent over -- he had space.  I don't know
8  exactly how many space.  I don't know exactly.
9  But I know it was plenty of space.  If you see
10  it, you'll know exactly what I'm talking about.
11  Q.  Was -- was it as wide as this table?
12  A.  It was wider than this table.
13  Q.  Okay.  So this table -- what do you
14  think?  Do you think this table is three feet
15  wide?
16  A.  You talking about across like this?
17  Q.  That's correct?
18  A.  Yes, it's -- it's wider than this
19  table.
20  Q.  How wide -- how much wider?
21  A.  Maybe a few extra inches wider.
22  Q.  So maybe a little bit more than three
23  feet?
24  A.  Yes.
25  Q.  Okay.

**Page 135**

1  A.  Because the garbage can was, like, in
2  a dip, like, you know.  And so I'm up over the
3  garbage, you know.  So he had space to go around
4  me.
5  Q.  Okay.  Did you say anything?
6  A.  I was shocked.  He went outside after
7  that, but I was shocked for a few seconds.
8  Like, right after that he went outside and --
9  Q.  So you did not say anything?
10  A.  No.
11  Q.  Okay.  And did he have anything in his
12  hands as he walked by you with the trash can?
13  A.  No.  He reached up but he didn't grab
14  nothing because it was, like, some -- some cups
15  and stuff.  He didn't grab nothing.  He reached
16  up like he might have been grabbing at something
17  and walked on outside.
18  Q.  And what -- tell me exactly what
19  Jordan told you.
20  A.  She told me, she was like, Don't leave
21  me.  And I said, I'm fixing to go.  And she was
22  like, Don't leave me because I'm going to be
23  back here with him myself and he did the same
24  thing to me.
25  Q.  And did you ask her what she meant by

**Page 136**

1  "he did the same thing to me"?
2  A.  I didn't.
3  Q.  And what did she say?
4  A.  I -- I didn't ask her.
5  Q.  Oh, you did not ask her.  Okay.
6  Was there anyone else in the Sonic or
7  in the cooking area?
8  A.  The car -- at that time the carhops
9  had took an order outside.  It was just me,
10  Jordan, and Eric.
11  Q.  Okay.  So when Jordan told you you
12  needed to stay or asked you to stay, did you
13  stay?
14  A.  Yes, ma'am.  I told her that I would
15  stay as long as I could, but I was going to have
16  to leave because I'll be left with him by
17  myself, and I couldn't take -- I wouldn't be
18  able to, you know, take no break.  He was, like,
19  no, he -- you know, I didn't want to be -- I
20  didn't want her to be there by herself, but I
21  felt like I needed to go get some help, so....
22  Q.  And why did you feel like you needed
23  to go get some help?
24  A.  I needed to get somebody -- because of
25  what he did to me.  I felt violated, like -- it

**Page 137**

1  wasn't right.
2  Q.  Now, is there any -- do you think that
3  there is any possibility that Eric was trying to
4  pass by you as you leaned over the trash can and
5  bumped against you?
6  A.  I raise my --
7  MR. STUTZMAN:  Object to the form.
8  You can answer.
9  A.  I raise my right hand to God that I'm
10  a hundred percent sure that he did that
11  intentionally.
12  BY MS. TAYLOR:
13  Q.  Did you ever ask him why he did that
14  or if he did that?
15  A.  I was, like, shocked.  Right after he
16  did that he went outside.  And I was shocked
17  that he did that, like -- because he did the
18  little other stuff but....
19  Q.  And so you did not ask him?
20  A.  No, I didn't.
21  Q.  How long did you stay after that
22  exchange?
23  A.  That happened at 7:00-something.  She
24  get off at -- she was going to get off at 9:00
25  that night.  I was going to have to close with

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021
Pages 138..141

Page 138

1 him. I didn't want to close with him. So I
2 left at like 8:30-something.
3     Q.   Was Jordan still there when you left?
4     A.   Yes.
5     Q.   Did you say anything to her about
6 leaving for the night?
7     A.   I told her that I was going to stay as
8 long as I could, but I didn't -- I was like,
9 It's no way I'm closing with him.
10     Q.   Did you clock out before you left?
11     A.   Yes. I think I did. Yes, I did
12 because -- I'm a hundred percent sure I clocked
13 out.
14     Q.   And did you say anything to Eric
15 before you left?
16     A.   I told -- I asked him, I was like,
17 Could I take a break?
18     Q.   And what did he say?
19     A.   He say, Yeah, sure. Go ahead.
20     Q.   And what did you do when you took a
21 break?
22     A.   I went -- I called my husband to come
23 get me. And when I got home, I called -- I told
24 my husband what happened, and I called the
25 police.

Page 139

1     Q.   And what did you tell your husband?
2     A.   That I leaned over to pull the garbage
3 bag out the trash can and he came behind me and
4 he humped me.
5     Q.   And what did your husband say?
6     A.   He was more -- he was -- he was
7 shocked. He said that every time I drop you
8 off, he always watching. He's always looking.
9     Q.   Could you repeat that?
10     A.   Every time I drop you off and come --
11 every time I drop you off and come pick you up,
12 he's looking. If he's there, he was always
13 looking.
14     Q.   Looking at the car?
15     A.   He was just -- I don't know what he
16 meant. He just said he was always looking.
17     Oh, I forgot. Eric also said to a guy
18 named Craig -- because people off the street
19 would come into Sonic and, like, they'll fix
20 them something to eat or something. But Craig
21 never fixed him something to eat. They will fix
22 Craig food for him.
23     And Craig -- he told Craig, She been
24 married 20 years. And Craig say, That's a good
25 thing, Baby. Don't let nobody tell you

Page 140

1 different. She been married her whole life.
2     And oh, yeah, he also asked me, Why
3 you got to check up on your husband at night?
4 He was like, You always got to call and check up
5 on your husband. That night he said that to me.
6     Q.   Okay. And would you call your husband
7 while you were on the clock?
8     A.   Yes. He would -- he would -- he
9 didn't care. He told me, I don't care about you
10 -- you know, you can make phone calls, because
11 everybody else had their phone out. Just
12 because they do it, I'm not going to come in and
13 do what they do. So I asked for permission:
14 May I use my phone?
15     Q.   Okay. Okay. And so he said, Why do
16 you have to call your husband to check in?
17     A.   Why you always got to call and check
18 in with your husband?
19     Q.   And you said that someone -- was Craig
20 a customer?
21     A.   No.
22     Q.   Who was he?
23     A.   He would come up there to -- he came
24 up there to Sonic to -- his name is Craig
25 Gardner. He would come up there to, I guess,

Page 141

1 visit or something. They'll fix him sandwiches
2 and stuff.
3     Like, people would come there and fix
4 them something to eat at Sonic that didn't even
5 work there.
6     Q.   So did -- did Craig -- was he related
7 to Alesha?
8     A.   That I don't know.
9     Q.   And would he pay for the food? Was he
10 a customer?
11     A.   No.
12     Q.   Would he -- would he go in the kitchen
13 and make his own food?
14     A.   No. He never made his own food.
15 Like, they would fix him something to eat.
16     Q.   Okay.
17     A.   That night no one fixed him anything.
18 Like, he didn't get nothing to eat. But he was
19 just talking, came up there talking that night.
20 But usually, like, when Tay there, Tay fix him
21 something to eat.
22     Q.   Okay. And when did you call the
23 police?
24     A.   Right after I got home. I told my
25 husband about it, and I was like -- I started

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021
**Pages 142..145**

**Page 142**

1  crying.  And I -- I grabbed the phone.  And I
2  was like, I hate Jordan -- you know, she's still
3  up there with him because I got two girls at
4  home, and I did not want to leave her up there.
5  But I had to because I wanted to get her some
6  help.  I wanted -- so she wouldn't be up there
7  -- even though she was going to get off at 9:00,
8  it would have stopped it, you know.
9      Q.    Ms. Haughton, would you like to take a
10 couple of minutes?
11     A.    I'm okay.  I'm getting sleepy.  I just
12 want to get it over with.  I'm fine.
13         THE WITNESS:  Thank you.
14 BY MS. TAYLOR:
15     Q.    Ms. Haughton, have you ever seen him
16 do that to Jordan?
17     A.    I never saw him do that.
18     Q.    Had you ever seen him do that to
19 anyone else?
20     A.    No, ma'am.
21     Q.    Had you ever seen him pass behind
22 employees or scoot by employees back in the
23 kitchen while --
24     A.    Yeah, because --
25     Q.    -- people were working?

**Page 143**

1      A.    Where we cook the meat, that part is
2  crowded.  I could have understood if he had've
3  bumped into me or something at that part.  But
4  where we were, it was enough space for him to go
5  around, and that was not an accident.  I could
6  feel it and tell.
7      Q.    Who did you speak to at the police
8  department?
9      A.    I called the police department, and
10 they came out.  And it was a guy, Chaz Thomas,
11 and some female.  And they asked me did I want
12 to press charges tonight.  And I said, Yes,
13 ma'am, and yes, sir.  And so I went to the
14 police station.
15         When I walked through the door, this
16 lady said, I figured, when you called, what job
17 you was talking about.  I had my uniform on.
18 Her name is -- she was the dispatch.  Her name
19 is Sierra.
20     Q.    And what did she tell you?
21     A.    She said, I figured -- when you
22 called, I figured what job you was talking
23 about.
24     Q.    And did you ask her what she meant by
25 that?

**Page 144**

1      A.    No, I didn't.
2      Q.    And who was the female?  You said you
3  spoke with Chaz Thomas and a female?
4      A.    I don't know her name.
5      Q.    And did you know Chaz Thomas before
6  you called the police?
7      A.    No.  It just I seen his name on the
8  report.  That's how I learned his name.
9      Q.    Okay.  Okay.  And what did you tell
10 Chaz?
11     A.    I told Chaz and the police lady what
12 happened, by him humping me.
13     Q.    And you did that at the police
14 department?  You went to the police department
15 to do that.
16     A.    I called -- I called them out, and
17 then they asked me did I want to press charges
18 tonight.  And I said, Yes, ma'am and yes, sir.
19 So they was like, Okay.
20         So me and my husband left, and I went
21 to the police station.  And the time I walked
22 through the door, she said, You the one called?
23 I said, I figure -- she said -- I said, Yes.
24 And she was like, I figure what job you was
25 talking about when you called, because I still

**Page 145**

1  had my uniform on.
2          MS. TAYLOR:  Go ahead and mark this as
3      the next exhibit number.
4
5                  - - - - -
6          (Exhibit Number 11 marked.)
7  BY MS. TAYLOR:
8      Q.    And, Ms. Haughton, is that your
9  signature on the bottom of that document?
10     A.    Yes, it is.
11     Q.    Okay.  And is that your handwriting on
12 the document?
13     A.    Yes, it is.
14     Q.    Okay.  And so what you reported to the
15 police was that the garbage bag fell over inside
16 the garbage?
17     A.    The garbage bag fell down inside the
18 garbage.
19     Q.    And that that you bent over to pull
20 the bag up, and Eric came behind me and humped
21 me, and then he said, Excuse me.
22     A.    Yes.
23     Q.    Okay.
24     A.    Yes.  But he had a big smile on his
25 face.

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 146..149

Page 146

1      Q.    But you didn't include that in your
2  statement to the police?  Was that correct?
3      A.    That he had a big smile on his face?
4  No, I didn't write that he had a big smile on
5  his face.  I was just trying to -- I didn't say
6  he had a big smile on his face, but he did.  I
7  was just trying to get to the main point.
8      Q.    And you said that your co-worker
9  Jordan was looking and that she said that she
10  had seen what he did?
11      A.    Yes.  She said that she saw what he
12  did.
13      Q.    And she said that she didn't want to
14  be left alone --
15      A.    Correct.
16      Q.    -- with him and that he had done that
17  to her before?
18      A.    Correct.
19      Q.    And that she gave you her Facebook
20  name?
21      A.    Yes.
22      Q.    And that's the information that you
23  included in your statement to the police; isn't
24  that right?
25      A.    Correct.  She told me that her

Page 147

1  Facebook name wasn't Jordan and that it was
2  J Marie.  She wrote it on paper.  That's how I
3  was able to....
4      Q.    Okay.  And you did not include in your
5  statement that he had touched your hand before;
6  isn't that right?
7      A.    No, I didn't.  I was just trying to --
8  that night I was just trying to get to -- I was
9  in shock still.  You know, my mind was -- I
10  don't know.
11      Q.    And after you -- and you did this at
12  the police department; is that correct?
13      A.    Yes, ma'am.
14      Q.    And after you made the complaint, what
15  was the next thing you did?
16      A.    I went home.
17      Q.    And what time was it when you went
18  home?
19      A.    I'm not really sure what time it was
20  when I got home.
21      Q.    And did you know what the police were
22  going to do with your complaint?
23      A.    No.
24      Q.    Did they tell you what they planned to
25  do or that they planned to go to Sonic or speak

Page 148

1  with Mr. Ellis?
2      A.    They said that they would.
3      Q.    Okay.  Did they tell you when they
4  were going to do that?
5      A.    No.
6      Q.    After you got back home that night,
7  what was the next thing that happened?
8      A.    Alesha called me, and she asked me why
9  did I tell on him.  She said the police came and
10  arrested him.  And I told -- she -- I said that
11  -- I told her what he did.  And I told her, I
12  even have a witness.
13          I never told her the name of my
14  witness.  She was like, Who is it?  Who is your
15  witness?  I knew eventually she would probably
16  figure it out because me -- we was the ones in
17  the kitchen.  But I didn't tell her.
18          So she was like, He been here
19  such-and-such amount of years.  It -- I think
20  she -- if I'm not mistaken, it was either seven
21  or nine years she said.  He been here that many
22  years and you come and you told on him.  You had
23  him arrested.
24          I'm going to call the camera man.  The
25  camera man -- I called the camera man.  That's

Page 149

1  what she said.  I called the camera man.  He's
2  on his way.  And I said, That's good.  You could
3  look at the camera, you'll see I'm telling the
4  truth that he did that.
5          And she was all, Yeah, he on his way.
6  I'm going to see.  Why you stay -- when he did
7  that, why you stay long as you did?
8          And I was like, Because I didn't want
9  -- the other person, I didn't want to leave them
10  by theirself with him.
11          And so she was like, Well, the camera
12  man on his way.  And she was like, I don't
13  believe he did that.
14          And I said, Ma'am, I said, God don't
15  like ugly.  I wouldn't try to blemish somebody,
16  you know, just make something like that up.
17          And she was like, God don't like
18  pretty either.  And I asked her what she meant
19  by that.  She said, That's something I always
20  say.  But like I said, the camera man on his
21  way.
22          She hung on me.
23      Q.    What did she say?  God don't like
24  what?
25      A.    Pretty either.

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 150..153

Page 150

1    Q.    Okay.  Did she say anything else?
2    A.    No.
3    Q.    Did you say anything?
4    A.    No, ma'am.  I just told her what
5  happened, you know.  She asked what happened,
6  and I told her what happened.  And she was like,
7  I don't believe he did that.
8    Q.    Did she tell you that she was going to
9  conduct an investigation and speak with
10 witnesses?
11   A.    No, ma'am.  She was mad.
12   Q.    What was the next thing that you did?
13   A.    My husband listened to the call, and
14 he was like, What in the world?  You know, What
15 kind of stuff is that, you know?
16   Q.    How long did the call last?
17   A.    I wrote it down.  I wrote it down in
18 my journal.  I can't remember off the top
19 because I didn't -- but I wrote it down, you
20 know, how long the call --
21   Q.    Do you keep a journal?
22   A.    I was keeping a journal, but I stopped
23 writing because -- I kept a journal -- I started
24 writing after that happened.  I started writing
25 after that happened.  And I thought it'll make

Page 151

1  me feel better, but it actually made me feel
2  worse, so I just stopped writing.  I stopped --
3  like, in middle -- the middle of January, I just
4  stopped writing.  It was like I kept reliving
5  it.
6    Q.    Why would you think that it would make
7  you feel better?
8    A.    Just -- just getting it off my chest
9  instead of holding it in and just writing it
10 out.  You know, me being a writer, I thought it
11 would make me feel better, but it -- it didn't.
12   Q.    And have you produced a copy of your
13 journal in this litigation?
14   A.    I did.
15   Q.    And did you write in the journal every
16 day, or did you go back and write it based on
17 your recollection?
18   A.    No.  I wrote -- like, say, sometimes I
19 will write, like, that night; after the day,
20 that night.  Sometimes I will write right then.
21 Most of the time I would write -- sometime I
22 will wake up and be like, I feel better, you
23 know.  I was -- a lot of -- some of it was about
24 my feelings, how I felt, you know.
25   Q.    Now, after speaking with Alesha, what

Page 152

1  was the next thing that you did?
2    A.    After she said that, after her
3  response, I called corporate because I knew she
4  was -- she was mad, so I....
5    Q.    And when did you call corporate?
6    A.    I googled their number, and I called
7  them that same night, I think.
8    Q.    You called them the evening of the
9  22nd?
10   A.    That -- the night after she called me,
11 I end up calling corporate.
12   Q.    So you called corporate the night
13 that --
14   A.    Yes.
15   Q.    -- the incident happened?
16   A.    After her reaction, and I seen she
17 wasn't -- well, she had already told me.  But I,
18 you know, still explained to her, you know, what
19 he did and tried to tell her I wouldn't do
20 nobody like that, you know.  But she was mad.
21 She said I shouldn't have told on him.  So
22 that's why I called corporate.
23   Q.    Okay.  And were you able to reach
24 anybody?
25   A.    I called the wrong corporate.  I

Page 153

1  called some -- somebody in Ohio or something.
2  That's the corporate I called.  But then I later
3  found out -- the one in Columbus.  I was
4  googling till I found the one in -- but I think
5  that one I called -- it might have been the next
6  day or -- I'm not sure, but it wasn't long
7  after.
8    Q.    And who did you speak with at
9  corporate?
10   A.    Anita Howard.
11   Q.    And what did you tell her?
12   A.    I told her what happened.  And she
13 said -- she said, Let me ask you something.  And
14 I said, Yes, ma'am.  And she said, Have you ever
15 smelled alcohol on Alesha's breath?  And I said,
16 Yes, ma'am.  I said, I smelled it on Eric
17 breath.  But I'm going to be honest.  It don't
18 be -- Eric don't be as loud as Alesha.  I only
19 smell it on -- you know, I smell it on Alesha's
20 breath all the time.
21        You know, I just told her.
22   Q.    So you're saying when you spoke with
23 Ms. Howard --
24   A.    Anita.
25   Q.    -- she asked you if you smelled

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 154..157

Page 154

1  alcohol on Alesha's breath?
2      A.   Yes, ma'am.  She asked me have I ever
3  smelled alcohol on Alesha, because I was telling
4  her about Eric, and she asked me about Alesha.
5      Q.   What did you tell her about Eric?
6      A.   That I smelled a little alcohol on him
7  that night.  It wasn't loud, but I smelled a
8  little alcohol that night.
9      Q.   What else did you tell her?
10     A.   I told her what happened, and I -- I
11 told her what happened, and she told me years
12 ago that wasn't even considered sexual
13 harassment.
14     Q.   Now, did she tell you that --
15     A.   She said she going to focus on Eric.
16 She wasn't going to focus on Alesha.  Her focus
17 was on Eric.  And I was thinking, What's the
18 point of even asking me about -- I didn't tell
19 her, but I was like, Why she even ask about the
20 alcohol on her breath?
21     Q.   So when she told you that years ago
22 that that wouldn't be considered sexual
23 harassment, did she tell you that there weren't
24 laws that would protect women against sexual
25 harassment in the workplace years ago?

Page 155

1      A.   I didn't even know that it wasn't
2  considered sexual -- I didn't know anything
3  about it till she told me.
4      Q.   Okay.  And did she tell you that they
5  were going to investigate and look into it?
6      A.   She did say that.  She did.
7      Q.   And did she tell you that that would
8  be inappropriate and that it would be against
9  the policy of the company?
10     A.   That's what she said.
11     Q.   And did she also tell you that the --
12 -- the owner of the company or the president of
13 the company was out of town and wouldn't be back
14 until after the holidays?
15     A.   That was the second time I called.
16     Q.   And she did tell you that?
17     A.   Yes.  And he end up calling.  He did
18 end up calling.  My husband had the phone.  He
19 the one that said that he would call back, but
20 he never called back.
21     Q.   How many times did you speak with
22 Nita, or Ms. Howard?
23     A.   I spoke to her only once.  The other
24 one was named Cynthia that I was speaking to.
25 Cindy.  It was Cindy or Cynthia, something like

Page 156

1  that.
2      Q.   And did you get her last name?
3      A.   No, ma'am.
4      Q.   And she was in Columbus?
5      A.   Yes, ma'am.
6      Q.   And what did you tell her?
7      A.   What did I tell her?  I told her -- I
8  can't remember.
9      Q.   Why did you call back a second time?
10     A.   I think I called after they -- after
11 Tay and Alexius Ellis tried to fight me, I
12 called.  I think I called -- if I'm not
13 mistaken, I think I called then because I --
14 yes, I did, because I went to the police station
15 to press charges on them, and the -- I didn't
16 know their address or none of that.  So the
17 police said it probably will be best if you go
18 through corporate.
19     Q.   And that would have been -- would that
20 have been on the 30th or 31st of January -- I
21 mean of December?
22     A.   Yes.  December, yes, ma'am.
23     Q.   Okay.  And the second time you called
24 you spoke with Cynthia?
25     A.   The second time I called -- I don't

Page 157

1  know who I spoke to the second time.  I really
2  can't remember -- I don't -- I think it was
3  Cindy, Cynthia, or something, but I only spoke
4  with Anita once.  Cindy or Cynthia or something
5  like that, her name.
6      Q.   Okay.  And what did you tell Cynthia?
7  You said you don't remember?
8      A.   I told -- then, well, about them
9  trying to jump on me.
10     Q.   And what did Cynthia say?
11     A.   I think that's when she told me that
12 the guy was out of town or something and he
13 would call when -- but he ended up calling,
14 though, and he said that he would get back in
15 touch with me after the holidays.  But he
16 didn't.  And I was calling, but they never
17 called me.  And when I called I couldn't get in
18 touch with anyone anymore.
19     Q.   And did he try to call you before or
20 after the altercation at Sonic?
21     A.   It was after the altercation.  He said
22 he was -- he left a message with my husband that
23 he was just calling to let me know that he was
24 going out of town and that he would contact me
25 after the holidays.  He was just letting me know

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 158..161

Page 158

1    that.
2        Q.   So that would have been after the 30th
3    or 31st of December?
4        A.   I want to say it was -- it had -- it
5    wasn't the 1st of January, I know.  So it had to
6    be the 30th or 31st after the -- after the
7    incident -- I'm not really sure, but I know it
8    was not in -- January hadn't came yet.  Hold on.
9    Let me make sure.
10       I don't remember.  All I know, he
11   called.  My husband had the phone.  And he told
12   me the guy said that he would call me back after
13   he got back in town or something.  And I tried
14   calling them and I could never get in touch with
15   ^ with "anyone"?  16:14 him anymore.
16       Q.   Okay.  Between December 22nd and
17   December -- what was the last -- let me ask you
18   this:  What was the last day that you worked at
19   Sonic?  Was it the 30th of December?
20       A.   I want to say it was the 30th.  I
21   think it was the 30th.
22       Q.   So I guess between December 22nd and
23   December 30th, did you work at all between that
24   time period?
25       A.   Yes, I did.  I worked -- the 23rd I

Page 159

1    worked with Tay.  I mean -- not Tay.  I'm sorry.
2    It was Alesha.  And she was telling Barbara how
3    she tossed and turned that night, and she
4    couldn't sleep because she was so D mad.  And
5    she said that she waste barbecue sauce all over
6    her.  So she was like, Gah, I was just so mad.
7    I was just P'd off, she said.  She didn't say P,
8    but, you know -- yeah.
9        Q.   She was telling who that.
10       A.   Barbara.
11       Q.   And did you overhear her say that or
12   did Barbara tell you she said that?
13       A.   No, I heard her.
14       Q.   And did she tell you why she was mad
15   or tell Barbara why she was mad?
16       A.   No.  She -- they had already been
17   talking.  But she came, I guess, so I could
18   hear, you know.  But I just ignored her, you
19   know, and kept working.
20       Q.   So you thought she was talking about
21   you?
22       A.   I know she was talking about me
23   because she said that -- well, she -- her exact
24   words was, She didn't have to tell on him.  And
25   she -- she said I didn't -- she didn't have to

Page 160

1    tell on him.  And when she said it, she was
2    rolling her eyes at me that night.
3        I didn't care about none of that.  I
4    didn't care.  I just did -- I was there to work.
5    I -- that didn't bother me at all.
6        Q.   Okay.  And you said that that was the
7    23rd of December?
8        A.   Yes, ma'am.
9        Q.   Okay.  And did you work any other days
10   between the 22nd and the 30th?
11       A.   I worked again, and one night the -- I
12   want to say two more times because one night the
13   lights went off at work, and she sent me home.
14   But, you know, the likes kept going off and on,
15   so that was understandable.
16       Q.   And -- okay.
17       A.   That was understandable.  I just
18   didn't understand why people that was there
19   after -- like, why I had to leave, you know, and
20   didn't nobody else, you know.  She just told --
21   she told Barbara to tell me to go home.
22       Q.   Now --
23       A.   She never said anything directly to
24   me.  Like, she stopped talking to me, like.
25       Q.   And you worked the 29th; is that

Page 161

1    correct?
2        A.   Correct.  And the 20 -- one night we
3    had -- one day we had something at work.  Yeah,
4    it was the 20 -- I think it was the 28th or 29th
5    when those lights went off at work.
6        Q.   Now, on the 29th when you worked, you
7    commented in your notes that it was a good
8    night, that you had a good day.
9        A.   Yes.
10       Q.   And then the 30th when you came in,
11   you said that you -- that was the day when you
12   got in the altercation with the other employees;
13   isn't that right?
14       A.   Correct.
15       Q.   Okay.  And I guess I'm going to kind
16   of take it in a -- a different order, but you --
17   I guess at the end of it, you ended up coming
18   into the store and telling the employees that
19   they didn't know you and didn't know what you
20   would do and threw your purse down; isn't that
21   correct?
22       A.   That's not correct.
23       Q.   You didn't tell them that they didn't
24   know you and --
25       A.   No.

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021                Pages 162..165

Page 162

1     Q.    -- what you would do?
2     A.    They was trying to jump on me.  I
3  don't know for sure, but I think that Alesha
4  intentionally put me to work for them -- with
5  them.  They was trying to jump on me that night.
6  His daughter, Alexius Ellis, and Tay was trying
7  to jump on me that night.
8     Q.    What do you mean by they were trying
9  to jump on you?
10     A.    They was trying to fight me.  His
11  daughter had her hands drew back.  Tay was
12  walking up, you know; and they was cussing at
13  me, calling me all kind of names.  That's why I
14  called the police because I was terrified, you
15  know.  I called the police hoping that it could
16  -- they could deescalate the situation.  But
17  they didn't know I called the police.  They was
18  trying to fight me.
19     Q.    Okay.  So what time did you come to
20  work that day?
21     A.    I came to work at 5:00.
22     Q.    At 5:00 o'clock?  And when did the
23  altercation happen?
24     A.    I'm not sure.  But ever since I had
25  walked through the door, like, they were saying

Page 163

1  stuff; but it didn't bother me, like, I didn't
2  care.  You know, I know they was trying to make
3  me mad.  But, you know, I was there to work.  I
4  was there for my children, you know, not for
5  them.  So I just blocked them out.
6           And after ignoring them for so long,
7  Tay, instead of talking to other people, you
8  know -- well, she would -- she said something
9  directly to me, you know.  And I told her that I
10  had just did five wraps, and it was no way --
11  it's no way in that time frame, you, me, nobody,
12  even -- not even her, could have that ready
13  within the time frame she wanted.
14     Q.    What was -- you say that Tay was
15  talking to you.  She was talking to you about
16  the food preparation?
17     A.    She said -- Tay never yelled at me
18  before.  And she said, why my chili cheese coney
19  taking so -- I mean, she was screaming at me,
20  like, yelling.
21     Q.    What did she say?
22     A.    Why is my chili cheese coney dog -- my
23  chili cheese coney ain't up here and my fries --
24  or either tater tots?  And she was screaming,
25  like -- she never did that before.  We got along

Page 164

1  so good.
2     Q.    Okay.  And then you said earlier that
3  they were saying stuff.  Who is "they"?
4     A.    That was Tay and his daughter.
5     Q.    And what were they saying?
6     A.    When I first walked through the
7  door -- it didn't bother me -- Tay said, Eric
8  made this coffee.  And she was looking at me.  I
9  just went on, washed my hands and --
10     Q.    What did she say?
11     A.    Eric made this coffee, because usually
12  we'll drink coffee at work.  And she say, Eric
13  made this coffee.  And I just went on to the
14  back and didn't say nothing, washed my hands and
15  start working.
16           And then she was like -- she went
17  outside and talked to Alesha for a minute.  And
18  his daughter came over there and was like, Hey,
19  Barbara, how you doing?  And she was like, I'm
20  doing good.  I just kept working, kept working.
21  And I was looking there, I noticed there was a
22  whole bunch of dishes in the sink.  It wasn't --
23  it never been that many dishes, but I like
24  washing dishes.  I didn't mind.  So -- because
25  that night it was my night to wash dishes.

Page 165

1           So then when Tay finally did -- after
2  Tay followed Alesha to her car, they talked for
3  a minute.  And when Tay came back in, she came
4  back over there and she was like Hey, Barbara,
5  how you doing -- like that right there.  She --
6  and Barbara was like, I'm doing good.
7           She was like, Come here, Barbara.  Let
8  me tell you about Bohays [phonetic].  And that's
9  my stepdad.  Well, my mama used to go with him.
10  She got -- my little sister and brother, that's
11  they daddy and she know that me and Tay -- she
12  know that.  Me and Tay was -- she know that.
13           And she was like, He took my phone
14  with his old -- she was like, I -- I should have
15  knocked him in the head with his ugly -- you
16  know.  And I just ignored her.
17     Q.    And who is that?
18     A.    My --
19     Q.    What's his name?
20     A.    They call him Bohays.
21     Q.    Okay.
22     A.    But his name is James Eckford.
23     Q.    And that was who saying that?
24     A.    Tay.
25     Q.    Okay.  And she was saying that to

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021    Pages 166..169

**Page 166**

1  Barbara?
2      A.   Yes.
3      Q.   Okay.  Okay.  But you had said that
4  they were -- so that's what they were saying,
5  the stuff they were saying?
6      A.   Oh, no.  What they were saying to me
7  was -- well, they was throwing it towards me:
8  You better stop before you get to her -- because
9  the girl was yelling "motz," you know, because I
10  would have to get the stuff out the freezer.
11  And she was screaming at the other girl --
12  Haley.  That's the other girl I couldn't think
13  of her name.  Her name is Haley.  She was
14  screaming loud.  And they was laughing because,
15  you know, I had to get the stuff.  When she was
16  screaming, I was getting the stuff.
17      Q.   What were you -- so she was screaming
18  to get something out of the freezer?
19      A.   Yeah.  She would say "motz."  And she
20  was screaming at the top of her lungs for me --
21      Q.   She was saying what?
22      A.   Motz.  They say "motz" for mozzarella.
23  They say "motz."
24      Q.   Okay.
25      A.   Whatever I needed, she was screaming.

**Page 167**

1  I was -- I just kept working, kept working.  And
2  then Alexius Ellis said you better stop before
3  you get charges pressed on you and reported on.
4  And Tay bust out laughing, and she -- she was
5  screaming laughing, like.
6      Q.   Where were you and where were they at
7  this point?
8      A.   They was at the front and I was at the
9  back fixing the food.  But I just kept working,
10  you know.
11      Q.   And you could hear them at the front?
12  Were they in the building or out --
13      A.   It's small.
14      Q.   -- out of the --
15      A.   No.
16      Q.   -- outside?
17      A.   In the front -- the front is like,
18  okay, the end of this table to maybe where we
19  are now.
20      Q.   Okay.  Any other comments?
21      A.   When things got heated, I asked her
22  could I take a break.
23      Q.   And who did you ask if you could take
24  a break?
25      A.   Tay, because they started -- when --

**Page 168**

1  after the coney incident, they started yelling
2  at me and stuff.  I don't know exactly what they
3  were saying.  They were saying a lot.  But I
4  know I was terrified enough to go and call the
5  police.
6          I asked her could I take a break.  She
7  was like, No.  I got my purse anyway because I
8  was scared.  I was afraid.  I got my purse.  I
9  went outside and called the police and asked --
10  and I told them I wanted them -- could they
11  deescalate the situation.
12      Q.   So you asked Tay -- you asked Tay if
13  you could take a break?
14      A.   Yes.
15      Q.   Were there orders pending and food
16  that needed to be cooked at that time?
17      A.   No.  Not -- orders was coming but they
18  wasn't, like, you know, back to back.
19      Q.   How many cooks were in the kitchen at
20  that time?
21      A.   It was me and Barbara in the kitchen.
22      Q.   And what time of the day was this?
23      A.   I got there at 5:00 o'clock.  And I
24  know when I went to the clock to clock out, it
25  was 5:55.

**Page 169**

1      Q.   So --
2      A.   I went -- I didn't clock out because
3  they kept walking up on me -- but I'll get to
4  that point.  After I called the police, I came
5  back in and --
6      Q.   So hold on.  Let me back up just for a
7  minute.  So you asked Tay if you could take a
8  break and she told you no.
9      A.   Yes, she did.
10      Q.   But then you took a break anyway.
11      A.   I did.
12      Q.   Okay.  And you did not clock out?
13      A.   No.  I didn't take a break.  I just
14  walked outside and made a call.  I didn't take a
15  break.  I walked outside and made a call.
16      Q.   Okay.
17      A.   And I was telling the police what
18  happened.
19      Q.   And was there any other comments or
20  anything said before that you haven't told me
21  about before you took a break?
22      A.   No.  Tay -- when I asked her could I
23  take a break, I went outside, called the police.
24          When I came back inside, Alexius Ellis
25  say, Why you call me a B?  And I said, I didn't

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 170..173

Page 170

1  call you no B.  And I said -- that's when I said
2  something.  I said, Y'all been picking at me all
3  night -- because they was talking at me -- when
4  I asked to take a break, she was like, No, you
5  can't take no -- and she was cussing and, you
6  know, they -- they was.  They was coming -- I
7  was scared.  I was.
8          So instead of them jumping on me, I
9  called the police.  And I knew I called the
10  police; they didn't know.  So I tried to record
11  them to have proof to show the police.  And when
12  Tay seen that I was trying to record them, she
13  was like, Oh, no -- because his daughter say,
14  You could record later.  And Tay say, Oh, no,
15  not on my mother -- you know.  You're going to
16  have to get your -- on with this -- you know,
17  get out of my clock -- clock out.  That's what
18  she told me, to clock out.  She said that I
19  couldn't record her but I didn't know that the
20  phone wasn't recording.
21     Q.    So when Alexius said -- asked you if
22  you called her a bitch, why did she ask you
23  that?  Had you talked to her and made comments
24  about her?
25     A.    No, ma'am.  I walked in -- after I got

Page 171

1  off the phone with the police, by the time I
2  walked in, she said, My question for you is why
3  you call me a bitch?  And I was like, I didn't
4  call a -- what are you talking about?
5          And I said, Y'all been -- all night
6  y'all been trying to get to me.  Like, I didn't
7  tell a story on Eric.  He really did that.  I
8  was trying to tell them that I wasn't lying on
9  him.  But they kept on trying to jump on me.
10  And I was there for my kids.  I wasn't there to
11  fight.  I wasn't trying to fight.
12     Q.    Now, when you went outside, I guess
13  the first time, were you yelling on your phone
14  and yelling profanity?
15     A.    No.  No.  I didn't, no.  I called the
16  police.  I told -- I was on the phone with the
17  police.  They could verify that I was not
18  cursing.  Just go back and listen to the call.
19  After I called the police, I called my husband.
20  My son answered and said he was going to wake
21  him up, you know.  So my son -- I said, Tell him
22  that the police is on they -- fixing to come up
23  here, you know, because they're trying to jump
24  on me.
25     Q.    And why did you think they were trying

Page 172

1  to jump on you?
2     A.    They was walking towards me and
3  calling me names and stuff, talking about
4  they'll -- I'll die -- got -- she got to write
5  -- I'll F her up, and this and that.  When I
6  came back in, his daughter drew back, fixing to
7  hit me, Tay walking up on me and stuff.
8     Q.    So let me -- I just want to make sure
9  I understand the timeline.  So before you went
10  and called the police there -- Tay yelled at you
11  about --
12     A.    She called me a B.
13     Q.    -- getting the cheese coney, where's
14  my chili --
15     A.    Yeah, she --
16     Q.    -- cheese coney.
17     A.    Yes.
18     Q.    And then came in and said something to
19  Barbara along the lines of, how are you doing?
20     A.    No.  She said something how you doing
21  first to Barbara.  How you doing, to Barbara
22  and --
23     Q.    And did you --
24     A.    And she was like, Girl, let me tell
25  you about Bo -- that's when she said that about

Page 173

1  let me tell you about Bohays.  The coney part
2  got after she got to talking, and she -- I guess
3  -- it's like I wasn't -- you know, I kept
4  working.  I wasn't saying nothing.  Everything
5  they said, calling me Bs, all that, I kept
6  working through it.
7     Q.    And then did they call you -- you said
8  that they called you a bitch?
9     A.    Yes, ma'am.
10     Q.    Who called you a bitch?
11     A.    Tay and Alexius Ellis both was calling
12  me that.
13     Q.    So when did they call you a bitch?
14  Was it before you called --
15     A.    Alexius --
16     Q.    -- the police or after you called the
17  police?
18     A.    Oh, before I called the police, it was
19  Alexius Ellis.  Tay was sitting up there.  She
20  was watching, you know -- no, you can't take no
21  movie.  She was cursing and stuff.  So --
22     Q.    Okay.  Stop just for a moment --
23     A.    Okay.
24     Q.    -- because I just want to make sure I
25  understand the timeline.

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021
**Pages 174..177**

**Page 174**

1  A.  Okay.
2  Q.  You said before you called the police
3  Alexius called you a bitch?
4  A.  She was -- they -- she was calling --
5  she was like, That -- it'll be one less cook if
6  I can help it.  That B will be gone.
7  Q.  And when did she say that?
8  A.  She said that before I went outside
9  and called the police.
10  Q.  And what was she -- what was she
11  referring to or talking about?
12  A.  Because they asked, How many cooks in
13  the kitchen.  Tay said -- say, How many cooks in
14  the kitchen?  And she said, It going to be one
15  less cook if I can help it.  And Tay busted out
16  laughing.  It's like it was planned or
17  something, to me.
18  Q.  Did anyone else say anything directly
19  about you or that you thought was directly about
20  you --
21  A.  When I --
22  Q.  -- before you called the police?
23  A.  Before I called the police?  Tay had
24  -- I don't remember -- I really don't remember
25  exactly, but I know it was badder than how I'm

**Page 175**

1  saying it.  It was -- I was terrified enough to
2  call the police to try to deescalate the
3  situation.  That's all I know.
4  Q.  Now, when you stepped outside you
5  called your husband as well?
6  A.  Yes.
7  Q.  And your husband came up to the Sonic?
8  A.  He got there before the police got
9  there.  He -- when she drew back to hit me, he
10  jumped in the middle and, you know, he did like
11  this (indicating), you know.  Tried to block her
12  lick, like.  He was facing me, but he just put
13  his arms up so she wouldn't hit me because Tay
14  was coming on this side and Alexius drew back
15  fixing to hit me.
16  Q.  And where were you when Alexius drew
17  back?  Were you inside the restaurant or outside
18  the restaurant?
19  A.  All this happened in the inside.  I
20  was going to the clock because Tay told me to
21  clock out because I was trying to record.  She
22  told me not on her watch or whatever, to clock
23  the F out or whatever.  And so I was headed
24  toward the clock to clock out, but they kept
25  walking on me like they was trying to fight me

**Page 176**

1  while my back was turned.
2  Q.  So your back was turned, and you say
3  that someone drew a hand to fight you?
4  A.  Yes.  Alexius Ellis drew back.  She
5  was fixing to hit me.
6  Q.  How did -- if your back was turned,
7  how did you know she was fixing to hit you?
8  A.  No, I was turned to the clock to --
9  fixing to clock out, and I was -- I was telling
10  them, I was like, I didn't -- because I didn't
11  want to -- I just came -- I was like, I didn't
12  lie on him.  He really did do that.  And so
13  that's when she drew her fist up, fixing to hit
14  me.
15  Q.  Did she come into contact with you?
16  A.  She didn't hit me, no.
17  Q.  Now, did you leave the building at
18  that point?
19  A.  When she told -- when they told me to
20  leave, I went and sat in my husband -- well, I
21  was headed to the car.  Tay followed me outside
22  and called me a dysfunctional B.  And I told
23  her, It takes a dysfunctional B to know a
24  dysfunctional B.  And I -- I was in my husband's
25  car then.

**Page 177**

1  Q.  When did the police come on the scene?
2  A.  Like, a few minutes after that.  I sat
3  in the car -- I'd say about two minutes after
4  that the police pulled up, and they told me that
5  -- I was sitting in the car; and when I seen
6  them pull up, I got out the car and went and
7  told them, I was the one that called y'all.  And
8  Chaz was the one that came.  He already knew.
9  And he was like even though that happened, by
10  you were on their property and they say leave,
11  you've got to leave.  And I was like, I was just
12  waiting for y'all to come.  That's all.  I was
13  in the car just waiting on y'all to come.
14  Q.  And so he told you that you needed to
15  leave at that point?
16  A.  He told me by they told me to leave
17  the premises, by Tay and them told me -- by Tay
18  told me to leave the premises, I had to leave.
19  And I told him, No problem.  I was going to -- I
20  was waiting on you-all to come.
21  I was sitting in my husband's car
22  waiting on them to arrive.
23  Q.  And so when your husband came on the
24  scene, did your husband have to restrain you
25  from physically attacking the other employees?

## SHEARSON HAUGHTON vs JA-CO FOODS, INC.
### Shearson Gabrielle Haughton Sims on 11/15/2021
**Pages 178..181**

Page 178

1  A.  No, ma'am.

2  Q.  So he didn't have to hold you back?

3  A.  No, ma'am.  I wasn't -- I do remember
4  that -- I was terrified, but I was not going to
5  let them just jump on me.  I would defend my --
6  I was going to defend myself, but I wasn't
7  trying to fight at the same time.  I knew the
8  police was coming.  They didn't.  I wasn't -- I
9  wasn't trying to fight.  I....

10  Q.  And did you -- did you tell them that
11  they did not know you, that they didn't know
12  what you could do?

13  A.  No.  Huh-uh.  I don't recall that.
14  I'm sure I would remember that.  I don't
15  remember that.

16  Q.  Do you remember at any point throwing
17  your purse down?

18  A.  I dropped my purse when she drew back
19  fixing to hit me because I had my purse in my
20  hand.  So yeah, I did drop my purse when she
21  drew back fixing to hit me.

22  Q.  And did you -- did you lunge towards
23  them like you were going to hit them?

24  A.  No.  When she drew back at me, my
25  husband, we don't stay that far from there, just

Page 179

1  a few minutes.  So my husband came when she drew
2  back fixing to hit me.

3  Q.  And did you -- did you try to fight
4  them?

5  A.  I -- I would not try to -- no, ma'am.
6  I wasn't trying to fight them.  But I wasn't
7  going to just let them jump on me either.  I was
8  going to defend myself, but I didn't start
9  nothing.  And I wasn't trying to fight, you know
10  -- I was trying to avoid all that.

11  Q.  Now, after -- after Tay asked you to
12  leave and go home, did you leave the store?

13  A.  I left the store.  I went to the car,
14  my husband's car.  She followed me outside,
15  called me a dysfunctional bitch, and --

16  Q.  And so did you leave the store and
17  then come back in?

18  A.  No, I didn't go back in at all.  I sat
19  in my husband's car.  And when the police
20  arrived, I got out the car and went and talked
21  to the police.  One went inside and one talked
22  to me outside.

23  Q.  If customers said that you were
24  yelling and ranting and raving and using
25  profanity, like, the F word and the B word and

Page 180

1  outside the store within the customers' hearing,
2  would you dispute that?

3  A.  I would dispute that because I was on
4  the phone with the police.  Why would I -- you
5  know, I was on the phone with the police.  And
6  when I called my son I don't talk -- my husband
7  didn't answer.  I talked to my son.  I don't
8  talk around my son like -- no.

9  After I got off the phone I went back
10  inside.  I don't -- I -- I don't even remember
11  -- I remember saying how they -- how they act
12  toward me, like, talking to the police, but no.

13  Q.  If people reported that you were
14  pacing back and forth and yelling profanity,
15  according to you, you did not do that.

16  A.  I'm sure I would -- I do not remember
17  doing that.  I'm sure I would remember doing
18  that.  I don't remember doing that.

19  Q.  And did you press charges against
20  anyone that night?

21  A.  I went to press charges on them, but
22  the dispatch told me by I didn't know their
23  address, that it was best that I go through
24  corporate.

25  Q.  And you said that you called

Page 181

1  corporate?

2  A.  Yes.

3  Q.  And what did you -- that was Cynthia
4  that you spoke with?

5  A.  It was -- I think that was Cynthia,
6  yeah.  It wasn't Anita.  Yeah, I think it was
7  Cynthia.  Cindy or Cynthia.

8  Q.  Now, when you spoke with Jordan after
9  the incident on the 22nd, did Jordan not tell
10  you that she didn't know or didn't see what
11  happened?

12  A.  No.  She never said that because
13  that's not true.  She saw it.  She said she saw
14  it.  That's not true.  She never said that.

15  Q.  And did you ever tell Jordan that you
16  wanted her to be a witness for you, and she told
17  you that she didn't see it, she couldn't tell
18  you -- she couldn't testify for you?

19  A.  That's not true.  Ma'am, God know that
20  is not true at all.  That's not true.

21  Q.  So did you ever ask Jordan if she
22  would be a witness for you?

23  A.  When I made it to work after the
24  incident, I asked her did she tell her mama.  I
25  was, like, You need to talk to your mother.  And

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021                    Pages 182..185

Page 182

1  she said, I don't know -- I don't know how to
2  tell her. And she was also, like, afraid of
3  losing her job.
4        Q. Jordan was still in school; isn't that
5  right?
6        A. Correct.
7        Q. So she was, like, a 16-year-old; isn't
8  that right?
9        A. She had just turned 17, I think. I
10 know she's -- yeah, at that time she was, like
11 -- I think she was -- she had just turned 17.
12       Q. And did she tell you that she couldn't
13 testify for you?
14       A. No, ma'am, she didn't. She never said
15 that.
16       Q. But you asked her to testify for you;
17 isn't that right?
18       A. I never said "testify." I told her --
19 the -- the only time we had that conversation is
20 when she wrote down her name to find her on
21 Facebook because she said she didn't have no
22 phone. I told her that I might need her as a
23 witness through the police, you know. That's
24 when she told me, My name is not Jordan on
25 Facebook. It's J Marie. That's when -- that's

Page 183

1  how I knew her name.
2             But after that, the next -- I only
3  worked with her one time after that, and I asked
4  her -- I waited till wasn't nobody around. I
5  was back there washing my hands because Alesha
6  kept looking, and I didn't really want Alesha to
7  know it was her. But she -- seemed like she was
8  shaky that day or something. I don't know.
9             But I told her, I was like, Did you
10 tell your mama? I asked her, I said, Did you
11 tell your mama? And she was like, No, I don't
12 know how to tell her. And I said, You need to,
13 you know, talk to her and just sit her down and
14 tell her, you know. And -- I don't know. But
15 yeah.
16             I contacted Jordan mama because I'm
17 like, if she can't talk to her, maybe I could,
18 you know, talk to her for her because the whole
19 time I'm thinking in mind -- you know, I'm
20 keeping in mind that she's a child, and I have
21 girls myself. So I would want somebody to do
22 the same for me, you know, for my girls.
23       Q. When did you contact Jordan's mom?
24       A. After I tried to contact her, she
25 didn't respond. I don't know the exact date

Page 184

1  that I -- it's in the --
2        Q. Was it -- was before or after you were
3  terminated from Sonic?
4        A. It was after I was terminated because
5  I was trying to give her time to contact her
6  mama -- you know, to tell her mama.
7        Q. And how did you contact her mom?
8        A. Through Facebook.
9        Q. And what did you tell her mom?
10       A. That -- I asked her to call me ASAP,
11 and I gave my number. But I never got a
12 response.
13       Q. If Jordan told people that you asked
14 her to falsely testify that Eric Ellis came up
15 behind you and humped you in the kitchen, would
16 you have any reason to dispute --
17       A. Yes, ma'am.
18       Q. -- that she did not view that or see
19 it?
20       A. Yes, ma'am, I would dispute that
21 because -- well, all I know she told me she saw
22 it. I never forced her to say anything. I
23 wouldn't do nothing like that, like -- like, at
24 the end of the day, like I said, God don't like
25 ugly. And I would never do somebody like that

Page 185

1  or make something like that up against somebody
2  because I have a brother, I have an uncle. I
3  wouldn't want nobody to do that to them.
4             Jordan told me that she saw what he
5  did, and not only that, that he did the same
6  thing to her. I know, she know, and God know.
7  She said that.
8        Q. Did you try to contact anyone else and
9  get them to testify for you?
10       A. I did try to contact Barbara, and I
11 just told her to call me or something. But she
12 -- I didn't get a response from her.
13       Q. And how did you contact Barbara?
14       A. I didn't get a response from her.
15       Q. How did you try to contact her?
16       A. Through Facebook. I'm sorry.
17       Q. Did you try to contact anyone else?
18       A. I contact the witness, like -- the
19 witnesses in the statement on the recording.
20 The people on the recording, I contacted them.
21       Q. Okay. So what recordings did you --
22 did you make?
23       A. I recorded Paris. She told how --
24 that's how I -- I didn't understand why Tay was
25 that way towards me, and she revealed to me that

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
**Shearson Gabrielle Haughton Sims on 11/15/2021**                    **Pages 186..189**

Page 186

1   Tay and Eric had something going on.
2       Q.   What did they have going on?
3       A.   I don't know.  She said that they
4   would go to the back, and they knew what they
5   was doing.  I seen them go to the back, but it
6   was boxes, you know.  They was in the freezer.
7   I don't know what they was doing.  I'm not going
8   to speculate on that.  But I just know that's
9   what she said.
10      Q.   What is Paris's last name?
11      A.   Purnell or something.  Purnell.
12      Q.   And did you know Paris before you
13  worked at Sonic?
14      A.   The first time I worked at Sonic, she
15  worked there.
16      Q.   Did she work there while you worked
17  there the second time?
18      A.   No, not the second time.  But she told
19  me that she had been going off and on.  She had
20  been going there, working, like, since the --
21  since the time we worked together.
22      Q.   And why did you record the
23  conversation with her?
24      A.   She didn't know.  Nobody knew I was
25  recording them.  I recorded it to try to have

Page 187

1   some proof, you know, to see -- so people would
2   know how he is.
3       Q.   Who else did you record?
4       A.   Brittany.  I don't know her last name.
5   I worked with her at Sonic the first time.
6       Q.   Did Brittany work with you the second
7   time?
8       A.   No.
9       Q.   And what did Brittany tell you?
10      A.   She told me that Eric told her that
11  Alesha wanted him and Tay wanted him too.
12      Q.   And did Brittany tell you why Eric
13  told her that?
14      A.   No.  She didn't say.
15      Q.   Okay.  Who else did you record?
16      A.   Tyler.  Tyler Blanchard.
17      Q.   What's Tyler's last name?
18      A.   Blanchard.
19      Q.   And why did you record Tyler?
20      A.   Because my brother came and told me
21  that Tyler said he was there and he seen them do
22  me wrong or whatever.
23      Q.   Was Tyler an employee at Sonic?
24      A.   No.  I didn't even know he was sitting
25  in his car.  He was a customer.

Page 188

1       Q.   Have you contacted anyone else to be a
2   witness or try to record any statements?
3       A.   Not that I -- not that I can remember.
4   I can't remember.
5       Q.   Now, the charges that you filed
6   against Eric Ellis were dismissed; isn't that
7   correct?
8       A.   I actually called the police to get an
9   update of when we go to court.  I never went to
10  court.  I didn't even know he had already been
11  to court and the judge threw it out because the
12  police wrote on there stalking, and the judge --
13  it was the wrong thing.  It wasn't supposed to
14  be stalking.  It was supposed to been
15  harassment.  They said they wasn't -- they
16  couldn't put sexual harassment, so they just put
17  harassment, and -- they told me they was going
18  to just put harassment.  But come to find out
19  the police put stalking on the paper, and it was
20  threw out.
21      Q.   So by the time you contacted the
22  police, it was after the time that it had been
23  dismissed; is that right?
24      A.   Yes.  I found out afterwards.  And I
25  called the court and -- the lady at the

Page 189

1   courthouse and found out that the judge threw it
2   out, and not only that, that the judge that
3   threw it out was no longer there or something.
4       Q.   Pardon?
5       A.   The judge who threw it out was no
6   longer there, because I was trying to explain
7   how I never got a court date or anything.  They
8   just threw it out because -- something about the
9   police put stalking, and it was supposed to been
10  harassment.
11      Q.   And if the court records indicate that
12  it was dismissed on February 19th of 2020 --
13      A.   Uh-huh.
14      Q.   -- then you would have contacted them
15  sometime after that date?
16      A.   I contacted the police before that
17  date, and it was Officer Ealy, and he told me
18  that I would -- someone would get in touch with
19  me.  And then I found out -- after February, I
20  found out that they had threw it out.  And I'm
21  like, I never even got a court date.
22      Q.   Did you try to refile charges against
23  him?
24      A.   I didn't know I could.
25      Q.   Did you ask to?

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021                    Pages 190..193

Page 190

1    A.   No, ma'am, I didn't, because I didn't
2  know I could.
3    Q.   Why did you wait until March to file
4  your charge of discrimination?
5    A.   No, I had filed it with the EEOC.  I
6  had already filed it with the EEOC, like, on the
7  23rd.  They didn't contact me -- they didn't
8  start just getting to my case until, like,
9  March.  I had been filed it.
10       MS. TAYLOR:  Let's go ahead and mark
11    this one as the next one.
12
13              - - - - -
14       (Exhibit Number 12 marked.)
15  BY MS. TAYLOR:
16    Q.   So is this the charge of
17  discrimination that you filed?
18    A.   Yes.
19    Q.   At the time that you filed your charge
20  of discrimination, had you already talked to an
21  attorney about your case?
22    A.   Charge of discrimination.  I can't
23  remember.  I really can't remember.
24    Q.   Did you review your charge of
25  discrimination before you signed it?

Page 191

1    A.   Yes, I called myself reviewing it.
2    Q.   And you marked in here that the
3  earliest date that discrimination took place was
4  on the 22nd of December; isn't that right?
5    A.   Yes.  Discrimination as in they -- the
6  options they had on my discrimination fell under
7  the sexual harassment or something, how it went.
8    Q.   Okay.  So you meant the earliest date
9  the sexual harassment began was December 22nd;
10  is that right?
11    A.   Correct.
12    Q.   And the latest was the 30th of
13  December?
14    A.   Yes.  When the discrimination took
15  place.
16    Q.   And you indicate in your charge that
17  you were sexually harassed and terminated on
18  December 30th; isn't that right?
19    A.   Correct.
20    Q.   And then as far as the details of your
21  harassment, you talk about the incident with
22  Eric Ellis on December 22nd; isn't that correct?
23    A.   Uh-huh.  Yes.
24    Q.   And you never talked about Eric Ellis
25  saying anything inappropriate to you before

Page 192

1  December 22nd; isn't that right?
2    A.   That's correct.  I didn't mention
3  that.  It was, like, that night, that was way
4  too far, like....
5    Q.   You don't -- you didn't mention in
6  your charge of discrimination that he touched
7  your hand; isn't that correct?
8    A.   Correct.  I didn't mention that.
9  That's correct.  I didn't mention that.  But it
10  did happen.  He did do it.  It's just that night
11  he went too far.
12    Q.   We'll go ahead and mark this as the
13  next exhibit.  It's the Complaint that you
14  filed.  This will be Exhibit 13.
15
16              - - - - -
17       (Exhibit Number 13 marked.)
18  BY MS. TAYLOR:
19    Q.   Actually, this is the First Amended
20  Complaint.  The initial Complaint was filed on
21  November the 10th of 2020, and then this Amended
22  Complaint was filed on December 28th of 2020.
23       Now, did you review the Complaint
24  before it was filed?
25    A.   I think I did.  I....

Page 193

1    Q.   Do you remember reviewing the
2  Complaint before it was filed?
3    A.   Yes.  I think I -- I called myself
4  reviewing everything.  I may have skipped
5  something, I don't know, but I did review it.
6    Q.   And in the Complaint you didn't -- you
7  didn't mention that Mr. Ellis had allegedly said
8  anything inappropriate to you before
9  December 22nd; isn't that correct?
10    A.   I told --
11       MR. STUTZMAN:  Object to the form.
12  You can answer.  You can answer.
13    A.   In the complaint I told the lady on
14  the phone -- when I spoke to the lady from EEOC
15  on the phone I told her about -- it was -- I
16  mainly told her about that night, what occurred
17  that night, because all the other stuff, I felt
18  like I could ignore that.  But what he did that
19  night was too far.  It was -- it's traumatic,
20  like....
21    Q.   But you agree that you didn't include
22  that in your Complaint that you filed in federal
23  court; isn't that right?
24    A.   Correct.
25    Q.   And in your Complaint you alleged

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021                    Pages 194..197

Page 194

1   sexual harassment, retaliation, and then I guess
2   vicarious liability, claiming assault?
3       A.   Yes.
4       Q.   And what do you base your allegations
5   of assault on?
6            MR. STUTZMAN:  Object to the form.
7       You can answer if you understand it.
8       A.   Could you rephrase it?
9   BY MS. TAYLOR:
10      Q.   What are you claiming as the factual
11  basis for your assault allegation?
12      A.   What he did to me.  Assault for the
13  girls.  They tried to fight me.  Like,
14  regardless of what they -- they really tried to
15  fight me that night.
16      Q.   So you allege that both what you claim
17  Eric Ellis did on the 22nd and you claim that
18  employees trying to fight you on the 30th as
19  your basis for assault?
20      A.   That's -- could you rephrase what
21  you're asking?
22      Q.   I just want to understand -- you're
23  alleging that what Eric Ellis did on the 22nd
24  related to the trash can incident was assault?
25      A.   Yes.

Page 195

1       Q.   And you're also alleging --
2       A.   That was harassment.  That was sexual
3   assault to me.  And what they did was, like,
4   assault because even though they didn't hit me,
5   if my husband hadn't have stepped in, ain't no
6   telling what they would have did to me.
7            MR. STUTZMAN:  I'm going to object to
8       this line of questioning, just to the
9       extent that you're -- she has to offer a
10      legal opinion.  And she can testify as to
11      what -- and I think she has testified on
12      enough instances that would qualify for
13      assault under the law; but to the extent
14      that your question is asking for her to
15      offer a legal definition of assault and to
16      describe with particularity that, I'm going
17      to object to that.
18           MS. TAYLOR:  Okay.  So just to clarify
19      for the record, I was asking what the
20      factual basis is for the allegation of
21      assault.
22           MR. STUTZMAN:  And to the extent you
23      understand, you know, the legal definition
24      of assault.  You can plug in those facts.
25           MS. TAYLOR:  I think she's answered

Page 196

1   the question previously, so I think we're
2   okay.
3            MR. STUTZMAN:  Okay.
4   BY MS. TAYLOR:
5       Q.   Now, we talked earlier about Sonic's
6   policies and what is prohibited by Sonic's
7   policy.  You would agree that Sonic's policy
8   prohibits sexual harassment; isn't that correct?
9       A.   Correct.
10      Q.   And it also prohibits threatening or
11  violent conduct; isn't that correct?
12      A.   Yes.  Correct.
13      Q.   And so the actions undertaken or
14  allegedly undertaken by the girls on the 30th
15  would be a violation of Sonic's policy; isn't
16  that correct?
17      A.   Correct.
18      Q.   And then also the alleged actions that
19  Eric Ellis -- you claim that Eric Ellis took on
20  the 22nd of December would also be a violation
21  of Sonic's policy; isn't that correct?
22      A.   Correct.
23      Q.   Now, you allege that you have suffered
24  emotional distress, loss of sleep, depression,
25  weight and hair loss related to this claim.  If

Page 197

1   you could, just tell me what the basis of that
2   is.  Have you -- have you had hair loss?
3       A.   Yes, ma'am.
4       Q.   And have you sought any medical
5   treatment related to your hair loss?
6       A.   I can't afford medical treatment.  I
7   -- I know that as long -- me being stressed out,
8   like, it probably will continue; but it has
9   gotten better.  But I still have flashbacks and
10  stuff.  I still have times when I can't sleep at
11  night.
12      Q.   You still have where you can't sleep?
13      A.   When I can't sleep.
14      Q.   Have you ever had trouble sleeping
15  before?
16      A.   No, ma'am, not at all.
17      Q.   And you also claim that you have
18  depression.  What do you base that on?  Have you
19  ever sought treatment or medical treatment for
20  either sleeplessness or depression?
21      A.   No.  I couldn't afford it.  I didn't.
22  I was -- I really didn't even want to -- I will
23  go stay in the house.  I wouldn't go nowhere.  I
24  felt like -- I felt like I was worthless, like
25  didn't nobody even care.  And for a while I

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 198..201

Page 198

1  didn't even want my husband to touch me. When
2  he touched me I got pregnant.
3      Q.   Could you repeat that?
4      A.   For a while I didn't want my husband
5  touching me. When he did touch me, I got
6  pregnant with my son.
7      Q.   Has it impacted you in any other way?
8      A.   Well, I did gain my weight back.
9  After I had my baby, I gained my weight back.
10  Before -- like, at the store, I hate for a man
11  to stand behind me too close at the store in a
12  line or something. I don't like for men to
13  stand behind me. I dropped some keys and there
14  were some guys outside, and I did not want to
15  bend over to pick up my keys up. That was like,
16  toward the beginning, though.
17          It getting better with time, but I
18  still have the flashbacks of it, like it's a
19  traumatic experience I wouldn't wish on nobody.
20      Q.   Do you have any other continuing
21  problems related to your employment at Sonic?
22      A.   That's pretty much it. Me staying in
23  the house, like, I really -- I don't like to go
24  -- I'll go places; but at first it was very bad,
25  like, I'll just stay in the house.

Page 199

1          Christmas, I didn't even really spend
2  time with my family. Like, in the house I spent
3  time with my kids. And I would go in the
4  bathroom and cry because I didn't want them to
5  see me crying.
6          MR. STUTZMAN: Do you need a break?
7          THE WITNESS: I'm okay. I'm okay. My
8  head hurting. I just want to get it over
9  with.
10  BY MS. TAYLOR:
11      Q.   Is there anything --
12      A.   I wouldn't eat. I couldn't eat.
13      Q.   And how long were you not able to eat?
14      A.   To this day sometimes I'm still like
15  that, to this very day.
16      Q.   And how much do you weigh?
17      A.   Around 230.
18      Q.   How much did you weigh before -- or
19  while you worked at Sonic?
20      A.   I weighed around 2 -- I weighed around
21  248.
22      Q.   Is there anything that happened to you
23  while you worked at Sonic that you're
24  complaining about that we have not talked about
25  today?

Page 200

1      A.   I can't remember. I don't know. I --
2  I can't remember. I really can't remember.
3      Q.   Well, let's do this, because I have to
4  use the restroom, and this is the only
5  opportunity that I have to speak with you today.
6  So let's take a quick break so you can kind of
7  think about that and see if there's anything
8  else that you need to tell me, and then we can
9  continue.
10      A.   Okay.
11          (Brief recess.)
12  BY MS. TAYLOR:
13      Q.   Ms. Haughton, you've had an
14  opportunity to think about it?
15      A.   Yes. I can't -- I cannot think of
16  anything.
17      Q.   Okay. And you have gone to a doctor
18  since you left Sonic; isn't that correct?
19      A.   Correct.
20      Q.   And during your doctors' appointments,
21  you didn't complain about depression or hair
22  loss or weight loss or sleeplessness; isn't that
23  right?
24      A.   Well, they knew about my weight, you
25  know, because I wasn't really gaining weight and

Page 201

1  they told me not to worry about it because the
2  baby was still gaining weight. But I told them
3  I had trouble sleeping. They said -- but I
4  never mentioned anything about the case because
5  I didn't talk about it, you know. I didn't tell
6  people about it.
7      Q.   So in your medical records in July of
8  2020, which would have been six months after --
9      A.   Uh-huh.
10      Q.   -- this incident in December of 2019,
11  you didn't complain about any depression or hair
12  loss or sleeplessness or weight loss; isn't that
13  right?
14      A.   Well, the weight loss -- I didn't tell
15  them what was going on, no. And I was like, I'm
16  not gaining any weight, like I -- I can't eat,
17  you know. And they was like, Well, the baby --
18  I'm like, I eat but not like I should. You
19  know, when I was pregnant, I was eating, but not
20  like I should. I got my appetite back a little,
21  but it wasn't where it should have been, like it
22  used to be.
23          And no, I didn't -- I didn't say
24  anything about why, you know. I just told them
25  that I had trouble sleeping. And they was --

**SHEARSON HAUGHTON vs JA-CO FOODS, INC.**
Shearson Gabrielle Haughton Sims on 11/15/2021 — Pages 202..205

Page 202

1  the doctor said, Once the baby come you'll sleep
2  better. And I just didn't say nothing. So
3  that's correct. I didn't say nothing.
4      Q.   And you were asking if you were having
5  any trouble with depression, and you denied
6  depression; isn't that right?
7      A.   If I had trouble before?
8      Q.   You were asked at the time of your
9  visit in July of 2020 whether you had any
10  trouble with depression, and you denied that;
11  isn't that right?
12      A.   That's correct. That's embarrassing.
13  Like, I told them that I didn't. Like, I --
14  when I was -- I couldn't tell them about the
15  case. You get what I'm saying? I couldn't tell
16  them what was going on, why. So no, I didn't
17  tell them.
18      Q.   And why couldn't you tell them about
19  your case?
20      A.   I just didn't talk about it. I didn't
21  -- I didn't talk about it. I didn't tell them.
22  You're right, I didn't tell them. Maybe I
23  should have, but I didn't.
24      Q.   And your testimony under oath is that
25  you had sleeplessness, depression, and hair loss

Page 203

1  and weight loss due to a three-second incident
2  where your manager allegedly came up and humped
3  you from behind; is that correct?
4      A.   But you have to understand that my
5  husband the only man I know. You know, that's
6  the only man I know. So for another man to
7  violate you like that....
8      Q.   This is your book; isn't that right?
9      A.   Correct. Yes, it is.
10      Q.   Let's go ahead -- and I have a copy of
11  your book. Let's go ahead and put that as an
12  exhibit.
13
14              - - - - -
15          (Exhibit Number 14 marked.)
16  BY MS. TAYLOR:
17      Q.   Could you go to page 133 of your book?
18      A.   133.
19      Q.   133?
20      A.   Okay. Yes.
21      Q.   And could you begin reading on the
22  first paragraph of page 133?
23      A.   Hello. Lola answered, Who is this,
24  and where is Patricia? Rose, is this you?
25  Baby, I love you and miss you. I'm so sorry.

Page 204

1  Patricia is right here.
2      Q.   I think you're on page 132. If you
3  could go to 133.
4      A.   Oh, I'm sorry. Patricia -- then
5  Patricia said, We must follow through with our
6  plan and smile, said Lola. Lola walk in the
7  hall and got the broom and stuck the cell phone
8  under her shirt. She walked back into the room,
9  fully running like she had a gun. Patricia went
10  and got some Vaseline and gloves. Oh, no, this
11  some bull -- can I say the word?
12      Q.   (Nods head up and down.)
13      A.   -- bullshit, yelled Vernon. Patricia
14  put the gloves on her hand and put Vaseline on
15  top of her fingers on one of her hands. She
16  told Vernon, If you move, Lola will shoot you.
17  You determine if you live or -- or die.
18          But that's only entertainment
19  purposes. That was before I got --
20      Q.   Is that -- oh, if you could continue
21  on page 134, and then -- and then you can
22  provide --
23      A.   I'm sorry.
24      Q.   -- some context.
25      A.   Vernon was frowned up with his lips

Page 205

1  poked out. Vernon was already on his knees in
2  handcuffs, so Patricia told him to bend over.
3  He said, It's hard. Lola made the click sound
4  with her mouth. Vernon said, Oh, God, please
5  don't, and he started crying. Snot started
6  flowing out his nose. He looked a mess.
7          Continue on some more?
8      Q.   Yes, please.
9      A.   Vernon leaned forward, and Patricia
10  rubbed lots of Vaseline on his butthole. Then
11  she stepped to the side. Lola shoved the broom
12  so far up Vernon's ass he said, It hurt. Stop.
13  It -- don't kill me. Please stop.
14          Lola said, I don't give a damn. You
15  hurt my daughter, and I'm going to hurt your
16  ass.
17          Patricia started laughing, saying, Get
18  it -- your ass. Vernon said, Please stop.
19          Lola said, You had me bent out of my
20  mind, and now I got you bent on your ass.
21          Continue on some more?
22      Q.   No. That's -- and so your sworn
23  deposition testimony is -- is that you were so
24  traumatized by Eric Ellis, quote, humping you
25  from behind for three seconds at work that

**Page 206**

1  you've been depressed, sleepless, lost weight
2  and lost hair?
3      A.   That's my sworn testimony because I
4  really was -- and those around me know, because
5  this book was just entertainment.  You know,
6  after I wrote the first book, they loved it.
7  They wanted more.  They want -- I actually have
8  people that love my writing.  And I -- yes, I
9  wrote this book, but I left it alone.  I don't
10  deal with this anymore.  I haven't -- I don't
11  even deal with this.
12     Q.   Now, you would agree that at Sonic, if
13  an employee uses profanity and yells and
14  screaming -- screams in front of customers, that
15  Sonic would be able to terminate the employee
16  for engaging in disrespectful and rude and
17  obscene conduct in front of customers; isn't
18  that right?
19     A.   She cursed at me.  All the curses they
20  did, I -- she called me a dysfunctional bitch,
21  and I called her -- I told her it takes one to
22  know one.  It takes a dysfunctional bitch to
23  know a dysfunctional bitch.  But they had been
24  doing all that, calling me -- that's the only
25  time, like, I said something to her.

**Page 207**

1      I was outside.  You know, I was at the
2  car.  She followed me outside.  She was outside
3  too.  Why not terminate both of us?  Why not --
4  why just me?
5      Q.   So, Ms. Haughton, but you would agree
6  that Sonic could terminate an employee who yells
7  profanity in front of customers; isn't that
8  correct?
9      A.   Correct.
10     Q.   And it would be a violation of that
11  policy; isn't that right?
12     A.   That's correct.
13     MS. TAYLOR:  Okay.  Those are all the
14  questions I have.
15     MR. STUTZMAN:  I don't have any.
16     MS. TAYLOR:  Thank you, Ms. Haughton.
17     THE WITNESS:  Oh, you're welcome.
18     COURT REPORTER:  Do you want her to
19  read and sign?
20     MR. STUTZMAN:  Yes, please.
21     COURT REPORTER:  Do you need a copy?
22     MR. STUTZMAN:  Yeah.  You can send it
23  to Craig or myself either one.  That's
24  fine.
25     THE WITNESS:  Can I go ahead on and

**Page 208**

1  call or text my husband so he'll be --
2      MR. STUTZMAN:  Yeah, you're finished.
3      THE WITNESS:  Okay.
4      MS. TAYLOR:  You're fine.  You're
5  released as far as I'm concerned.
6      (Deposition concluded at 3:12 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 209**

1           C E R T I F I C A T E
2  STATE OF MISSISSIPPI }
3  COUNTY OF MONROE    }
4  DEPOSITION OF SHEARSON GABRIELLE HAUGHTON SIMS
5      I, Gena Mattison Glenn, CSR 1568, a
6  Notary Public within and for the aforesaid
7  county and state, duly commissioned and acting,
8  hereby certify that the foregoing proceedings
9  were taken before me at the time and place set
10  forth above; that the statements were written by
11  me in machine shorthand; that the statements
12  were thereafter transcribed by me, or under my
13  direct supervision, by means of computer-aided
14  transcription, constituting a true and correct
15  transcription of the proceedings; and that the
16  witness was by me duly sworn to testify to the
17  truth and nothing but the truth in this cause.
18      I further certify that I am not a
19  relative or employee of any of the parties, or
20  of counsel, nor am I financially or otherwise
21  interested in the outcome of this action.
22      Witness my hand and seal on this 26th day
23  of November, 2021.
24
25  My Commission Expires:   CSR 1568
   July 19, 2023          Notary Public

SHEARSON HAUGHTON vs JA-CO FOODS, INC.
Shearson Gabrielle Haughton Sims on 11/15/2021          Pages 210..211

**Page 210**

```
 1            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF MISSISSIPPI
 2                     ABERDEEN DIVISION

 3   SHEARSON HAUGHTON              PLAINTIFF

 4   VS.          CIVIL ACTION NO. 1:20-cv-241-SA-DAS

 5   JA-CO FOODS, INC. d/b/a SONIC DRIVE-INs

 6                                 DEFENDANT

 7
               CERTIFICATE
 8        I, Shearson Gabrielle Haughton Sims, have
 9   read the foregoing pages, 1-209, of the
     transcript of my deposition given on November
10   15, 2021, and it is true, correct and complete
     to the best of my knowledge, recollection and
11   belief except for the list of corrections, if
     any, attached on a separate sheet herewith.
12   Witness my hand, this the _____ day of
     _____, 2021.
13

14         Shearson Gabrielle Haughton Sims
15
16               CERTIFICATE
17        Subscribed and sworn to before me, this
18   the _____ day of _____, 2021.
19
20

21   Notary Public in and for the
     County of _____
22   State of Mississippi
     My Commission Expires:  _____
23
24
25
```

**Page 211**

```
 1
 2
                 CORRECTION LIST
 3   Shearson Haughton vs. Sonic Drive-In
     No. 1:20-cv-241-SA-DAS
 4
     CAPTION
 5
     November 15, 2021
 6                Shearson Gabrielle Haughton Sims
 7   DATE OF DEPOSITION         DEPONENT'S NAME
 8   PAGE  LINE   CORRECTION          REASON
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23
24        Shearson Gabrielle Haughton Sims
25
```