IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

SHEARSON HAUGHTON                                               PLAINTIFF

V.                                        CIVIL ACTION NO. 1:20-CV-241-SA-DAS

JA-CO FOODS, INC. d/b/a SONIC DRIVE-IN'S                        DEFENDANT

ORDER AND MEMORANDUM OPINION

On November 10, 2020, Shearson Haughton initiated this civil action by filing her
Complaint [1] against JA-Co Foods, Inc. ("Sonic") in the District Court for the Southern District
of Mississippi. The case was transferred to this Court, and Haughton later filed an Amended
Complaint [8]. After the discovery period closed, Sonic filed the present Motion for Summary
Judgment [36]. Having reviewed the parties' filings, along with the applicable authorities, the
Court is prepared to rule.

*Relevant Factual and Procedural Background*

Haughton is a female from Aberdeen, Mississippi. On or about November 12, 2019, she
was hired to work as a cook at Sonic in Aberdeen. At the time, Alesha Gardner was the general
manager; Eric Ellis was the assistant manager; and Sehaqueeka "Tay" Randle was the shift lead.[1]
Haughton's allegations in large part concern the conduct of Eric Ellis.

Prior to being hired by Sonic on November 11, 2019, Haughton had previously worked for
Sonic sometime around 2014 or 2015. Haughton testified that her first stint of employment with
Sonic was brief and that she was terminated for failure to appear for work. In particular, she stated:

---

[1] In her EEOC Charge, Haughton alleges that Tay's last name is "Davis." However, in her deposition, she
admitted that she was not certain about Tay's last name but that she "went by Davis" at Sonic. [36], Ex. 1
at p. 16. In her Declaration, Gardner refers to Tay's last name being "Randle." The Court notes this
discrepancy but will attempt to make clear who it is referring to throughout this Order and Memorandum
Opinion.

"The first time I was fired because I did miss then. I didn't come in. I was sick that day. And I hadn't been there that long." [40], Ex. 3 at p. 22.

Nevertheless, as noted above, Sonic hired Haughton again on November 11, 2019.[2] This lawsuit concerns her second employment stint. Haughton contends that once her employment commenced, she immediately began experiencing issues with Eric Ellis. Specifically, she testified that Ellis would sing inappropriate songs to her, that he called her "baby" twice, and that he inappropriately touched her hand in a suggestive way "at least three" times when passing food to her. *Id.* at p. 31. Haughton said that she tried to report Ellis' conduct to Alesha Gardner but that Gardner "cut [her] off" and did not want to hear about it. *Id.* at p. 28. Further concerning that conversation, Haughton testified as follows:

> **Q.** Okay. And tell me what you told [Alesha Gardner].
>
> **A.** I told her, I said, When I work with Eric, he touch - - and she was like, Like me stop you - - she said, Let me tell you: This my store - - it's like she knew what I was fixing to say or something.
>
> She cut me off, and she was like, This is my store. When I'm not here, Eric in charge. He my right-hand man. You'll never see the owner of this store. So therefore, this is my store.
>
> **Q.** Did you tell her that he touched your hand or did you not get it out?
>
> **A.** I didn't because Alesha was drunk - - I didn't see her drinking, but I smelled the alcohol. She - - she was - - it's hard to explain, but she wasn't trying to hear me.

*Id.* at 31.

According to Haughton, things got much worse on the night of December 22, 2019. Specifically, she avers that she "bent over to fix a garbage bag that fell in the garbage can" and

---

[2] It is not clear whether Haughton's second stint of employment with Sonic began on November 11, 2019 or November 12, 2019.

"Ellis came up behind her and began 'humping' her from behind." [8] at p. 3. Describing that incident in her deposition, Haughton stated:

> Q.     Okay. Tell me what happened the night that you claim that Eric Ellis was inappropriate with you when you leaned over a trash can. Tell me, where were you and what - - what time of the night was that?
>
> A.     It was around 7:00-something. I was just got done with - - work had got slow, and so I started cleaning my work area. And I noticed that the trash bag fell down into the can, into the trash can. So I bent over to pull the trash can - - the trash bag out the - - up over the trash can, and I felt grinding stroke feeling behind me. And I looked to the side and all I seen was that big grin on his face.
>
> And I looked and I seen - - I seen [J.A.][3] was looking, but I didn't know if she actually seen what he did. So after he did it, he went outside. And I asked her I said, Did you see what he did? And she was like, Girl, yes. And I told her I said, I'm fixing to go. And she was like, Don't leave. I said, No, I'm not staying here. I'm fixing to go. And she said, Don't leave me because he did the - - she said, I'm going to be back here with him by myself, and he did the same thing to me.
>
> . . .
>
> Q.     Okay. So let's go back to the incident. Did you see where Eric was before you leaned over the trash can? Did you know where he was in the store?
>
> A.     I wasn't really paying attention. I was just cleaning. And I noticed the bag fell down and I pulled the - - I got the bread off the top of the garbage and was putting inside the - - inside the bag. And I was fixing to pull it up, you know. It happened so fast, you know. And I was, like, in shock for, like a few seconds.
>
> Q.     Now explain to me what - - you said that you felt stroking?
>
> A.     It was like a stroke and a grind, like.
>
> Q.     What do you mean by a stroke and a grind?

---

[3] The parties jointly refer to the co-worker who was a minor (at least at the time) as "J.A." The Court sees no need to depart from the parties' reference to her in this manner.

> **A.** It felt like he was humping me and moving, like.
>
> **Q.** How long did it last?
>
> . . .
>
> **A.** I would say maybe - - maybe three seconds.

[36], Ex. 1 at p. 26-28.

After this incident occurred, Haughton did not immediately leave the restaurant. Instead, she waited approximately two hours to take a break and call her husband. Haughton then left work around 9:00 PM and went to the Aberdeen Police Department to file charges against Ellis. Later that evening, Haughton spoke about the incident with Gardner, who was not at the restaurant that night. Haughton also spoke with Anita Howard—a corporate representative—about Ellis' alleged conduct.

Gardner stated that she immediately commenced an investigation. She testified via Declaration that, through her investigation, she found Haughton's claims against Ellis to be unsubstantiated. Nevertheless, she still instructed Ellis to not communicate with Haughton and the two were no longer scheduled to work with each other.

Haughton thereafter worked for the next week, apparently without any major issues. That changed on the night of December 30—eight days after the incident with Ellis—when Haughton got involved in a heated exchange with two other employees, Sehaqueeka "Tay" Randle (who was the shift lead on this particular night) and Alexis Ellis (who was Eric Ellis' daughter). In her Amended Complaint [8], she alleges that Tay and Alexis Ellis "began to verbally harass and taunt [her]. When Ms. Haughton refused to engage their taunts, Ms. Davis and Ms. Ellis attempted to fight Ms. Haughton. In order to de-escalate the situation, Ms. Haughton was required to contact law enforcement. Before law enforcement arrived, two of Ms. Haughton's co-workers had to

restrain Ms. Davis and Ms. Ellis to prevent them from attacking Ms. Haughton." [8] at p. 4. Haughton testified in her deposition as follows:

> **A.** They was trying to jump on me. I don't know for sure, but I think that Alesha intentionally put me to work for them - - with them. They was trying to jump on me that night. [Eric's] daughter, [Alexis] Ellis, and Tay was trying to jump on me that night.
>
> **Q.** What do you mean by they were trying to jump on you?
>
> **A.** They was trying to fight me. His daughter had her hands drew back. Tay was walking up, you know; and she was cussing at me, calling me all kind of names. That's why I called the police because I was terrified, you know. I called the police hoping that it could - - they could deescalate the situation. But they didn't know I called the police. They was trying to fight me.

[40], Ex. 3 at p. 42.

The following day, Sonic engaged in an investigation, the result of which was a termination of Haughton's employment. As stated in Gardner's Declaration, Haughton "worked until December 30, 2019 when her employment was terminated for violating company rules and insubordination after she erupted in a profanity-filled rant and engaged in threatening conduct in front of Sonic customers and other employees." [36], Ex. 2 at p. 3.

After filing a charge of discrimination with the EEOC and receiving a right-to-sue letter, Haughton commenced this litigation. In her Amended Complaint [8], she asserts the following claims: (1) hostile work environment in violation of Title VII; (2) retaliation in violation of Title VII; and (3) common law assault. Through the present Motion [36], Sonic seeks dismissal of all claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240 at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Management of Louisiana, LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted above, Haughton asserts three separate claims against Sonic. The Court will address them in turn.

I.      *Hostile Work Environment*

Title VII makes it "unlawful for employers to require 'people to work in a discriminatorily hostile or abusive environment.'" *West v. City of Houston, Tex.*, 960 F.3d 736, 741 (5th Cir. 2020) (quoting *Gardner v. CLC of Pascagoula, LLC*, 915 F.3d 320, 325 (5th Cir. 2019)) (additional citation omitted). A hostile work environment consists of "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); 42 U.S.C. § 2000e-5(e)(1)). To establish a hostile work environment claim, a plaintiff must show:

> (1) she is a member of a protected class; (2) she suffered unwelcomed harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment "affected a term, condition, or privilege of employment"; and (5) "the employer knew or should have known" about the harassment and "failed to take prompt remedial action."

*Id.* (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)); *see also Moody v. Region IV Community Mental Health Comm'n*, 2022 WL 1151266, at *2 (N.D. Miss. Apr. 18, 2022) (quoting *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 434 (5th Cir. 2005)) (additional citation omitted).

In analyzing these types of claims, the reviewing court must remain mindful that "Title VII does not impose 'a general civility code' on employers." *West*, 960 F.3d at 740 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)) (additional citation omitted). Sonic emphasizes the high standard in these types of cases and contends that Haughton cannot meet that burden. In particular, Sonic contends that Haughton cannot survive

summary judgment on the fourth element, asserting that she "cannot demonstrate the alleged harassment was severe or pervasive enough to alter the terms and conditions of her employment and to create an abusive working environment." [37] at p. 12.

"To affect a term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *West*, 960 F.3d at 741-42 (quoting *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)). Importantly, "[t]he alleged conduct must be objectively *and* subjectively hostile or abusive." *Id.* at 742 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)) (emphasis added). Further on this point:

> The totality of the employment circumstances determines whether an environment is objectively hostile. Although no single factor is determinative, pertinent considerations are (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance.

*Id.* (citing *Harris*, 510 U.S. at 21-22) (internal citations and quotation marks omitted).

The above-referenced factors apply in the determination of whether the alleged conduct is *objectively* hostile. *See, e.g., Mendoza v. Helicopter*, 548 F. App'x 127, 129 (5th Cir. 2013) (citing *WC&M Enters., Inc.*, 496 F.3d at 399). The conduct must also be *subjectively* offensive. *Id.* (noting that the "conduct complained of must be both objectively and subjectively offensive") (citation omitted); *see also Spann v. United Parcel Serv., Inc.*, 2018 WL 3213140, at *5 (N.D. Miss. June 29, 2018) (noting that the harassment must be "both objectively and subjectively offensive"). In other words, the victim must "perceive the environment as hostile[.]" *Id.* (quoting *WC&M Enters., Inc.*, 496 at 399).

> a.     *Objectively Hostile*

The Court will first address whether the alleged conduct was objectively hostile. In so doing, the Court will address the relevant totality of the circumstances factors which the Supreme Court and the Fifth Circuit have articulated. *See*, *e.g.*, *West*, 960 F.3d at 741.

However, before doing so and for the sake of clarity, the Court will reiterate the alleged conduct at issue. Haughton alleges the following: (1) that Ellis would sing inappropriate songs to her; (2) that he called her "baby" twice; (3) that he inappropriately touched her hand in a suggestive way "at least three" times when passing food to her; and (4) that he "humped" her for approximately three seconds when she bent over to pull up a garbage bag that had fallen down into a garbage can.[4]

As noted above, under the totality of the circumstances test, the Court first looks to the frequency of the conduct. As to the singing of inappropriate songs, Haughton testified in her deposition as follows:

> **Q.**     And what songs?

---

[4] As to all alleged conduct other than the trash can incident, Sonic argues that "[i]t is expected that Haughton will attempt to bolster her sexual harassment claim by referring to additional alleged conduct she disclosed *for the first time* in deposition. Haughton identified the following: Ellis touched her hand approximately three times when she handed him food and would frequently sing songs at work that she thought were directed toward her. This alleged conduct was not identified in her charge of discrimination or alleged in her Complaint or Amended Complaint." [37] at p. 13 (emphasis in original). In other words, Sonic emphasizes that the subject evidence, other than the trash can incident, was not listed in Haughton's EEOC Charge or her Amended Complaint [8]. Presumably, Sonic emphasizes this point in an effort to have this Court decline to consider that conduct—or perhaps to give it less weight. The Court rejects Sonic's request on this point. In addition to the trash can incident, Haughton's EEOC Charge specifically references Tay allegedly calling Haughton a "dysfunctional bitch" in front of customers and further contends that Eric Ellis sexually harassed another Sonic employee. *See* [1], Ex. 1. Furthermore, the Charge makes clear that Haughton is pursuing a sex discrimination claim, and the Amended Complaint [8] makes clear that she is pursuing a hostile work environment claim. Although each of the specific facts to which Haughton testified in her deposition is not included in the EEOC Charge or the Amended Complaint [8], the Court finds that the conduct falls within the realm of conduct which was reasonably expected to grow out of her EEOC Charge. *See*, *e.g.*, *Gates v. Lyondell Petrochemical Co.*, 227 F. App'x 409, 409 (5th Cir. 2007) (per curiam) (affirming district court's dismissal of hostile environment claims "because such claims could not be *reasonably expected to grow out of* her EEOC charge.") (emphasis added).

**A.** "Back that A up."

**Q.** Does that mean back that ass up?

**A.** Yes, ma'am.

**Q.** Okay.

**A.** "Drop it like it's hot." He would say, Do something strange for a little piece of change."

**Q.** Excuse me?

**A.** He'd say, Do something strange for a little piece of change.

**Q.** Okay. Is that a song he would sing?

**A.** He would say that. He would say that, Do something strange for a little - - and he'd also will say, I'll make you "holla for a dolla." Stuff like that.

**Q.** And when did he say that?

**A.** He said stuff all the time. That's the only inappropriate things he said.

. . .

**Q.** How many times did he say, Do something strange - - what did you say he said?

**A.** Do something strange for a little piece of change. *He only said that once.* And I'll make you "holla for a dolla*," he only said that once.* But he also sung, "Back that A up."

**Q.** When did he tell you - - did he say that to you?

**A.** Yes, ma'am. I backed up and looked at the screen and he said - - that's when he said "back that ass up." And when I - - I - -

. . .

**Q.** Well, what were the circumstances surrounding him saying, Do something strange for a little piece of change?

**A.**     I don't know. He just - - that was - - he just did it. I don't know.

**Q.**     And are you saying that he said that to you?

**A.**     When he said it, I was beside him. He was looking at me. He - - I don't know for a fact he was talking to me, but he was looking at me and he said it when I walked by him.

[40], Ex. 3 at p. 28-29 (emphasis added).

As illustrated by these portions of Haughton's deposition, the alleged singing of inappropriate songs happened sporadically during her employment. Concerning the circumstances surrounding Ellis allegedly calling Haughton "baby," Haughton stated that Ellis called her "baby" twice approximately a week before the trash can incident. According to Haughton, she asked him not to do so and he immediately responded "Excuse me, Baby." [40], Ex. 3 at p. 29. She admitted that Ellis did not call her "baby" thereafter. She additionally testified that Ellis inappropriately touched her hand "at least three" times when he passed her food when they were working together. [40], Ex. 3 at p. 31. All this alleged conduct happened prior to the trash can incident.

When considering the frequency of the allegedly wrongful conduct, the Court takes note that Haughton was only employed with Sonic for around a month and a half—specifically, she was hired on or about November 12, 2019, and the trash can incident (which provides the bookend for the allegedly sexually harassing conduct) occurred on December 22, 2019. Thus, while in the abstract there was not a huge number of allegedly wrongful acts, when considered in light of this brief time period, the number of alleged acts weighs slightly in Haughton's favor.[5]

The Court turns next to the severity of the alleged conduct. *See*, *e.g.*, *West*, 960 F.3d at 742. As noted above, the Court must remain cognizant of the extensive precedent directing district

---

[5] The Court will further address the frequency factor when analyzing the severity of the conduct at issue hereinafter.

courts to "ensure that Title VII does not become a 'general civility code.'" *Id*. (quoting *Faragher*, 524 U.S. at 788) (additional citation omitted). The Court first begins with Ellis' alleged singing of songs toward her. The Court acknowledges that the language allegedly used by Ellis was inappropriate, as it was undoubtedly foul and suggestive. However, the Court also notes that this happened on a limited number of occasions and does not seem to be extremely severe, especially in light of the applicable standard. *See*, *e.g.*, *id*. at 741-42 (quoting *Faragher*, 524 U.S. at 788, 118 S. Ct. 2275 ("Properly applied, the standards for judging hostility will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.") (additional citation and quotation marks omitted). As to Ellis calling her "baby" twice, the Court likewise finds that this conduct in isolation is not sufficiently severe for the same reasons.

However, the Court sees differently the alleged trash can incident. Unlike the singing of inappropriate songs or the calling of an unwanted name, a supervisor "humping" an employee while she was engaging in the performance of her job duties rises above "the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id*. (citations and quotation marks omitted). This allegation is much more serious than insensitive comments as it involves undesired and uninvited physical contact initiated by another employee with supervisory authority over Haughton. Thus, while some of the alleged conduct may not in isolation rise to the requisite severity threshold, the trash can incident constitutes a serious, severe allegation. As a result, this factor weighs in Haughton's favor.

The next factor concerns whether the conduct is "physically threatening or humiliating, or a mere offensive utterance." *West*, 960 F.3d at 742. As to the singing of songs and Ellis calling her "baby" twice, the Court finds that the conduct is more properly characterized as offensive

utterances, as opposed to being *physically* threatening or humiliating. Viewing the evidence in the light most favorable to Haughton, Ellis touching her hand on "at least three" occasions certainly approaches the line of becoming physically threatening. As to the trash can incident, Haughton asserts that "[i]t bears repeating that what Ellis did to [her] was not 'teasing.' It was not an offhand comment or an off-color joke. It was sexual harassment and assault." [41] at p. 14. The Court agrees with Haughton's contention on this point. A rational trier of fact could find being "humped" by a supervisor for a period of about three seconds—allegedly in front of another employee—to be physically threatening and *certainly* humiliating.[6] This factor therefore weighs in Haughton's favor.

Having considered and analyzed these factors, the Court also feels compelled to note some other cases involving hostile work environment claims.

The Court first notes that it recognizes that the allegedly inappropriate conduct in this case did not occur as frequently as the underlying conduct in other cases which have come before the Fifth Circuit such as *Lauderdale v. Tex. Dep't of Criminal Justice, Inst. Div.*, 512 F.3d 157, 164 (5th Cir. 2007), where the Fifth Circuit found harassment to be pervasive when the plaintiff received unwanted phone calls for ten to fifteen times a night for a period of four months.

However, the Court also finds pertinent another Fifth Circuit opinion. *Woods v. Cantrell*, --- F. 4th ---, 2022 WL 871885 (5th Cir. Mar. 24, 2022). In *Woods*, the plaintiff alleged that his supervisor, in the presence of other employees, directly called the plaintiff a "Lazy Monkey A__

---

[6] Sonic emphasizes that J.A., the employee who (according to Haughton) observed the trash can incident, told Gardner that she had not observed anything and that Haughton was pressuring her to "falsely testify." [36], Ex. 2 at p. 5. As previously noted, Haughton testified that, immediately after the alleged incident, J.A. confirmed that she had seen what had occurred. Of course, it is not the role of this Court to decide that factual controversy, or any other such controversy, at the summary judgment stage. *See, e.g., Grogan v. Kumar*, 873 F.3d 273, 279 (5th Cir. 2017) ("It is not the court's role on summary judgment to weigh competing evidence or make credibility determinations."). As such, the Court will continue its analysis without weighing or deciding factual controversies of this nature.

N___." *Id*. at *1. The district court dismissed the plaintiff's hostile work environment claim on the basis that "a single utterance of a racial epithet, despicable as it is, cannot support a hostile work environment claim." *Id*.

The Fifth Circuit reversed, holding that "[t]he incident Woods has pleaded—that his supervisor directly called him a "Lazy Monkey A__ N___" in front of his fellow employees—states an actionable claim of hostile work environment." *Id*. at *2 (citing *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("In my view, being called the n-word by a supervisor—as plaintiff alleges happened to him—suffices *by itself* to establish a racially hostile work environment.")) (emphasis added). In reaching that conclusion, the Fifth Circuit noted some of its previous decisions on this issue:

> It is true that this court has indicated that a single instance of a racial epithet does not, in itself, support a claim of hostile work environment. *See*, *e.g.*, *Mosley v. Marion Cnty.*, 111 F. App'x 726, 728 (5th Cir. 2004) (per curiam) (finding no hostile work environment despite three incidents involving a racial slur). We have further said, however, that "under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, can give rise to a viable Title VII claim." *See*, *e.g.*, *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007).
>
> As other circuits have recognized, perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as the N-word by a supervisor in the presence of his subordinates. . . The N-word has been further described as a term that sums up . . . all the bitter years of insult and struggle in America, a pure anathema to African-Americans, and probably the most offensive word in English.

*Id*. at *1 (citations and internal quotation marks omitted).

Contrast *Woods*, though, with another recent Fifth Circuit case. *See Daniel v. Bd. of Supervisors for La. State Univ. Agric. and Mech. Coll.*, 2022 WL 1055578 (5th Cir. Apr. 8, 2022). In *Daniel*, the plaintiff, an African American female, alleged that she was subjected to a hostile

14

work environment during her employment as a professor with LSU's School of Veterinary Medicine ("LSU SVM"). *Id*. at *1. The plaintiff first alleged her supervisor told her, within a week of the commencement of her employment, that he "didn't know she was Black because she didn't sound Black on the phone." *Id*. In addition, she alleged that her supervisor made "disparaging remarks about African Americans in her presence." *Id*. The plaintiff compiled a list of those remarks:

> Those remarks included that (1) gifted Black students typically applied to medical school, not veterinary school; (2) most "Black students just cannot keep up with the pace and content" of veterinary school; (3) students from Southern University, the local historically black university, were "not academically strong enough" to attend LSU SVM because Southern University's animal science program was "weak"; and (4) LSU SVM did not want to "burden" Black students "down with student loans."

*Id*. at *2.

After the district court granted summary judgment in the defendants' favor, the plaintiff appealed. *Id*. In a *per curiam* opinion, the Fifth Circuit affirmed, holding that:

> As an initial matter, the record contains only one alleged racist comment that an LSU SVM employee made about Dr. Daniel. In January 2014, [her supervisor] allegedly told [her] that he did not realize that she was Black until her campus visit because she did not "sound Black on the phone." Dr. Daniel "ignored" that comment, and there is no evidence that [the supervisor] or anyone else at LSU SVM made similar statements later. The other statements in the record, though made in Dr. Daniel's presence, were purported explanations for the lack of diversity at LSU SVM. Those statements thus focused on Black applicants to the school, not Dr. Daniel. Moreover, according to Dr. Daniel, these scattered statements were made over six years. This is not enough to prove a hostile work environment claim under this court's precedents.

*Id*. at *4.

This Court recognizes that the Fifth Circuit's analysis of the single incident at issue in *Woods* largely revolved around the egregious nature of the use of the "N" word in the workplace.

15

The conduct at issue in this case is undoubtedly very different than that. Nevertheless, *Woods* does provide an example of the proposition that "under the totality of the circumstances test, a *single incident* of harassment, if sufficiently severe, can give rise to a viable Title VII claim." *Woods*, 29 F.4th at 285 (emphasis added).

The Court also notes that, unlike many of the comments at issue in *Daniel*, the alleged conduct in this case was specifically directed toward Haughton. In particular, Ellis allegedly calling her "baby" twice, touching her hand "at least three" times, and "humping" her when she bent over a trash can were certainly directed toward her. This is a critical distinction and, in this Court's view, differentiates the case from *Daniel*.

In sum, "[t]he totality of the employment circumstances determines whether an environment is objectively hostile." *Wantou v. Wal-Mart Stores*, 23 F.4th 422, 433 (5th Cir. 2022) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). And "[a]n egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment." *Id*. (quoting *Lauderdale*, 512 F.3d at 163). "The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. . . Consequently, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Id*. (quoting *Lauderdale*, 512 F.3d at 163; *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991)) (internal citations and quotation marks omitted).

Here, the Court finds that Haughton has come forward with sufficient evidence to survive summary judgment as to the issue of objective hostility. Although much of the conduct considered

in isolation might not be sufficiently severe to support a hostile work environment claim under the applicable standard, the number of allegedly wrongful actions in this case seem relatively significant as they all occurred in an employment period of approximately six weeks. Furthermore, the alleged trash can incident itself is, in this Court's view, severe—or at least much closer to that line than the other conduct.[7] Considering the totality of the circumstances, the Court finds that Haughton has come forward with sufficient evidence to create a genuine issue of material fact as to whether the alleged conduct was objectively hostile.

       *b.*     *Subjectively Offensive*

      To be actionable, the conduct at issue must also be subjectively offensive. *See Spann*, 2018 WL 3213140 at \*5. Sonic argues that Haughton was not subjectively offended by Ellis' conduct. To support this argument, Sonic emphasizes that "Haughton has published multiple erotic novels depicting very graphic sexual encounters." [37] at p. 14. Sonic notes, and Haughton admitted in her deposition, that these novels include graphic sexual encounters between the characters. Therefore, Sonic takes the position that "Haughton's novels suggest that she is not subjectively offended by very overt sexual acts." *Id.* at p. 15. In response, Haughton notes that the novels are fiction and the fact she wrote them does not mean she cannot be subjectively offended by the subject conduct.

      The Court finds Sonic's argument to be premature, as the Court may not make a factual finding of this nature at this stage of the proceedings. *See, e.g.*, *Kinsella v. OfficeMax, Inc.*, 2017 WL 1274054, at \*4 (N.D. Miss. Apr. 3, 2017) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980)) ("At the summary judgment stage, the Court's function is not to resolve

---

[7] In reaching this conclusion, the Court does not decide as a matter of law that the trash can incident alone is sufficiently severe to preclude summary judgment. While that conduct is undoubtedly the most severe of the conduct at issue, the Court finds that it need not decide the Motion [36] on that ground alone, as there are other actions which support Haughton's theory of the case.

factual disputes but, rather, simply determine if such disputes exist."). In other words, viewing the evidence in the light most favorable to Haughton, questions of fact remain as to whether she was subjectively offended.

    *c.*    *Imputed Liability*

Finally, Sonic contends that even assuming Haughton could meet the elements of actionable hostile work environment, she "cannot pursue a hostile work environment claim because once Sonic learned of Haughton's complaint against Ellis, Sonic conducted [a] prompt and thorough investigation, and even though Haughton's complaint was unsubstantiated, Sonic implemented measures to ensure no further interaction between Ellis and Haughton." [37] at p. 15.

As set forth above, a plaintiff must establish the following to succeed on a hostile work environment claim:

> (1) she is a member of a protected class; (2) she suffered unwelcomed harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment "affected a term, condition, or privilege of employment"; and (5) "the employer knew or should have known" about the harassment and "failed to take prompt remedial action."

*West*, 960 F.3d at 741.

Sonic's present argument concerns the fifth element. Again, Sonic contends that its response to the alleged harassment was prompt and that it therefore cannot be held liable.

However, in circumstances where "the alleged harasser is a supervisor with immediate or successive authority over the victim, *the fifth prong is unnecessary because the employer is subject to vicarious liability for hostile work environments created by that supervisor*." *Tucker v. United Parcel Serv., Inc.*, 34 F. App'x 937, 941-42 (5th Cir. 2018) (citing *Watts v. Kroger Co.*, 170 F.3d 505, 509 & n. 3 (5th Cir. 1999)) (additional citations omitted) (emphasis added); *see also Moody*, 2022 WL 1151266 at *2 ("Where the alleged harasser is a supervisor with immediate or higher

authority over the harassed employee, only the first four elements of the test need to be met.")
(citing *Watts*, 170 F.3d at 509; *Faragher*, 524 U.S. at 807, 118 S. Ct. 2275).

Here, although not briefed in great detail by the parties, the Court finds that, at least for summary judgment purposes, Ellis was Haughton's supervisor. As noted above, Haughton testified that when she attempted to report Ellis' alleged inappropriate conduct, Gardner "cut [her] off" and told Haughton that Ellis is "in charge" when Gardner was not at the restaurant. [40], Ex. 3 at p. 31. Furthermore, Gardner's Declaration explains that "Assistant Managers and Shift Leads are responsible for overseeing the operation of the Sonic when [the General Manager is] not present[.]" [36], Ex. 2 at p. 4. This evidence creates, at a minimum, a question of fact as to whether Ellis was Haughton's supervisor. Thus, the Court finds that the fifth element is inapplicable and therefore rejects Sonic's argument for summary judgment on this point.

For the reasons set forth above, the Court finds that Haughton has come forward with sufficient evidence to proceed on her Title VII hostile work environment claim. Therefore, Sonic's request for summary judgment on that claim is denied.

## II.    Retaliation

In addition to hostile work environment, Haughton avers that Sonic retaliated against her by terminating her employment because she "opposed and complained of the misconduct of Mr. Ellis." [8] at p. 7.

Pursuant to Title VII's antiretaliation provision, protected activity may involve either: "(1) 'opposing any practice made an unlawful employment practice by this subchapter' or (2) 'making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under this subchapter.'" *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e-3(a)) (internal punctuation omitted). "Retaliation claims under Title

VII are governed by the familiar three-step *McDonnell Douglas* test." *LeMaire v. La. Dep't of Transp. and Dev.*, 480 F.3d 383, 388 (5th Cir. 2007) (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

To establish a *prima facie* retaliation case, a plaintiff must show: "(1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the materially adverse action." *Loomis v. Starkville Miss. Pub. Sch. Dist.*, 150 F. Supp. 3d 730, 751 (N.D. Miss. Dec. 15, 2015) (quoting *Aryain*, 534 F.3d at 484); *see also Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). "If the employee establishes a *prima facie* case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation[.]" *Feist*, 730 F.3d at 454 (quoting *LeMaire*, 480 F.3d at 388-89).

Here, there can be no real dispute as to the first two *prima facie* elements. First, Haughton reported Ellis' conduct to Sonic almost immediately after the trash can incident occurred. *See Rite Way*, 819 F.3d at 239 (explaining that protected activity includes opposing any practice made unlawful by Title VII). Second, she suffered an adverse employment action as her employment was terminated. *See, e.g.*, *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004) ("[I]t is beyond dispute that a termination constitutes an adverse action.").

Sonic does contest the third element, however, arguing that it terminated Haughton's employment after an internal investigation concluded that "she engaged in abusive and threatening conduct in violation of Sonic's policies." [37] at p. 18. In response, Haughton asserts that "one of

20

the employees was the daughter of Ellis, and she and a manager attempted to physically attack [her]. Those facts, and the close proximity of events, is sufficient to create an issue of fact as to a causal connection." [41] at p. 19.

The Fifth Circuit has relatively recently explained that "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013)). "However, the but-for standard does not apply at the *prima facie* case stage. Instead, 'at the prima facie case [stage], a plaintiff can meet [her] burden of causation simply by showing close enough timing between [her] protected activity and [her] adverse employment action.'" *Id.* (quoting *Garcia v. Prof'l Contract Servs., Inc.*, 938 F.3d 236, 242-43 (5th Cir. 2019)) (internal citation omitted).

Here, although Haughton does not rely solely on temporal proximity, only approximately eight days passed between Haughton's reporting of Ellis' alleged inappropriate conduct and her termination. Taking this into account—in addition to the additional evidence referenced above— the Court finds that Haughton has carried her *prima facie* burden.

The burden then shifts to Sonic to come forward with a legitimate, non-discriminatory reason for its employment decision. *See Feist*, 730 F.3d at 454. Sonic points to the finding of its internal investigation following the events of December 30—particularly, that Haughton was the instigator of the events which transpired and that she violated company policy by yelling and using profanity in front of customers. The Court finds that Sonic has satisfied its burden for purposes of this stage of the proceedings.

Therefore, the burden shifts back to Haughton to "demonstrate that the employer's reason is actually a pretext for retaliation." *Id.* (quoting *LeMaire*, 480 F.3d at 388-89). As noted above,

21

Haughton emphasizes that, in addition to the short amount of time between her reporting of Ellis' conduct and her termination, she was subjected to a verbal attack which nearly became a physical altercation at the hands of Tay and Eric Ellis' daughter, Alexis. She points to her own deposition testimony to support these contentions. In other words, she makes the argument that she did not initiate that altercation but was the victim thereof. The Court recognizes that Sonic rejects this characterization of the underlying events, as its own investigation reached a different conclusion. However, the Court's duty at this stage in the proceedings is not to decide factual controversies but, rather, simply determine if any such controversies exist. *See*, *e.g.*, *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020) ("The resolution of a genuine issue of material fact is the exclusive province of the trier of fact and may not be decided at the summary judgment stage.") (citations omitted). The Court finds that genuine factual controversies exist here, rendering summary judgment inappropriate. Sonic's request for summary judgment is therefore denied on Haughton's retaliation claim.

###### III. *Common Law Assault*

In the final claim of her Amended Complaint [8], Haughton alleges that on or about December 30, 2019:

> Ms. Haughton's manager, Shequeeka Davis ["Tay"], and Alexis Ellis began to verbally harass and taunt Ms. Haughton. When Ms. Haughton refused to engage their taunts, Ms. Davis and Ms. Ellis attempted to fight Ms. Haughton. In order to de-escalate the situation, Ms. Haughton was required to contact law enforcement. Before law enforcement arrived, two of Ms. Haughton's co-workers had to restrain Ms. Davis and Ms. Ellis to prevent them from attacking Ms. Haughton.

[8] at p. 4.

Haughton contends that these actions "constitute the common law tort of assault." [8] at p. 7. To be clear, Haughton did not assert claims against Tay and/or Alexis Ellis individually; rather,

she is pursuing a common law assault claim against Sonic on the basis that the employees "committed the assault in the course and scope of their employment, making Sonic liable for their actions." *Id*.[8]

"It is well established that an employer is responsible for the torts of its employee only when the torts are committed within the scope of the employment." *Hall v. Mi Toro No. 2, Inc.*, 115 So.3d 125, 128 (Miss. Ct. App. 2013) (quoting *Parmenter v. J & B Enterprises, Inc.*, 99 So.3d 207, 213 (Miss. Ct. App. 2012); *Favre v. Wal-Mart Stores, Inc.*, 820 So.2d 771, 773 (Miss. Ct. App. 2002)); *see also Tichenor v. Roman Catholic Church of Archdiocese of New Orleans*, 32 F.3d 953, 959 (5th Cir. 1994) ("Under Mississippi law, an employer is liable for the tortious conduct of his employees if that employee was acting within the scope of his employment."). As to the parameters of the scope of employment:

> Acts committed by a servant are considered within the scope of employment when they "are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment."

*Partridge v. Harvey*, 805 So.2d 668, 671 (Miss. Ct. App. 2002) (quoting *Thatcher v. Brennan*, 657 F. Supp. 6, 9 (S.D. Miss. 1986)). "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Akins v. Golden Triangle Planning & Dev. Dist., Inc.*, 34 So.3d 575, 580 (Miss. 2010) (quoting *Commercial Bank v. Hearn*, 923 So.2d 202, 208 (Miss. 2006)).

---

[8] To reiterate, as the above-quoted section of the Amended Complaint [8] makes clear, Haughton's assault claim is based upon the alleged conduct of Tay and Alexis Ellis on the night of December 30—not the alleged conduct of Eric Ellis on December 22 or any other date for that matter.

Sonic points to its employee handbook, which specifically advises employees that "UNLAWFUL DISCRIMINATION OR HARASSMENT OF ANY EMPLOYEE IN VIOLATION OF THIS POLICY WILL NOT BE TOLERATED AND MAY RESULT IN DISCIPLINARY ACTION UP TO AND INCLUDING IMMEDIATE DISCHARGE." [36], Ex. 2 at p. 10. In addition to emphasizing its policy, Sonic takes the position that "[n]one of the alleged actions of Sonic's employees were within the scope of employment and, therefore, the assault claims should be dismissed." [37] at p. 25.

In response, Haughton contends that a question of fact remains as to this issue. To support her position, she relies on *Singley v. Smith*, 739 So.2d 448 (Miss. Ct. App. 1999). In that case, a baseball struck the plaintiff in the face while she was attending a fund-raising event on the grounds of the Oak Grove Attendance Center. *Id*. at 449. The baseball came from a baseball throw booth where participants could throw a baseball against a backstop and have a radar gun "clock" the speed at which the ball was thrown. *Id*. When one participant made an errant throw, the ball missed the backstop and struck Singley. *Id*. Philip Lee Smith, who was on the faculty at Oak Grove and was the assistant baseball coach, had organized the baseball throw booth. *Id*. Singley sued multiple defendants, all of whom settled, except Smith. Id. Singley contended that Smith "was negligent in designing and operating the booth by failing to provide adequate safeguards to prevent errant throws from striking unsuspecting festival attendees." *Id*. The trial court granted summary judgment in favor of Smith, holding that "he was a public employee acting within the course and scope of his official duties and, thus, entitled to statutory sovereign immunity." *Id*.

The Mississippi Court of Appeals reversed on this issue. *Id*. In particular, the Court of Appeals noted the affidavit of the Oak Grove principal, who had stated that no employee was

required to attend or participate in the festival and that Smith was not expected to work at the festival as part of his job duties. *Id*. at 450. The court further held:

> In this case, there is conflicting evidence on the question of whether Smith was acting in the course and scope of his employment in connection with the construction and operation of this baseball throw event. The principal's affidavit alone is sufficient to suggest that credible evidence exists tending to show that Smith was not acting in an official capacity event though his activities were beneficial to the sports program in which he was officially employed.

*Id*. at 451.

Haughton also cites a 2002 Mississippi Court of Appeals case. *Partridge*, 805 So.2d 668. There, Kenneth Partridge filed suit against Bestway Rentals, Inc. and two Bestway employees, Bernard Harvey and Billy Voss, alleging that "Harvey and Voss broke into his home without permission in efforts to repossess certain furniture and appliances and that Bestway was vicariously liable for these criminal acts of its employees." *Id*. at 669. After the trial court granted summary judgment in favor of Bestway, Partridge appealed. *Id*.

The Court of Appeals reversed:

> We recognize that breaking into a home, whether under the auspices of doing business or not, is certainly so unlike those acts which are authorized that it is substantially different. We also find that in no circumstances could the break-in qualify as having been within the scope of the employees' authority, since Partridge was the owner of the home and was the only one who could authorize entry into the home. In contrast, we note that Harvey and Voss were *actually working to further the business of Bestway in committing the break-in to recapture the property*. . . The allegation here is that Bestway's employees, *involved in a business that requires the physical seizure of property*, took the opportunity of Partridge's absence to break into his home. Further, instead of just taking the property that might have been subject to repossession, other items were taken as well. Access to the inside of the house and physical taking of property were incident to Bestway's business, even though we accept that Bestway wanted the access and seizure to be performed within the constraints of the law. Consequently, we find that a jury issue existed of whether

this means of gaining access and this measure of seizure were reasonably incidental to Bestway's business.

*Id*. at 672 (emphasis added).

This Court finds both cases to be distinguishable. First, in *Singley*, the Court of Appeals noted specific evidence which supported the plaintiff's theory—in particular, an affidavit executed by the Oak Grove principal, wherein she testified that Smith's participation in the event was completely voluntary. Here, in the portion of her Memorandum [41] dedicated to the state law claim, Haughton cites no evidence whatsoever; instead, she simply makes legal argument. *See*, *e.g.*, *Marks v. Smith*, 241 F. Supp. 3d 726, 731 (E.D. La. 2017) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)) ("Unsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the claim. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (addition citations omitted).

Likewise, the Court finds Haughton's reliance upon *Partridge* to be misplaced. As the Court of Appeals noted, the individual employees there were, at least to some extent, working to further the business of their employer. The very nature of their employment involved the physical seizure of property—much like the conduct in which they were engaged at the time of the subject conduct. In the case *sub judice*, there has been no contention whatsoever that Tay's and Alexis Ellis' job duties or responsibilities involved verbal attacks and/or threatening physical assaults upon other employees. Unlike *Partridge*, this type of conduct was in no way related to their duties as restaurant employees.

Ultimately, there is no evidence before the Court indicating that the alleged conduct was in any way connected to the objectives of Tay's and/or Alexis Ellis' employment with Sonic. There

is nothing to support Haughton's conclusory allegation that those employees were acting within the scope of their employment at the pertinent times.

While Haughton may be able to pursue claims against those individuals, she has not named either of them as defendants in this case, and her claim for vicarious liability against Sonic cannot proceed. Summary judgment is therefore granted in Sonic's favor on the common law assault claim.

*Conclusion*

For the reasons articulated above, Sonic's Motion for Summary Judgment [36] is GRANTED IN PART and DENIED IN PART. Haughton shall be permitted to proceed to trial on her hostile work environment and retaliation claims. Her claim for common law assault is dismissed *with prejudice*.

SO ORDERED, this the 11th day of May, 2022.


/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

27